IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

Irina SHELIKHOVA,

        Movant

v.

UNITED STATES OF AMERICA,

        Respondent

Case No. _____

      (1:10-cr-0071-NG)

## MEMORANDUM IN SUPPORT OF MOTION UNDER 28 USC §2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY.

"[A] collateral attack on a final judgment in a federal criminal case is generally available under §2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." Reiter v. U.S., 371 F. Supp. 2d 417, 429 (S.D.N.Y. 2005).

**NOW COMES** the movant, pro se, and states the following in support of her motion under 28 USC §2255 and prays this court will recognize and take corrective measures for the injustice served against the movant.

As a matter of notice to the court, the movant did not author the motion or memorandum in support. She was assisted by russian speaking prisoners, who are not attorneys; all filings were read to the petitioner in full, line by line, and she affirms all statements herein as being true to the best of her knowledge and belief.

### JURISDICTION

This court was the sentencing court in this matter and as such it is the only court which has jurisdiction under 28 USC §2255.

### FACTUAL BACKGROUND

It is assumed the court is familiar with the government's rendition of the background of this case based on the submitted and docketed sentencing memorandum.

Although most of the facts have been misconstrued, embellished, or misrepresented my attorney, Michael Rosen, was not willing to object or argue these points. He did not want me to advise the court or request a Fatico hearing, as that would have resulted in a harsher sentence for myself as well as my son, Maksim Shelikhov. Although I

-1-

insisted to challenge all of the inconsistent statements and wanted Rosen to request a Fatico hearing, he was adamant in his refusal and even stated so at the sentencing hearing (see Transcript page 6-11). Not challenging the false statements prejudiced this court against the movant and ultimately benefited movant's son.  Based on this turn of events Rosen's advocacy was not only unethical, but perpetuated the continuous coercion and deception orchestrated to maintain the constant duress necessary to induce movant to sign a plea agreement she neither wanted to sign nor fully understood.

These unchallenged inconsistancies, in both the sentencing memorandum for the government as well as in the pre-sentencing report, caused movant significant prejudice and established facts that were either complete fabrication or the movant was never aware of.  As a result of her signing the agreement her son was able to obtain a cooperation agreement with the government.  The actions of movant's attorney Rosen caused her to succomb to the excrutiating pressure upon her person and was the end result of his manipulative production fueled only by greed and a self-serving conflict of interest.

In order to have a factual background, the movant must list these inconsistencies for the court prior to proceeding on to the grounds for this motion.  These are:
(In sequential order as addressed by the government in the sentencing memorandum.)

- Movant was never willingly or knowingly a part of any conspiracy to commit any criminal conspiracy, to commit any criminal offense, not health care fraud and not money laundering.
- Elena Girenko, movant's niece, and Dr. G. Drivas formed an agreement to open a legitimate medical practice, "Bay Medical PC", and offered movant the position in billing and accounting.  Movant had no ownership or management interest in this entity.

- Bay Medical PC was originally opened to no fault and workmen's comp. patients only, but later expanded to include other insurance coverages, including Medicare.
- The practice's services were advertised by newspaper and magazine advertisement, the conventional methods of solicitation, as well as by word of mouth (referrals).
- Referral fees were paid later by the suggestion of I.Barikyan, who also used

-2-

this common business practice to steal and embezzle large sums of money from the business.

- Computer glitches, program/transmittal problems, along with data entry errors created a multitude of problems in billing. However Medicare (MC) had a variety of audit options, which all business entities (Bay Medical, SVS, SZS) were regulary and randomly subjected to. MC, at one point, checked billing submittals on a daily basis during an entire annual period and even sent auditors for surprise audits of randomly selected records and files, along with monitoring the billing processes and practices of the respective office. Each surprise audit was passed and cleared.

- MC rejects billings for a multitude of reasons and flags for errors of the submittals; the billing is canceled and returned to the submitter for correction and resubmittal.
- It is common to have multiple submittals for the same service on the same date; it is not fraudulent and MC does not pay duplicate submittals. What this procedure does do is to give the appearance of much higher submittalls to the untrained layman, who does not know how to properly interpret and present the data transmitted by MC.

- The formations of the respective corporations are simple and easily explained. They do not represent any fraudulent schemes or have any deceptive intent.

- Bay Medical Care PC (7612 Bay Parkway) - was Dr. G. Drivas personal clinic / professional practice, with Elena Girenko as administrative partner. Movant was billing and accounting.
- SVS Medical PLLC (7616 Bay Parkway) - was the "partnership" of Doctors Drivas and Collins, with the intent to create a full service medical practice. Sergey Shelikhov was the administrative partner in this venture along with Elena Girenko. Movant remained in her billing and accounting position.

-3-

- SZS Medical PLLC (7620 Bay Parkway; later 8686 Bay Pkwy.) - was the result of the Drivas / Collins practice diversifying and incorporating additional physicians, specializing in a large spectrum of areas.  Due to the expansion the corporation expensed significant costs in the development of the new location at 8686 Bay Parkway.  Sergey Zhamaryan was the administrative partner in this corporation, along with Elena Girenko.  Movant became corporate accounting manager.  The billing department had its own manager and staff (K.Kostichenko).

    - At no time did movant ever instruct anyone, **nor** was movant ever aware of anyone, to bill for services, tests or procedures which were not performed.

    - In movant's PSR her only health problem listed is a sleeping disorder.  The government refers repeatedly to plastic surgery procedures the movant had around the period the government sought to arrest her.  What the government omits in its villainous description of the movant and her pursuits of vanity, is that these procedures were corrective in nature, and stem from explorative breast surgeries performed by movant's oncologist.  Movant at the time of the indictment and to this day has serious oncological problems along with a hypertonic condition, hypertension, neurological and nearly incapacitating orthopedic problems.  These are serious health conditions, which place movant into a high risk category as well as into a high maintenance chronic care classification.  Although all of these conditions were disclosed they were not noted within movant's PSR.  Movant's conditions therefore are not properly addressed and recognized by the DOJ/BOP and movant's health is in rapid decline as a consequence.  To date the BOP has authorized one surgery, one is pending approval, but other pressing conditions are ignored by her care provider.

    - The majority of the patients treated by the respective medical practices were elderly with various levels of health care needs.  More than 20 (twenty) doctors, in various capacities and with various specialized training, diagnosed conditions, developed treatment plans, and prescribed surgeries - in critical circumstances.  Yet only two (2) doctors were ever indicted, charged and prosecuted.  In emergencies patients were transported by ambulance to hospital.

    - Multi-million dollars of debts were incurred by the sheer size, necessary maintenance, and constant expansion of facilities and services.  Business meetings and celebratory gatherings, to promote employee morale

cannot possibly be interpreted as illegal activity.

- Sergey Zhamaryan was the main corporate organizer of SZS Medical PLLS (SZS), not as depicted by the government, a non-consequential schmuck.

- Likewise, contrary to the government's depictions, movant was not aware, neither has she ever been informed nor has she ever directed that Yuri Khandrius was to impersonate Dr. Drivas. In fact, Mr. Khandrius was not even a part of Bay Medical, Dr. Drivas' sole practice, in the beginning. He was added to the staffing a considerable time later upon expansion of the practice.

- In 2006 movant was solely responsible for the billing of medical services at the respective offices, but due to the lingistic barriers as well as, technical problems, and the eventual volume of billings to be entered, additional billing personnel had to be hired, which ultimately resulted in a fully staffed billing department, managed and supervised by Elena Girenko and K. Kostichenko.

- The discussions of professional formations and the proper legal filings were always discussed with all individuals involved and Olga Novgordskaya, who prepared all legal documents for proper corporate filing.

- In the position as corporate accountant movant was indeed on most corporate accounts, as authorizer user, not as a primary account holder; additionally as correctly stated by the prosecution, movant was authorized on only four of six accounts. On that fact alone it contradicts the government's depiction of movant being the leader and mastermind of anything.

- There is no factual basis to support the government's claim of either intended or actual losses. Movant was never shown any documentation or evidence in form of discovery and all of movant's requests along with objections were very unreasonably refuted.

- At no time did movant ever request, much less demand, that any employee or associate open a business or business account in order to receive their salaries. Such a statement is completely ficticious and lacks any type of logical foundation or factual evidence.

- Neither was movant's son, Maksim Shelikhov, a "deputy" of any sort. He had some operational responsibilities, but completely lacked the interest, competence, and motivation to be involved in any accounting or responsible, intense managerial position.

- Movant, S. Zharmaryan, E. Girenko, S. Shelikhov, and I. Barikyan

-5-

had free access to any cash kept at the office. Movant shared her office space with S. Zharmaryan and E. Girenko. There was only one safe located in the administrative areas, it was located in S. Shelikhov's office and movant was not privy to its combination.

- Movant never negotiated nor distributed any cash payments to patients. I. Barikyan suggested paying referral fees to patients and convinced everyone that this was common practice. In hindsight the movant realizes that this was an ellaborate guise in order to embezzle money from the practices and thusly fund her own clinic along with Olga Novogorodsky  together they would also later steal the entire patient database and conspire with Dr. Wahl to open a competitive center, all under the nose of movant, but completely unbeknownst to her.

- Movant never instructed to fraudulently complete charts or patient files. Movant however insisted on responsible, proper, and complete record keeping, to include recording test results, treatment activity, and progress notations.

Files were reviewed for accuracy and completeness, and if necessary were amended. MC required high standards of record keeping and movant was dedicated  to maintaining these standards. Therefore, as previously mentioned, several surprise audits by MC were successfully concluded.

In an effort to reduce processing errors, returns, or denials from MC a verification process was developed and a log was kept as a part of that verification process. This was not a fraudulent practice, but it provided verification and made the billing process more efficient and minimized data entry delays for the many different providers and practitioners.

- I. Barikyan's testimony was completely perjurous and only self-serving to avoid more severe consequences and detection of the fraud perpetrated against movant and her subsequent fraudulently conceived medical clinic, created with the help of Olga Novogorodsky  and Dr. Wahl, whom she then rejected.

It is impossible for I. Barikyan to know any details about any business dealings with Vladimir Kornev, which were all legitimate in nature, thusly he was ultimately acquitted of all erroneous charges. Neither could she have given any truthful factual testimony regarding S. Zhamaryan. Movant had no influence over how, where, and with whom he would spend any money generated by his business. Movant certainly could not "gift" him his own funds. Although there was a personal

relationship between Zhamaryan and the movant, it did not extend to
financial control or co-mingling of personal funds.

- The suggestion of greed and fraud certainly is not based on
any factual grounds.

Out of more than 20 doctors two were indicted and the specialties
that were most critized, ridiculed and questioned by the government
were neither one of their specialties. If these doctors were in fact
as purported and alleged, they represent less than 10% of the asso-
ciated practitioners. On this basis alone the billing v. loss theory
of the government does not line up and neither does the loss v. crim-
inal activity / intent.

Significant investments were made by the corporations for expan-
sions and into state of the art equipment. Neither would have been
needed if this operation was a criminal scheme.

- Although there was some initial investment into the start up
of S. Zhamaryan's transportation company, this business was solely his
to direct, control, and operate. Any funds from that business depo-
sited into any of the clinic's accounts represent a repayment, not an
interest into that particular company or its operations.

- The day prior to the agents attempting to serve an arrest
warrant the movant had corrective surgery, as previously discussed,
this surgery left movant in a serious condition and in dire need of
lengthy recovery and additional corrective measures. As it became
painfully obvious that the movant would be unable to receive proper
medical care, movant decided to go to the Ukraine to recover, antici-
pating a much quicker return then it ultimately turned into. Since
movants coerced and pressured premature return her critical condition
continues to deteriorate.

- Finally there is absolutely no supporting evidence for the
claims made by the government; attorney Michael Rosen refused to pro-
perly represent movant, only badgered her into signing a plea and with
that "saving" her son. He asserted constant demands from movant as
well as members of her family and circle of friends to pay him more
money, although he had been previously paid more than the amount he
quoted for trial representation.

Had it not been for his unprofessional, unethical, and immoral
behavior it is reasonably assumable that the outcome of these proceed-
ings would have been very different. Movant would have proceeded to

trial and been able to present evidence, confront and question wit-nesses, and prevail in the assertion of her innocence.  Furthermore, professional counsel would not have engaged in constant duress by continually using movant's son as leverage and threatening potential consequences if she were to succeed in her assertions, thereby avoiding his professional duty of effective representation which was significantly impaired by his inherent conflict of interest.

Counsel for the movant was not only deceptive and ineffective, he acted rogue and without consultation or consideration of his client's interest, depriving her of her Fifth and Sixth Amendment rights.  He denied her the opportunity to go to trial and therefore by extention to appeal if necessary.  He deprived her of reviewing and scrutinizing any discovery and coerced her to plead guilty, using her son as leverage. As such the conviction was obtained by plea of guilty, which was unlawfully induced, not voluntary, intelligently, or knowingly made.  Additionally the conviction lacked any factual or evidentiary foundation for the charge and indictment.

In determining whether a defendant's right to effective assistance of counsel has been so violated as to entitle them to relief, the Supreme Court has established a two prong standard.

First the defendant must articulate the deficiency in counsel's performance, and second the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors / conduct, the result of the proceedings would have been different.

The Sixth Amendment to the Constitution of the United States of America guarantees the right to effective assistance of counsel at all "critical stages of a criminal proceeding," U.S. v. Wade, 388 U.S. 218, 226, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), including during the plea - bargaining process, see Padilla v. Kentucky, 559 U.S. 356, 373, 130 S.Ct. 1473, 1486, 176 L.Ed.2d 284.

In addition critical stages include the arraignment, post indictment, considerations of plea agreements, entry of a guilty plea (Fontaine v. U.S. (1973), 411 US 213, 36 L.Ed. 2d 169, 93 S.Ct. 1461) and even sentencing, since "ineffective assistance during sentencing [] can result in prejudice." Lafler v. Cooper (2012 US), 182 L.Ed. 2d 398, 132 S.Ct. 1376.

GROUND ONE:

<u>MOVANT'S COUNSEL WAS SO UNPROFESSIONAL AND INEFFECTIVE THROUGHOUT THE
ENTIRE PROCESS OF REPRESENTING THE MOVANT THAT BY HIS DECEITFUL AND
COERCIVE ACTIONS HE PREDETERMINED AND STRATEGICALLY ORCHESTRATED THE
END RESULT AND THEREFORE SEALED MOVANT'S FATE AND DEPRIVED HER OF HER
FITH AND SIXTH AMENDMENT RIGHTS.</u>

Movant's attorney Rosen, together with movant's son's attorney and
the government colluded to coerce movant to return from the Ukraine pre-
mature to her full recovery, by using her son and furthermore to secure
a guilty plea.

Movant was led to believe that her son would take his life if she did
not return to the United States and accept full responsibility for all
charges and plead guilty as instructed.

Since movant's attorney was a party to this treachery he was well
aware of the disadvantages to his client and that the advantage was only
to Maksim Shelikhov, movant's son, once he delivered his mother.  See
Corrlinks email from Maksim Shelikhov dated November 13, 2013 (<u>Exhibit 1</u>)
stating, "...I was given full protection for the return of my mother,
so she should not think it was all in vain ...".  On November 19, 2013
he writes to movant, "I am not only going to live!!!  But till the last
beat of my heart I will be proud of you and of what you have done for me."
<u>Exhibit 2</u>.

Movant, in a conference call with Attorney Rosen and her son's attorney
Shapiro, was told in no uncertain terms that her son's sentence and re-
lease are contingent upon her return and guilty plea.

Upon her return and arrest attorney Rosen all but abandoned her,
abscent from asking for money.  The visitor log at the detention center
reflects the following attorney-client interaction:

[<u>Prelude</u> - Attorney Rosen was retained on July 19, 2010 for $50K, prior
to movant's return he received various additional payments totalling $30K,
and between June and August 2012 he continuously badgers M. Shelikhov's
then-Fiance, who pays him an additional $75K --- the fact that movant's
attorney harrasses a co-defendant's fiance for payment is in itself un-
ethical and the mere start of the conflict of interest.)

Log:

| | |
|---|---|
| 6-14-2012 | Arrest and detention of movant. |
| 6-15-2012 | Arraignment - no prior meeting with Rosen. |
| 6-19-2012 | First meeting with Rosen and Bondar - 1 hour. |
| 6-27-2012 | Meeting with Rosen and Bondar - 1.5 hours. |

| | |
|---|---|
| 07-06-2012 | Rosen came alone to MCC - unable to communicate without a translator - he brought 3 discs (computer storage discs), which he was unable to open, and which purportedly contained M. Shelikhov's telephone records and banking information. Since he was unable to discuss anything or open the discs he left in <u>less than 1 hour's</u> time. |
| 07-19-2012 | Rosen and Bondar - approx. 2 hours regarding M. Shelikhov. |
| 08-03-2012 | Once again Rosen came alone and was unable to communicate. The meeting lasted less than 15 minutes as he was there to see someone else. |
| 08-27-2012 | Rosen and Bondar brought proposed plea agreement (Bondar translated) - Rosen stated that going to trial is not an option as it would adversely affect Maksim Shelikhov and others.  Movant rejected the plea, the meeting lasted <1 hour. |

***** Rosen refused to communicate or return any messages and movant was told the government ordered no contact with anyone. *********

| | |
|---|---|
| 10-12-2012 | Rosen and Bondar asking for an additional $60K, when he was told there was no money and reminded that he quoted $75K for trial representation, he left, the meeting lasted <1 hour. |

From November 21 to November 26, 2012 Rosen kept calling a friend of the movant's asking for money.  From December 6 to December 10, 2012 Rosen kept calling for money stating that he cannot help without money for a translator. On December 11, 2012 he called the friend for the last time and told him that he would have to inform the prosecutor (of what is unclear). There was no further contact until December 18, 2012 when Rosen appears at court with Bondar and the court translator.  Movant was told she <u>MUST</u> sign the plea <u>TODAY</u>; when the interpreter started the translation the movant stated that she could not sign the plea upon which Rosen stormed out. Rosen, Bondar and the interpreter returned 15 minutes before the scheduled pre-trial conference and movant was again told she <u>MUST</u> sign and that the judge is waiting.  Movant signed under duress and then Rosen proceeds to instruct her how to respond to the court; immediate thereafter movant is ushered into the courtroom.

   Any attorney who adheres to his professional ethics and codes would not have colluded to lure his client back to be prosecuted without any argument or objection.  He would not have abandoned her as counsel (the MCC visitor / attorney meeting logs will confirm the movant's rendition of the facts) and met with her less than 8 hours from the time he was to actively represent her, and between her arrest and guilty plea hearing.  Instead he

should have protected her constitutional rights, honored her decision to assert arguments and go to trial, and guarded her legal rights and interests.

The United States Supreme Court and the Second Circuit of Appeals have historically stated that package deals adventagous to one party at the detriment of another party create disparity and should be disclosed. Neither movant's attorney nor the government disclosed this to the Court.

Abscent of counsel's unprofessional, threatening and coercive behavior movant would not have pled guilty, proceeded to trial, and been able to prevail and present her assertions.


GROUND TWO:
THE CONVICTION WAS OBTAINED BY PLEA OF GUILTY, WHICH WAS NOT KNOWINGLY, INTELLIGENTLY, OR VOLUNTARILY MADE.

This court must recognize that confronting a mother with the possibility of her only child taking his life if she does not comply with the only offered solution, and having no communication or support system is psychological warfare, and at minimum "mental coercion overbearing the defendant's will." Miller v. Angliker, 848 F.2d 1312, 1320 (2nd Cir. 1988). As such the resulting plea must be deemed void, particularly in combination of the shock and incredible language barrier. United States v. Yang Chia Tien, 720 F.3d 464 (2nd Cir. 2013). The russian language is not only fundamentally linguistically different, but it even has an entirely different script structure. It is impossible that the movant, under direct pressure from her attorney, the worry and concern of a mother, and the more than difficult language barrier, is able to make an informed and rational decision, despite what she was instructed to tell the court.

The transcript of the guilty plea hearing is the best testimony to what actually happened, although it conceals from the court the fact that the government stipulated to a deal with movant's son pending movant's plea of guilty. On page 3 of the transcript Attorney Rosen admits he "just" had the plea signed.

On page 8 the movant states in court that she was not given all the information and details, but "based on the explanation [she] was given, [she] understand[s] everything." This is a reflection of sarcasm and a dominant cultural difference. The movant implies that she understands that she has to surcome to the pressures as inflicted by the government, the court being a part of the government - as compared to the previous regime of the USSR breaking its opposition.

On page 9 when the court inquires about the offense the movant pleads to, it is not the movant, but Attorney Rosen who responds.  On page 19 the movant responds to the court in all sincerity that she hopes "that everything will be calculated properly."  Not being familiar with a democratic justice system and once again taking her birth country's history and cultural experiences into consideration, the movant is pleading to the court for mercy.  These sensitive expressions would have been noticed in her country of origin, but without a doubt they are lost to a country which boasts the freedom of speech as its First Amendment right.

Movant was under the impression that there would be an additional procedure in which the court verified the government's claims.  She did not know that her attorney has to challenge, but most importantly practice due dilligence and ethical representation to present her argument.  She does not know that every statement left unchallenged is an admission on her part.  How would a layman know these nuances of the law practice? Her attorney not only withholds this information, he further withholds representation, advice, and counsel; but for the lack of counsel and his unprofessional errors and omissions, movant would have asserted her arguments, insisted on going to trial, and informed the court of this horrific misconduct.

Additionally the legal terminology was foreign to the movant, who did not receive an explanation of the charges she pled guilty to, much less an explanation as to procedure or legal repercussions and consequences of her plea, such as forfeiture of her right to appeal or what it means when the court referred to filing a 2255.  All she understood was the assurance that her son would live and be okay.  If the court questions any of these statements, a review of the MCC communication logs and the sequential order of the legal proceedings as documented on the docket will confirm the movant's assertions.

The transcript of the movant's guilty plea hearing continues to illustrate attorney Rosen's coercion and the movant's confusion and utter resignation to her terrible fate.  On page 24 Rosen admits he wrote the movant's allocution and that they "have something that the interpreter has gone over with her."  The court instructs movant to speak and her response demonstrates that she has no idea of what she was told to say, but first and foremost it demonstrates that the movant does not describe a factual act she understands.  When the government tries to fill in the "blanks", Rosen "conceded" and states, "[he] went over that, but [he] forgot that element,"  and continues "[b]ut it certainly is not disputed."

At no point in the exchange with the court did the movant clearly state what she supposedly did, but most importantly, even if the court disagrees, the statement of the movant does not identify ANY element of the alleged criminal charge.   Neither did the court inquire as to any of the elements of the charge from the defendant.   This indeed invalidates the plea.   Bradshaw v. Stumpf, 545 U.S. 175, 125 S.Ct. 2398, 25 L.Ed.2d 143 (2005).

The charge of "Laundering of monetary instruments", Title 18 USCS §1956 (a)(1)(B)(i), requires proof of these following elements:

1.- Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity,

2.- conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part

3.- to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

In accordance with Rule 11 (b)(3), the movant must admit to all elements of the charge, however the transcript reflects that nothing the movant stated met the requirement of the rule.   The movant does not admit to affecting interstate commerce, that the proceeds were from any illegal or unlawful activity, or that there was any intent to conceal or disguise anything.   The plea would be valid if "the conduct to which the defendant admits is in fact an offense under the statutory provision under which [s]he is pleading guilty." United States v. Maher, 108 F. 3d 1513, 1524 (2nd Cir. 1997).   Clearly, this plea does not meet this requirement and should be therefore invalidated.

The entire interaction of the court and the movant is a stretch to be viewed as the movant's admission of guilt as required when pleading guilty.   It does however provide proof that she neither understood the charges nor the proceedings, in fact she is unable to explain how she committed the instant offense.   What it does undisputably prove is the cunning and manipulative actions of defense counsel and it clearly provides the purest manifestation of ineffective assistance of counsel.

Abscent of counsel's unprofessional and unethical behavior the movant would not have plead guilty and proceeded to trial, where she would have been able to prevail in her assertions and present her own exculpatory evidence.

Counsel never prepared an argument or defense strategy and never shared any disclosure with movant.   He blatantly lied to the court when he stated that movant had reviewed anything.   In fact, movant reviewed absolutely

nothing. Not one piece of discovery was shown to the movant. After sentencing movant obtained MC billing information through a FOIA request and is therefore now able to factually attack the government's statements and accusations. Exhibit 3. The MCC meeting log timeline verifies that there was no opportunity for Rosen to actually discuss or share any discovery with the movant. When movant requested her file from Rosen and had to file a bar complaint before he responded to the request it was able to be determined that he had to request the discovery from Shapiro, Maksim Shelikhova's attorney. Exhibit 4. Surely the court will agree that an attorney who lies to the court is ineffective as counsel, at minimum.

The Court wanted to affirm that movant "had [] various discussions with Mr. Rosen and that [she is] satisfied with him as [] attorney." The movant responds that they "discussed everything [she] was worried about, yes" and ellaborates no further. Her language barrier did not let her realize the importance of the court's inquiry, and that the court court have possibly intervened in the completely disfunctional and broken down relationship, including Rosen's temper tantrums, threats, and ultimate abandonment. But for counsel's irresponsible and unprofessional errors and behavior the movant would have never pleaded guilty and proceeded to trial, which would have resulted in a very different procedural outcome as the movant would have had the opportunity to review discovery, question witnesses, and disprove the government's allegations.


GROUND THREE:
THE MOVANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AT HER SENTENCING HEARING.
The Supreme Court addresses the aspect of sentencing hearings in Wong v. Bemontes (2009 US), 175 L. Ed. 2d 328, 130 S. Ct. 383. It held that for a defendant to establish reasonable probability that a competent attorney, aware of available mitigating evidence, would have introduced it at sentencing, and that had a jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned a different sentence or even verdict. Rosen never reviewed crucial evidence, in fact he was not in possession of any disclosure and had to request it from a co-defendant's counsel to forward it to the movant, but for his unprofessional error there is a very real probability that the outcome of this proceeding would have been very different.
A federal criminal defendant, in order to obtain relief for alleged

violations of right to effective assistance of counsel under the Sixth
Amendment to the Constitution of the United States of AMerica, must show
that counsel's performance was deficient and as such prejudiced the defen-
dant.  A defendant establishes prejudice where it is shown that (1) the
trial court erred in the application and determination of the Federal
Sentencing Guidelines and (2) as a result of such error, about which
counsel failed to argue, defendant's sentence was increased by at least
6 months.  Glover v. United States (2001), 531 US 198, 148 L.Ed. 2d 604,
121 S.Ct. 696.  Rosen half-heartedly made an incomplete attempt to argue
the loss amount the government alleged, but failed in his attempt and the
court completely discarded an unreliable and unsubstantiated argument.
Had Rosen reviewed and discussed the records and the MC billing he could
have properly argued the loss amount, which is substantially different
from the government's allegations.  But for the unprofessional and unethical
errors and behavior of counsel the outcome of the proceeding can be
reasonably presumed to have been very different.

Counsel for the movant violated movant's Fifth and Sixth Amendment
rights to due process and to effective assistance of counsel when he in-
correctly challenged errors in the PSR which enhanced the movant's offense
level and thusly her sentence.  He failed to identify the proper citation
to authority and support the position herein with proper case law resulting
in an enhanced sentence for the movant.  His unprofessional performance
resulted in ineffective assistance of counsel and prejudiced the movant, thus
but for his errors the outcome of the proceedings most probably would have
been very different.

Counsel for the movant again, at the sentencing hearing, lied to the
court implying that he met with his client frequently and made every effort
of effective and competent counsel, but as previously argued, the MCC
visitor logs would prove very different.  It is up to the Court to decide
if a constant liar can be trusted to be effective and competent to any
client, but in particular the movant.


GROUND FOUR I:
COUNSEL ABANDONED CLIENT AND FAILED TO MAINTAIN THE MINIMUM STANDARD OF AN
ATTORNEY-CLIENT RELATIONSHIP WHEN HE DID NOT DISCUSS ANY DEFENSE STRATEGY,
REVIEW ANY RECORDS OR DISCOVERY, ASSEMBLE FAVORABLE EVIDENCE TO SUBSTAIN
AN OBJECTION AND THEN INTELLIGENTLY ARGUE HIS CLIENT'S CONCERNS.

Rosen does not raise any objections or misstatements as outlined in the
PSR or the sentencing memorandum as requested by movant.  On one occasion
he cut the discussion short by stating that movant is not able to object

and if she intends to do so, he will testify against her son alleging perjury; once again reverting to his original tactics of coercion and utilizing a mother's concern for her only child against her. In civilized society, such an action could be summed up as a criminal act. In this instance, it represents coercion and ineffective assistance of counsel.

For a criminal attorney to request and obtain discovery from another attorney,rather than the prosecution, after his client plead guilty (Exhibit 4) based on his insurmountable coercion; he does this after the client requests the information from him in the hopes to be able to succeed with another attorney upon appeal (although she was unable to, but lacked the procedural understanding thereof). Rosen non-chalantly admits he did not have any records and therefore had to request them from Shapiro (M. Shelikhov's attorney), this in and of itself is unacceptable, but for him to share that with the client is unprofessional, unethical, unbelievable, and so many other things, including possibly criminal, but definitely it demonstrates wreckless disregard and ineffective assistance of counsel.

Although the forwarded discovery obtained from Shapiro by Rosen contained no significant information, it proves that Rosen made absolutely no effort. The court stated at sentencing (transcript doc. 44, page 63), "I assume that, like every other defense attorney in this case, you had full access to all of the records ...". Although assumably, this is true, it would only confirm that he was able to access, but not that he actually did access the information. The eventually obtained client file (after filing a bar complaint against Rosen) revealed no work product whatsoever, which supports the movant's ineffective assistance of counsel claim.

Pages 6-11 of the sentencing transcript memorialize Rosen's incoherent gibberish to the court regarding only an offset to the loss amount, but clearly he states absolutley nothing; he has no facts or figures to argue and is very obviously not-at-all prepared. He finally concludes his nonsensical ramblings on page 11 stating, "[o]ther than that, I don't have any factual objections to the PSR." Even the government on page 13 of the transcripts "conceed[s]" that the guidelines allow an offset, but the AUSA clearly and logically deduces that since it was not argued or addressed until sentencing that government has met the preponderance standard. On page 19 the court states that the defense should have proven and argued the issue before, but since it did not, the court would therefore not accept the argument. This represents a multitude of failures on Rosen's part and undoubtably ineffective assistance of counsel - at first, he

-16-

only raises this one issue, but even if the court would have been willing to hear an argument, by his own admission, he had "no factual objection". Secondly, he was obviously completely unprepared to present an argument on the issue with facts and figures and thirdly and finally he did not appropriately and timely file a motion to argue any issue.  As a result the court on page 21 concludes that since the defendant did not argue the restitution amount, it agreed, and therefore confirmed the government's loss analysis.

The government as well as the court, by their own comments on the record, confirm movant's assertions that her counsel's performance was so ineffective that it prejudiced her.  Although the record only reflects one (this mentioned) issue, there is no more convincing proof than the record, the concession of the government and the admonishment of court regarding counsel's ineffectivness and the consequential prejudice to the movant.

Thus, but for the ineffective assistance of counsel, it is more than reasonably probable that the outcome of the proceedings would have been different.


Ground Four II:
MOVANT HAD NO ASSISTENCE OF COUNSEL FOR THE BENEFIT OF HER DEFENSE AND AS SUCH COULD NOT DISPROVE ANY OF THE GOVERNMENT'S ASSERTIONS AGAINST HER.

It is without a doubt difficult for anyone to clearly communicate with someone else if neither of the two parties speak the same language.  A conscientious professional would not agree to perform a task as greatly responsible as defending someone's life, reputation and liberty if he cannot clearly, easily, openly and directly communicate with that person. Misunderstandings occur between two persons of the same linguistic background; imagine the conflict between two people who neither speak each-other's language not have any other commonality, such as cultural, temper-amental, educational, or professional experiences.  Without being able to guarantee the elimination of all possible hurdles as the result of the language barrier Rosen should have declined representation.  It was greed on Rosen's part, which prevented him from doing so and by this action alone he **knowingly** , willingly and voluntarily contributed to the prejud-ice and the resulting consequences to the movant.  No logical and intel-lectual person can possibly disagree that if one does not speak the lang-uage of the client, he cannot communicate; if one cannot communicate, one cannot advocate for the client; and if one cannot advocate for the client, he cannot be effective.  Therefore by definition and default alone, Rosen's

counsel was ineffective from day one, as he was not able to communicate
with his client without help and communication of a third party.  Since
he did not have a third party for this purpose at his dipsoal in order
to perform his professional duty, he was not qualified to perform the on-
ly task he was engaged to perform - the representation of the movant.
This is in itself is disturbing, what is even more disturbing and disheart-
ening is his fee and the additional constant demands of additional funds.
Even by the high cost of living standards of New York City, $165K for Mr.
Rosen's performance is ridiculous and closer to the extortion standards
of organized crime, but it is at minimum ineffective assistance of counsel.

Had Rosen performed a minimum standard of professional duty and con-
sulted with the movant, his client, he would have been able to:

- proceed to trial and expose perjurous testimony, which to date remains
unchallenged.

- expose and correct misrepresentations made by the government to influ-
ence the outcome of the proceedings and prejudice the movant, by impacting
the sentencing in this matter.

- the government strategically supported all arguments with hearsay,
questionable testimony and misrepresented evidence, but as the court stat-
ed in the sentencing hearing, an argument not made is an agreement in sup-
port of the government's case.

On page 41 the court recaptioned the perspective it gained from the
government's presentation and the basis for the harsh sentence (in respect
and comparison to the sentences of other co-defendants) of the movant.
the analysis of her Honor's statement, if Rosen would have reviewed and
argued the evidence, would have been very different.  Her Honor stated,
"she had doctors who were not performing as doctors should.  She had non-
doctors, Mr. Khandrius, performing as a doctor, injecting people with
things, which were not medicines, but water, and getting money from MC
to do it, ...:.

- Had Rosen reviewed the records or discussed any of the allegations
with movant, he could have established that more than 20 physicians were
providing services at the medical offices (Exhibit 5).  Two doctors out
of this distinguished group of licensed professional specialists were
indicted, 1 became a cooperating government witness and supplied per-
jurous, vindictive, and self-serving testimony for which he was greatly
and ellaborately rewarded).

- Had Rosen consulted expense records and medical inventory logs, and
compared them to patient files reflecting the administration of the med-
icines, he could have refuted the allegation of water having been used

-18-

instead of medicine.  In any case he could have established that movant
had no knowledge of this and, to date, doubts the accuracy of this in-
formation.  See Exhibit 6 - pharmaceutical expenses for allergy treat-
ment medication.

The court further stated, "... using therapists who were not licensed,
all of this under her immediate supervision...".

- Had Rosen reviewed any records he would have been able to identify
a number of highly qualified professional therapists, with specialties
ranging from acupuncture to cardiology to gastroenterology (licensed for
micro-surgeries in office).  See Exhibit 5 for a complete list of all
professionals and their services provided at the medical offices.

- Furthermore Rosen would have been able to identify that the movant's
primary function was the corporate accounting responsibility, i.e. ac-
counts payable, accounts receivable, profit & loss statements, balancing
of bank accounts, payroll, and major due dilligence for purchasing.

- Additionally Rosen could have proven the extensive investment in
therapeutic equipment, such as multi aqua massages at a cost of $60K each
with additional regular high maintenance contracts, including specifically
required water and chemicals, mechanical service, etc. just to name one of
many such specialized equipment.  He could have also substantiated that
this expensive massage option was authorized by MC, but only reimbursable
as a regular massage expense, which was precisely what was billed in this
instance (and many), resulting in a nominal profit to the benefit of the
well-being of the patient.

- Had movant been able to go to trial, as she wanted, she could have
refuted the government's explanation of the allergy testing / treatment
fraud, which has no logical foundation.  Exhibit 6 shows the regular
purchasing of medicines for the treatments.  Movant was not aware of any
treatment being conducted with water until her Honor refered to it at
sentencing.  Had Rosen represented and informed movant, she would have
been able to fully prepare and argue, and disprove any knowledge of this
practice and accusation.  As documented, in small part, by the attached
payment schedule to PSS Northeast, averaging approx. $25K per month for
the purchases of such treatment medicines.

These are just some of the allegations Rosen could have disproven had
he performed in his capacity as counsel to the movant.

The government's summation of the facts of the case as well as the role
of the movant described at the plea hearing and perpetuated at the sen-
tencing hearing provides no factual basis and is solely based on facts
proffered by the government.

The second circuit recognizes that the burden of proof is solely on the government regarding establishing specific conduct engaged in by the defendant, as well as the defendant's agreement.  It is not legally sufficient to proclaim someone a mastermind and the principle profiteer without the specifics leading to this classification.  However, as the Honorable Judge Gershon stated during sentencing, which is supportive of movant's instant action, the failure to timely argue any allegation represents confirmation and affirmation of the allegations.  See transcript of sentencing hearing page 21.

For all of the aforementioned reasons movant asserts a claim of ineffective assistence of counsel, but for the obvious and unprofessional errors and the neglect of fiduciary obligation, the outcome of the proceedings would have been different and movant would have prevailed in disproving the government's assertions.


GROUND FOUR III:

HAD ROSEN FULFILLED HIS PROFESSIONAL DUTIES AND OBLIGATIONS HE COULD HAVE SUCCESSFULLY ARGUED THE ONE ISSUE HE RAISED IN THE INTEREST OF THE MOVANT AT THE SENTENCING HEARING.

The court, during the sentencing hearing, addressed the fact that counsel for the defense never requested a hearing on any issue, but specifically regarding his attempt of an argument pertaining to the losses as presented / analyzed by the government.

As previously mentioned to Honorable Court referred to counsel (and by extension the defendant) as having had full access to the records, yet counsel presents no evidence to support his argument.  Further, the court stated, "... it seems to me that if the defense wants to argue that there should be some offset for some legitimate services that were provided by this clinic, that it would be up to the defense to show me even one legitimate service that was performed...".  The court continues, "... that the defendant, having been fully aware of all the records, had she thought there were really offsets that were legitimate and that should be applied she should have brought them to my attention at that point."  The movant was never shown any records, was never able to discuss any analysis, findings, or facts with her counsel (as the MCC visitor log proves there was no time or opportunity for any discussion during the less than 10 hours Rosen spent with the movant from the time of her arrest to the induced plea hearing) throughout the months of movant's pre-trial incarceration movant had no access to any records and could not intelligently plead her case.

Had Rosen actually consulted the records and made an effort to discuss the facts with the movant he would have discovered:
(the following claims and informations are substantiated and based on data provided by MC - via FOIA request, see Exhibit 3 - MC COntrol No. 071620147006)

- As to MC claims and billing procedure:

1.- The service provider bills a service amount. This amount is established by the provider and billed equally to all patients, with or without a service provider. As a simplified example we will use a service fee of $100.00 assessed for a service visit.

2.- Each insurance provider has an agreed upon amount it negotiated to pay for their covered insured for a particular service. We will state for simplicity that for this billing the negotiated payable amount for the service provided is $60.00.

3.- Additionally to the negotiated lower amount MC will only cover 80% of the negotiated amount, with the remainder cover by either the patient or applicable co-insurance.

4.- Therefore, this is what actually transpired in medical billing:

|                            |        |
|----------------------------|--------|
| Service charge:            | 100.00 |
| MC coded service / charge: | 60.00  |
| MC cover amount:           | 48.00  |

Amount to be paid to provider:   $ 48.00

Based on this scenario, a true depiction of the process, the MC payment practice and schedule NEVER recognizes the full billed amount, as such it cannot, under any circumstances, be argued that the billed amount would represent intend loss. Any argument asserting such misinformation and any analysis in support of this argument represents a fraud upon the court.

Intended loss, at best, can only represent the MC negotiated, authorized, and reimbursable amount, not the billed amount, as this amount will never be paid by MC.

Rosen could have made this very simple, factual argument had he only reviewed the documentation and then reviewed it with the movant. Instead the court stated at sentencing that it feels the government has amply proven both the actual as well as the intended loss. On page 100 of the transcript her Honor states, "... I am satisfied that that is completely correct and that the attempted loss was $77 Million, the actual loss was over $50 Million, as set forth by Medicare, itself, and there really hasn't been any challenge to that other than this claim that set off should apply."

-21-

The government, during the hearing, conceeds that an offset would be correct and appropriate, however one cannot be applied without the effective efforts of counsel. But for this unprofessional error and behavior the outcome of the proceedings would have been different.

As to her Honor's challenge to show her "even one legitimate service that was performed" and can be applied to be offset, had Rosen reviewed the records and the filings he would have been able to document more than 100,000 legitimate claims filed with MC. Additionally he would have been able to prove that the totality of the disputed Drivas and Wahl claims (although they should be individually evaluated and reviewed, which was not possible to be accomplished by the movant without access to the patient records and other documentation she is not privy to while in custody) represented less than a quarter (>25%) of the filed claims. The data transmitted for SZS by MC reflected 65,535 claims filed, not one was submitted for Dr. Drivas, 22,600 claims were submitted for Dr. Wahl, and 42,935 claims were submitted for 11 other provider. Exhibit 7.

Had Rosen reviewed this discovery, consulted movant, and sought verification with a MC professional he could have also substantiated a significant overstatement of MC's actual disbursements in contrast to check listings, in some cases as much as 80%. This is a visual formatting program issue, not a billing, and or payment issue. Summaries are constantly carried forward giving the appearance to the untrained layman that these are repetitive payments, when in actuality they are carry-overs of the same check, listing the full check payment each time a fraction or itemized charge is listed. This sounds and appears very confusing but could be easily explained with the actual accounting visualization.

Rosen could have differentiated between filings returned for correction and refiled, which could equate to double of the amount filed, listed under filings, again increasing the filed amounts and with that the government's "intended loss" analysis.

Rosen could have also disproven the allegation that claims for Dr. Collins were filed after he had passed away. Although the filings were done after he was deceased, the service dates were certainly pre his passing. Just a simple correction such as this would have made a difference in correcting some of the perjured testimony and exposing the intent of the witness.

For all of these aforementioned reasons the movant asserts ineffective assistance of counsel; but for counsel's unprofessional errors, behaviors and omissions of duties, the outcome of the proceeding would have been very different.

-22-

<u>CONCLUSION</u>

Movant now appeals to the court to recognize the merits of her claims:

* the coercion to sign the plea
* the conflict of interest of her attorney (<u>United States v. Curcio</u>, 680 F. 2d 881, 888-90 (2nd Cir. 1982) and movant's right to a non-conflict lawyer (<u>United States v. Levy</u>, 25 F. 3d 146, 153 (2nd Cir. 1994)
* the movant's confusion and inability to make an informed decision due to her language barrier and the fear associated with her cultural differences, as well as her attorney's inability and indifference to properly advise and counsel movant, which voids her plea (<u>United States v. Yang Chia Tien</u>, 720 F. 3d 464 (2nd Cir. 2013)
* the movant's inability to state the elements of the charge she pled guilty to which specificity, nor could she describe the action which may infers her guilt in the charge, which invalidates the plea (<u>Bradshaw v. Stumpf</u>, 545 U.S. 175, 125 S.Ct. 2398, 25 L.Ed. 2d 143 (2005))
* the undisclosed terms of the package deal, in which the movant agreed to plead guilty to benefit her son and prevent him from serving a prolonged sentence in prison, without her having any understanding of the american legal system and her or rather their ability to fight the perjurous testimony of the witnesses against them, who agreed to testify with additional cooperation agreements, this renders the plea in the first act involuntary (<u>United States v. Peavy</u>, 31 F.3d 1341 (6th Cir. 1994) and United States v. Abbott, 241 F.3d 29, 34-35 (1st Cir. 2001)).

Counsel for the movant was ineefective, because he made no effort to familiarize himself with the details of the case and to create any work product.  The court translator, Ms. Isabella Avrutim, was exposed to the unprofessional conduct and temper tantrums of movant's counsel.

* movant was denied effective assistance of counsel when counsel ignored movant's concerns and objections to the statements and assertions in the PSR and the government's sentencing memorandum.
* movant was denied effective assistance of counsel when he failed to disclose and review discovery, discuss the same with movant along with the government's position prior to sentencing and

timely file objections, appropriate motions and / or request evidentiary hearings.

* movant was denied effective assistance of counsel when counsel did not prepare to intelligently argue any issue raised at sentencing as well as document his arguments with facts and figures or substantiating law in response and in opposition to the government's assertions.

* movant was denied effective assistance of counsel when she was denied access to exculpatory evidence furnished through dis - closure, by movant's counsel failing to make an effort to collect such disclosure, documentation and evidence.

Movant also asserts that the coercion of the government, in an effort to continue its pressure upon the movant, continues to this date, by the enduring influence of the United States Attorney's Office for the Eastern District of New York upon the Bureau of Prison.  The USAO insists the BOP refuses for the movant's son and grand-daughter, whom she has never met, to be granted permission to visit movant. The probation office supervising and monitoring movant's son, who was a co-defendant in this case and the tool of the government's coercion, stated no objections to any visitation and cleared him to do so with-out impact of the standing decision, visitation remains denied, pend-ing a court decision in the matter.

In contemplation of the devastating effect the aforementioned had on the movant; with enduring strength and desperation she now prays to the court to recognize the injustice inflicted and to rise to the high expectation of the dispensing of justice, the obligation to decency, and the protection of rights and liberty entrusted upon this honorable court and grant relief by either vacating the sentence imposed on the movant and letting her proceed to trial, or any other relief to which she may be entitled or the court deems appropriate in this proceeding.

Respectfully submitted,

this ___30___ day of November, 2016

Irina Shelikhova, pro se
Fed. Reg. No. 81448-053
FCI Tallahassee
501 Capital Circle NE
Tallahassee, FL 32301