UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
IRINA SHELIKHOVA,

                Petitioner,                 **AFFIDAVIT OF MICHAEL ROSEN, ESQ.**
                                                             **IN RESPONSE TO PETITIONER'S**
    -against-                                        **2255 MOTION**

UNITED STATES OF AMERICA,         10-cr-771 (NG)

                Respondent

--------------------------------------------------------X

**MICHAEL ROSEN**, being sworn, says:

      1.      I am an attorney admitted to practice in New York State in 1964 and admitted in the Eastern District of New York in 1968. I served as an Assistant United States Attorney in the Eastern District from March, 1965 to approximately 1968. I was Irina Shelikhova's (hereinafter, "petitioner") attorney from July 17, 2010 until her sentencing in this case on November 12, 2013. I submit this affidavit pursuant to the request of the Honorable Nina Gershon, United States District Judge, (ECF Doc. No. 849) to respond to petitioner's motion pursuant to 28 U.S.C. Section 2255. (ECF Docs. 846 and 846-1)

      2.      At the outset, I categorically and adamantly reject and deny petitioner's central, and false, allegations against me that I coerced her to plead guilty, that I "abandoned" her and that I lied to the Court. For example, petitioner's central theme in her papers against me is that I coerced her to plead guilty in order for her son, Maxim Shelikhov (hereinafter "Max") to obtain a cooperation agreement from the government. This assertion is untrue and absurd since <u>Max secured his cooperation agreement before petitioner entered her plea in this Court</u>. Although petitioner, in her moving papers, repeatedly and falsely attacks my personal integrity and professional conduct, I will avoid exchanging personal insults with her and let the facts I set forth below speak for themselves.

**CHRONOLOGY**

3. On July 17, 2010 I met petitioner after she learned that her "clinic", Bay Medical, was raided by Federal Agents, several persons there were arrested and that the Agents had contacted her son, Max looking for her. A person accompanying petitioner translated for us.

4. After the conversation ended, it was decided that I would call the EDNY U.S. Attorney's Office the next day, Sunday, July 18, 2010, and offer to surrender petitioner at the Courthouse on Monday, the 19th. I called, spoke with AUSA William Schaeffer to advise of the aforesaid planned surrender and was directed by him to work out the details and specifics of the surrender with one of the FBI Agents. It was agreed that Petitioner would come to the Courthouse early on July 19, 2010 to surrender, but as is now known, she skipped to the Ukraine where she could join up with Max, who also departed the United States.

5. For months thereafter I did not hear from petitioner. On or about November 14, 2011 petitioner's son Max was arrested in this case. At some point later I received a message that petitioner wanted to call me. I decided that because of the language difference, I would need the services of an interpreter who spoke Russian. I then made contact with and retained, in approximately February 2012, the services of Robert Bondar, Esq., an attorney (admitted in New York and the Eastern District) with an office in Brooklyn, to serve as an interpreter in conversations I had with petitioner. For the next approximately four months there were three-way telephone conversations between petitioner, Mr. Bonder and myself, and, as I recall, petitioner spoke with Mr. Bondar alone on occasion and he would thereafter discuss their conversation with me. As will be further set forth below, Mr. Bondar continued with me until petitioner's December, 2013 sentence.

6. At some point, I believe in the Spring of 2012, petitioner indicated a desire to return to the United States in the hope that it would aid Max's situation. Mr. Bondar acted as translator for these

conversations. I advised petitioner of the consequences to her of returning. Petitioner decided to return and told me she would let me know of her intended travel plans.

7. On or about May 29, 2012 I received information from Mr. Bondar that petitioner planned to return to the United States on June 14, 2012 on Aerosvit flight 131, arriving at 5:05pm at JFK, Terminal 4. I transmitted that information to AUSA Shannon Jones.

8. On or about June 8, 2012, I transmitted to AUSA Jones Russian and English translations of petitioner's medical records that she had sent to me.

9. On June 14, 2012, Mr. Bondar and I were present at JFK and witnessed petitioner's return and arrest by FBI Agents.

## POST ARREST CHRONOLOGY

10. On June 15, 2012, the day after petitioner's surrender and arrest, I appeared with her for arraignment before the Honorable Raymond E. Reyes, Jr. and a Russian interpreter. Petitioner was detained. (Doc.No. 263) I filed a Notice of Appearance that day.

11. On June 19, 2012, Mr. Bondar and I met with petitioner at MCC. The following day, June 20, 2012, Mr. Bondar appeared for petitioner, in my stead, for a status conference before this Court. The Court certified interpreter assigned for the conference was Mrs. Isabella Avrutin. (Doc. No. 277)

12. On June 27, 2012, Mr. Bondar and I met with petitioner at MCC.

13. On June 29, 2012, Mr. Bondar and I appeared in this Court with petitioner--and a Court certified interpreter--for a Curcio hearing at which petitioner, having been advised of her rights, waived any potential attorney conflict.

14. On July 6, 2012, I saw petitioner at MCC.

15. On July 19, 2012, Mr. Bondar and I met with petitioner at MCC.

16. On July 23, 2012, petitioner and I appeared before this Court, with a Court certified interpreter, for a status conference.

17. On August 3, 2012, I saw petitioner at MCC.

18. On or about August 22, 2012, the government sent me a proposed plea agreement. On August 27, 2012, Mr. Bondar and I met with petitioner at MCC.

19. On September 10, 2012, the case was on before this Court for an Order to Show Cause.

20. On October 12, 2012, Mr. Bonder and I met with petitioner at MCC.

21. On October 15, 2012, petitioner and I appeared before this Court , with a certified Court interpreter, for a status conference.

22. **ON NOVEMBER 8, 2012, MAX PLEADS GUILTY IN THIS COURT PURSUANT TO A COOPERATION AGREEMENT WITH THE GOVERNMENT.**

23. On November 14, 2012, petitioner and I, and a Court interpreter appear in this Court for a status conference.

24. On November 28, 2012, petitioner and I, with Court certified interpreter Isabelle Avrutin, appeared in this Court for a status conference.

25. **On December 18, 2012, with myself, Mr. Bondar and certified interpreter Isabelle Avrutin present, petitioner entered a plea of guilty to Count Four-money laundering conspiracy and executed her plea agreement--which was interpreted by Ms. Avrutin and so subscribed by her.   Court Exhibit One, p.14**
 --- during the proceedings I advised the Court that Mr. Bondar has assisted me with Russian translations and that Ms. Avrutin "has been with us during the day today." (Transcript, December 18, 2012, pp. 2, 6)

---during the proceedings, after being placed under oath and being advised by the Court of a potential prosecution for false statements, the following colloquy was recorded:

THE COURT: Ms. Shelikhova, do you feel that you have had enough time to discuss your case with your attorney?

THE DEFENDANT: I do think so.

THE COURT: And have you had enough time to make the decision whether to plead guilty or not guilty?

THE DEFENDANT: Well, yes, more than enough.

THE COURT: Okay, and are you satisfied with Mr. Rosen as your attorney?

THE DEFENDANT: Yes, as of now. Yes I'm happy with him.

*********

THE COURT: All right, but it is very important. I just want you to affirm for me that you have had these various discussions with Mr. Rosen and that you are satisfied with him as your attorney. Is that correct or incorrect?

THE DEFENDANT: Yes, we discussed everything I was worried about, yes. ( Id. pp. 7, 8)

*********

THE COURT: Are you ready to enter a plea to count four of the superseding indictment?

THE DEFENDANT: Yes, I'm ready.

THE COURT: What is your plea, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: Are you making the plea of guilty voluntarily and of your own free will?

THE DEFENDANT: Yes.

THE COURT: Has anyone threatened you or forced you to plead guilty?

THE DEFENDANT: No.

THE COURT: Did you commit this crime, the money laundering conspiracy?

THE DEFENDANT: Yes. (Id., pp. 23,24)

26. The Court then found that petitioner's plea was made voluntarily and knowingly and that there was a factual basis for it. (p.27)

27. At this point, I pause in the chronology to assert that based on all of the foregoing, petitioner's allegations that I coerced her to plead guilty and "abandoned her" are untrue and absurd. But for one or two instances, all my discussions with petitioner in the period between her surrender and her plea were with a Russian speaking attorney or in the presence of a Court interpreter--so petitioner's feigned "language barrier" contentions are without merit. During our discussions all aspects of the case were explored and explained to her. Petitioner never stated that she wished to go to trial, but rather she wanted to plea guilty because she was guilty.

## POST PLEA CHRONOLOGY

28. The Drivas trial commenced on February 25, 2013 and concluded on April 8, 2013. Petitioner's niece, Elena Girenko, had already pled. Son, Max, testifying for the government stated that he received fraudulently obtained Medicare monies in checks from petitioner and cousin Elena, had them cashed which he returned to them. (Tr. 1795-1797) He testified further that the loss actually suffered by Medicare as a result of the Bay Medical fraud was near $50 million dollars. (Tr. 1866) Significantly, he also testified that the prosecutors made it clear to him in no uncertain terms that in order for him to ever enter into a cooperation agreement he would have to get petitioner ("his own mother") to return to the United States. He agreed to it. (Tr.1906) Petitioner's guilty plea was not tied into Max's receiving his cooperation agreement.

29. On February 27, 2013, petitioner was interviewed in my presence, and in the presence of an interpreter, by USPO Amanda Donat for the purpose of the preparation of the Presentence Investigation Report (PSR). The PSR was issued May 6, 2013. On May 13, 2013 I met with petitioner, and interpreter Isabella Avrutin--who I engaged separately--to review the PSR. On May 19, 2013, I filed objections to portions of the PSR with the Probation Department.

30. On July 3, 2013, I received the Probation Department's Addendum to the PSR. I applied to the Court for an adjourned sentencing date, which was granted. (Doc. No. 578) On August 19, 2013, Ms. Avrutin and I met with petitioner at MCC. On September 4, 2013, (Doc. No. 657) I filed a sentencing memorandum, which referenced, among other things, Max's counsel's prior statement to the Court that he was told by the government that Max would have to get petitioner to return to the United States before he would be offered a cooperation agreement. (Id., p.2) Appended to my sentencing memorandum was an English translation of a letter to the Court from petitioner, acknowledging her commission of a crime and promising "never to commit a crime again." (Id., pp. 6,7)

31. On September 20, 2013 and October 8, 2013, Ms. Avrutin and I met with petitioner at MCC. On November 4, 2013, I filed a response to the government's sentencing submission. (Doc. No. 701) I requested that, among other things, the Court consider the "rare and unusual circumstances" of petitioner's situation in imposing sentence. On November 6, 2013, Ms. Avrutin and I met with petitioner at MCC.

32. Petitioner was sentenced on November 12, 2013. Although an official Court interpreter translated for the Court, both Mr. Bondar and Ms. Avrutin were present in the Courtroom. (Tr., November 12, 2013, pp. 3,4) On the issue of "loss", it was discussed that the Court had previously found that the intended loss was $77 million dollars and that the actual loss was over $50 million dollars. (Id., p. 6) Additionally, the Court referred to a letter (Id., p.4) received from Max, which,

among other things, states that petitioner returned to the United States to help him secure a cooperation agreement. Also, at the proceedings petitioner read a translated statement to the Court wherein she understood and accepted her guilt and was sorry that her actions led her to break the law. (p.30) The Court accepted the recommendation of the Probation Department and imposed a sentence of 15 years- which was below the Sentencing Guidelines. On November 22, 2013, Ms. Avrutin and I met with petitioner at MCC.

                                                                           S/
                                                            _____
                                                                     Michael Rosen

Sworn to before me this
25 day of January, 2017

     S/
----------------------------------------
Notary Public

RAHUL DEY
NOTARY PUBLIC STATE OF NEW YORK
NASSAU COUNTY
LIC. #01DE6147479
COMM. EXP. 07/07/2018