JPL:SCJ/WCC
F. # 210R01379

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

     - against -                                        Docket No. <u>10-CR-771 (NG)</u>

IRINA SHELIKHOVA,

         Defendant.

– – – – – – – – – – – – – – – – –X

<u>MEMORANDUM OF LAW IN OPPOSITON TO
SHELIKHOVA'S MOTION PURSUANT TO 28 U.S.C. § 2255</u>

ROBERT L. CAPERS
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Shannon C. Jones
William P. Campos
Assistant U.S. Attorneys
     (Of Counsel)

<u>Preliminary Statement</u>

The government respectfully submits this memorandum in response to Irina Shelikhova's <u>pro</u> <u>se</u> petition dated December 1, 2016, in which she challenges both her conviction and sentence, claiming she received ineffective assistance of counsel. The judgment was entered on November 22, 2013 by the United States District Court for the Eastern District of New York (Gershon, J.) following a December 18, 2012 guilty plea to a money laundering conspiracy charge, in violation of 18 U.S.C. § 1956(h). The Court sentenced Shelikhova to 180 months' incarceration, three years' supervised release, restitution in the amount of $50,943,386, and a special assessment of $100. Attached as Exhibit 1 and 2 are copies of the plea agreement and judgment. An order of forfeiture included a forfeiture money judgment of $38,241,545 plus forfeiture of certain seized assets and property.

Shelikhova moves to vacate her conviction. Specifically, Shelikhova argues that she is, in fact, innocent of all charges, her guilty plea was not knowing and voluntary because she was coerced into pleading guilty by counsel and she did not understand her plea agreement or the charges. In addition, Shelikhova argues counsel was ineffective at sentencing by failing to challenge the government's loss calculation under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines), her role in the offense and the restitution calculation. For the reasons set forth below, Shelikhova's petition is without merit and her motion should be dismissed in its entirety without an evidentiary hearing.

<u>Statement of Facts</u>[1]

I.      <u>Shelikhova's Background</u>

Irina Shelikhova was born in the Ukraine in 1962 and completed high school and some college in Ukraine. (Transcript of Plea ("Plea Tr.") at 5 (attached as Exhibit 3); Presentence Investigation Report ("PSR") ¶¶ 58, 70). In 1993, when she was 30 years old, Shelikhova immigrated to the United States. (PSR ¶ 63). From 2003 to 2005, Shelikhova worked in the billing department of Coney Island Rehabilitation, a medical office in Brooklyn which later changed its name to Flatlands Medical. (PSR ¶ 72). Those clinics were operated by Shelikhova, her family members and co-defendant Dr. Gustave Drivas. After leaving Coney Island/Flatlands, Shelikhova and Elena Girenko, Shelikhova's niece, opened a medical clinic incorporated under the names Bay Medical Care, PC, SVS Wellcare Medical PLLC and SZS Medical Care PLLC (collectively "Bay Medical" or the "clinic"), where the indicted conduct occurred. Girenko told law enforcement shortly after the clinic was shut down that the clinic was set up specifically to bill for fraudulent claims. (3500-EG-14.)

While Shelikhova's first language is Russian and her understanding of English may be limited, Shelikhova lived in the United States for over fifteen years prior to her arrest. There is no indication in the Presentence Investigation Report that Shelikhova has ever suffered from any diminished mental capacity or cognitive issues, nor has she argued that she suffers from any such problem.

---

[1] This statement of facts incorporates information that was contained in the Presentence Investigation Report, Shelikhova's plea and sentencing transcripts, the sentencing submissions that were before the Court at the time of sentencing, and the appellate record.

## II.    The Criminal Scheme

Over a five-year period, Shelikhova and her co-conspirators billed the Medicare program approximately $77.4 million and collected over $50 million in fraud proceeds.  To accomplish the fraud, Shelikhova directed a large-scale operation that involved the routine billing of Medicare for medical procedures not actually performed on patients, administering medically unnecessary procedures on patients in order to bill Medicare, directing non-medical professionals to fabricate medical charts, and the impersonation of at least one doctor.  Much of those ill-gotten funds were used to pay cash kickbacks to corrupt Medicare beneficiaries in order to entice their return to the clinic and buy their silence.[2]

At the height of the fraud, the clinic saw approximately 500 patients per day. United States v. Drivas et al. Trial Transcript[3] (hereinafter "Tr.") at 1431 (V. Tchernechenko).  In a 40-day period in 2010, the clinic paid approximately $400,000 to $500,000 in cash to the patients in the clinic's "kickback room," which was captured on videotape as part of the government's investigation.  Tr. at 919 (FBI SA Cohen).

## III.    Shelikhova's Role in the Scheme

After working with her niece (Elena Girenko), her son (Maksim Shelikhov) and co-defendant Dr. Gustave Drivas at two prior clinics in Brooklyn (Coney Island and

---

[2] In her motion papers, Shelikhova admits that Bay Medical's patients were paid illegal health care kickbacks, i.e. "referral fees," but argues that it was clinic worker Irina Barikyan's idea.  Def. Br. at 6.  Barikyan testified otherwise at co-defendant Drivas' trial.

[3] While Shelikhova and many of her co-defendants pleaded guilty, co-defendant Dr. Gustave Drivas, along with others, proceeded to trial, which commenced in March 2013 and concluded in April 2013.  References to the Trial Transcript ("Tr.") and government exhibits ("GX") are from that trial.  These references were also included in the government's sentencing submission filed on September 6, 2013.  DE 663.

Flatlands), in 2005, Shelikhova and Girenko opened Bay Medical. (Tr. at 1779-1780, 1787-1788, Maksim Shelikhov).   Shelikhova ran the business and the fraud.  As several former clinic employees and Shelikhova's son testified at the <u>Drivas</u> trial, Shelikhova hired employees and oversaw the clinic's operations and finances.   (Tr. at 989, Barikyan; Tr. at 1404-1406,Tchernechenko;Tr.at1490,Wahl;Tr.at1579, Zhamaryan; Tr. at 1787, Maksim Shelikhov).

Shelikhova did not seek to advertise her name in connection with the clinic and sought to hide behind others, including family members.   She used her estranged husband (Sergey Shelikhov) and her boyfriend (Sergey Zhamaryan) by having them put their names on Medicare and New York State Division of Corporations paperwork to avoid inserting her name on the documents.  (Tr. at 1793-1794, Maksim Shelikhov;  Tr. at 1586, Zhamaryan).   Shelikhova, however, put her name on the bank accounts.  Of the six clinic accounts that received significant sums from Medicare, Shelikhova was a signatory on four such accounts.   GX 11A (chart of Medicare payments to clinic bank accounts); GX40C (signature card for Bay Medical's Chase Bank account); GX 40B-i (signature card for SVS's Chase Bank account); GX 40A-i (signature card for SZS's Chase Bank account); GX 42A-i (signature card for SZS's TD Bank account).   Those four bank accounts alone received approximately $34.9 million from Medicare. GX 11B (list of clinic bank accounts scheduled by account).

Shelikhova also tasked her son, Maksim Shelikhov, with managing the money laundering operation of converting the fraudulently obtained Medicare funds into cash to pay the Medicare beneficiaries.  Her son first started by driving to Pennsylvania to exchange clinic checks, often in the amount of $15,00 to $40,000, for cash, which he would hand to

Shelikhova or Girenko. (Tr. at 1794-1797, Maksim Shelikhov). When the Pennsylvania check casher could no longer provide the service, Maksim Shelikhov used the services of others. He continued to hand Shelikhova or Girenko the cash. (Tr. at 1799, 1801-1812, Maksim Shelikhov). Shelikhova would dispense the cash to the clinic workers who paid the patients in the kickback room. (Tr. at 1118, Barikyan).

In addition, Shelikhova and her family members spent lavishly on homes, cars, jewelry, luxury goods and trips. As seen at the <u>Drivas</u> trial, Shelikhova used Medicare's money to pay Vladimir Kornev and V&V Construction to renovate her personal residences on Staten Island and on Emmons Avenue in Brooklyn. (Tr. at 1311, Barikyan). Girenko purchased a Bentley vehicle with money given to her by the defendant. <u>See</u> 3500-EG-15. Shelikhova gave Maksim Shelikhov a $280,000 Aston Martin vehicle for his 25th birthday (Tr. at 1867-1868, Maksim Shelikhov). Through the proceeds of the fraud that she gave him, Maksim Shelikhov purchased, among other things: a $115,000 Range Rover, a $90,000 BMW and a $80,000 Mercedes SUV (Tr. at 1869, Maksim Shelikhov); numerous luxury watches (including a $42,000 Jaeger-LeCoultre; a $32,000 Breguet; a $31,000 Audemars Piguet and a $19,000 Hublot; Tr. at 1873-1874, Maksim Shelikhov); a $100,000 engagement ring for his fiancée; and many luxury clothing items, including $30,000 in shoes alone. (Tr. at 1874-1876, Maksim Shelikhov). As for Shelikhova's boyfriend, Sergey Zhamaryan, she gave him a high paying job at the clinic; co-ownership of 8686 Bay Parkway, Apartment 2C; took him on trips to Miami; and gave him luxury items including a Zenith watch worth $20,000; a gold chain worth $10,000; a Breitling watch worth $9,000; and a gold chain and a cross worth $6,000. (Tr. at 1713-1714, 1726; Zhamaryan). As listed in the plea agreement, the government also seized numerous bank accounts belonging to the clinic, Shelikhova and

Girenko which contained, in total, over $3 million at the time of the initial arrests. Exhibit 1 at 7-8.

IV. <u>Shelikhova's Flight</u>

On or about July 14, 2010, a search warrant for Bay Medical's office and arrest warrants for eight individuals (including Drivas, Shelikhova and Girenko) were issued. On Friday, July 16, 2010, law enforcement agents executed the search and arrested everyone for whom they had a warrant except for Shelikhova. Shelikhova could not be located. PSR ¶30. The government was contacted by Shelikhova's retained defense counsel Michael Rosen, who reported that she would surrender to authorities at the courthouse the following Monday, July 19, 2010. Instead, on Sunday, July 18, 2010, Shelikhova went to John F. Kennedy Airport, purchased an airplane ticket and flew to the Ukraine. Maksim Shelikhov also flew to the Ukraine that same weekend.

On October 8, 2010, the original indictment in this case was unsealed, except as to Shelikhova and Maksim Shelikhov. The indictment named the original eight defendants that were in the complaint and added three additional defendants, including Maksim Shelikhov. Approximately one year later, on November 2, 2011, a superseding indictment was unsealed that added money laundering charges against Shelikhova, Maksim Shelikhov and five new defendants not previously charged. Because Shelikhova and Maksim Shelikhov had not yet been arrested, the superseding indictment remained sealed as to them.

After Maksim Shelikhov attempted to enter Canada on or about November 12, 2011, he was placed on a flight to New York where agents arrested him upon arrival. Despite multiple attempts to be released on bond, which included an appeal to the Second

Circuit (DE 179), Maksim Shelikhov was held in custody.  On June 15, 2012, Shelikhova voluntarily returned to the United States, almost two years after the warrant for her arrest was issued.

V.    The Guilty Plea

On or about December 18, 2012, Shelikhova pleaded guilty pursuant to a plea agreement.  See Exhibit 1.  In the superseding indictment, Shelikhova was charged with one count each of health care fraud conspiracy (Count 1 – 18 U.S.C. § 1349); kickback conspiracy (Count 2 - 18 U.S.C. § 371); health care fraud (Count 3 – 18 U.S.C. § 1347) and money laundering conspiracy (Count 4 – 18 U.S.C. § 1956(h)).  She was also charged with six counts of substantive money laundering (Counts 5, 7, 9, 11, 13 and 16 - 18 U.S.C. § 1956(h)).  The government's plea offer allowed Shelikhova to plead guilty to one count, Count 4, the money laundering conspiracy charge, which capped the maximum sentence at 240 months.  The government's estimate of Shelikhova's applicable Guidelines sentence, had she proceeded to trial, was 292 to 365 months (level 40).  By pleading guilty to only Count 4, the government's plea agreement stated that the bottom of the applicable Guidelines sentence was lowered to 235 months and the top was capped by statute to 240 months.[4]

At her plea allocution, Shelikhova was represented by Mr. Rosen, who had the assistance of Russian-speaking defense attorney Robert Bondar and Russian interpreter Isabelle Avrutin.  Shelikhova stated that she had "more than enough" time to make the decision whether to plead guilty (Plea Tr. at 7), and she was satisfied with Mr. Rosen as her counsel (Id. at 7-8).  Shelikhova was also warned about all the rights she would be giving up

by pleading guilty, including the right to go to trial, and to appeal any sentence less than 240 months.  Id. at 20, 22-23.  Shelikhova entered her plea of guilty and stated that she was doing so voluntarily and of her own free will.  Id.  Shelikhova also denied that there were any other promises, other than those contained in the written plea agreement, that caused her to plead guilty.  Id. at 23.

VI.     Sentencing

        The Probation Department's Guidelines calculation contained in the Presentence Investigation Report adopted the government's loss amount, but contained a slightly different Guidelines calculation than that contained in the plea agreement.  The Probation Department determined that the total offense level was a level 37, with a corresponding range of imprisonment of 210 to 240 months.  Sentencing Tr. at 20 (attached as Exhibit 4).   The government did not object to that calculation.   Id.  In anticipation of sentencing, defense counsel submitted two sentencing letters on behalf of Shelikhova.  DE 657, 701, Sentencing Tr. at 5.  Both letters requested a non-Guidelines sentence and emphasized that the Court should consider as a factor in Shelikhova's benefit that Shelikhova left the "safe haven" of the Ukraine in order to assist her son Maksim Shelikhov.   Defense counsel also pointed to Shelikhova's health issues, her concerns for her elderly mother and son, sentences imposed in other white collar cases and provided several character references.  In addition, defense counsel submitted a letter Shelikhova wrote, which expressed her remorse and shame at what she had done.  Maksim Shelikhov also submitted a letter on his mother's behalf.  Sentencing Tr. at 5.  Shelikhova had previously stipulated to the forfeiture and restitution amounts in her plea agreement.

At the sentencing hearing, the Court noted that the objections defense counsel raised with respect to the Probation Department's Guidelines calculation, with the possible exception of the loss calculation, were "immaterial" to the Guidelines calculation and sentencing, which included several of the issues Shelikhova raised in the instant motion. <u>Id</u>. at 6, 10-11. Regarding the loss amount, defense counsel noted that he was aware of the Court's prior sentences in this case where the Court had previously found that the intended loss was $77 million and the actual loss was over $50 million. <u>Id</u>. at 6. Mr. Rosen raised the point that the actual loss might be under $50 million, if the fair market value of legitimate services rendered to the Medicare beneficiaries was deducted, or set off, from the actual loss amount. <u>Id</u>. at 7, 13. However, Mr. Rosen stated he did not want have a <u>Fatico</u> hearing on this issue, and he understood the Court had already heard and rejected similar arguments regarding loss at the sentencing hearing for Dr. Drivas. <u>Id</u>. at 9, 11-12. The government argued that since all the services provided to the beneficiaries were induced by kickbacks, they were all considered fraudulent. <u>Id</u>. at 14. The Court also took a short recess to consider her prior findings with respect to this issue. <u>Id</u>. Ultimately, the Court found that defense counsel would have had to show that more than $27 million in legitimate expenses were billed to Medicare to get below the $50 million mark for purposes of the Guidelines calculation, which seemed unlikely based on the facts she knew about the case. <u>Id</u>. at 16. Defense counsel responded to the Court's statements, and did not concede that no legitimate services were provided by the clinic. <u>Id</u>. at 17-18. Shelikhova also addressed the Court in person and stated that she "understood and accept my guilt." <u>Id</u>. at 30.

Ultimately, the Court agreed with the government's arguments regarding the appropriate loss amount, and determined that the applicable Guidelines offense level was 37,

with a range of imprisonment of 210 to 240 months, then, after considering all the arguments, the defendant's statements and the factors required by 18 U.S.C. § 3553, imposed a below Guidelines sentence of 180 months.  Id. at 20-21.

VII.     The Direct Appeal

Shelikhova appealed her sentence to the Second Circuit Court of Appeals. The government moved to dismiss the appeal based on the appeal waiver contained in the plea agreement.  Appointed counsel filed a brief pursuant to Anders v. California, 386 U.S. 736 (1967), and concluded that there were no non-frivolous issues to raise on appeal. Shelikhova also submitted a pro se brief arguing that the plea was not knowing and voluntary because of the following: (1) her plea was induced by "mental coercion;" (2) she did not understand the offense conduct; (3) she did not understand that she was being held responsible for an intended loss of $77 million; (4) the language barrier prevented her from understanding the plea proceedings; and (5) she was not fully advised of all the elements of the money laundering charge.   13-AP-4594, Doc. 80 at 2.   Regarding her claim that she pleaded under duress, Shelikhova argued that her plea was invalid because of the "prosecutorial misconduct" relating to the government's failure to offer Maksim Shelikhov a cooperation agreement unless he could persuade Shelikhova to return to the United States. Shelikhova also, incorrectly, claimed that Maksim Shelikhov's ability to obtain a cooperation agreement was contingent on her pleading guilty.  Id. at 6-7.  According to Shelikhova, Maksim Shelikhov told Shelikhova that he would serve a lengthy sentence, "possibly life," if she did not return.  Id.  Shelikhova told the Second Circuit that she returned and pleaded guilty to "save the life of my son."  Id.

After review of the <u>Anders</u> submission, Shelikhova's <u>pro se</u> response and the

government's motion to dismiss, the Second Circuit concluded that Shelikhova's guilty plea

was valid, the waiver of her appellate rights was knowing and voluntary, and the rest of

Shelikhova's arguments were "without merit."  DE 779 (Mandate).

Argument

I.    Applicable Law on Appellate Waivers and Ineffectiveness Claims

"Waivers of the right to appeal a sentence are presumptively enforceable."

<u>United States v. Riggi</u>, 649 F.3d 143, 147 (2d Cir. 2011) (quoting <u>United States v. Arevalo</u>,

628 F.3d 93, 98 (2d Cir. 2010)).  "Knowing and voluntary appellate waivers included in plea

agreements must be enforced because, if they are not, the covenant not to appeal becomes

meaningless and would cease to have value as a bargaining chip in the hands of defendants."

<u>United States v. Granik</u>, 386 F.3d 404, 412 (2d Cir. 2004) (internal quotation marks omitted).

As a result, this Court has "repeatedly upheld the validity of [appeal] waivers" if they are

"knowingly, voluntarily, and competently provided by the defendant."  <u>United States v.</u>

<u>Gomez-Perez</u>, 215 F.3d 315, 318 (2d Cir. 2000).[5]

This Court has held such appellate waivers to be unenforceable "only in very

limited situations, such as when the waiver was not made knowingly, voluntarily, and

competently, when the sentence was imposed based on constitutionally impermissible

factors, such as ethnic, racial or other prohibited biases, when the government breached the

plea agreement, or when the sentencing court failed to enunciate any rationale for the

---

[5]    This Court has repeatedly articulated the importance of enforcing appellate waivers in
preserving the utility of the plea negotiation process between the government and a
defendant.  <u>See</u> <u>United States v. Morgan</u>, 406 F.3d 135, 137 (2d Cir. 2005); <u>United States v.</u>
<u>Rosa</u>, 123 F.3d 94, 97-98 (2d Cir. 1997).

defendant's sentence." Arevalo, 628 F.3d at 98 (citations and internal quotation marks omitted); see also Gomez-Perez, 215 F.3d at 319 (noting that the "exceptions to the presumption of the enforceability of a waiver . . . occupy a very circumscribed area of our jurisprudence").

Appellate waivers will generally not bar claims that the plea agreement was itself a product of the ineffective assistance of counsel. See United States v. Reddy, 527 F. App'x 81, 82 (2d Cir. 2013) (citing United States v. Monzon, 359 F.3d 110, 118-19 (2d Cir. 2004)). This is because, "[i]n challenging the ineffectiveness of counsel in connection with a plea agreement, a defendant is challenging the constitutionality of the process by which he waived [his right to appeal]." Parisi v. United States, 529 F.3d 134, 138 (2d Cir. 2008) (alterations in original; internal quotations omitted); see also United States v. Hernandez, 242 F.3d 110, 113-14 (2d Cir. 2001) ("The rationale [in permitting such claims to proceed] is that 'the very product of the alleged ineffectiveness' cannot fairly be used to bar a claim of ineffective assistance of counsel."). However, an appellant must "convincingly show[] that the waiver itself was the result of ineffective assistance." Reddy, 527 F. App'x at 82.

"To evaluate a claim that a guilty plea was involuntary or unknowing due to ineffective assistance of counsel, [this Court] use[s] the familiar framework" established in Strickland v. Washington, 466 U.S. 668 (1984). Hernandez, 242 F.3d at 112. A defendant must: (1) demonstrate that her counsel's performance "fell below an objective standard of reasonableness" in light of "prevailing professional norms" and (2) "affirmatively prove prejudice" arising from counsel's allegedly deficient representation, in other words establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694.

"With respect to the first prong of this analysis, a defendant's burden to show that [her] counsel's performance was deficient is a 'heavy one' because of the 'presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" United States v. Vailette, 578 F. App'x 32, 33 (2d Cir. 2014) (quoting Harrington v. United States, 689 F.3d 124, 129 (2d Cir. 2012)).  Where the defendant claims that counsel's alleged errors caused her to enter a guilty plea that was not knowing and voluntary, the prejudice prong of the Strickland test requires the defendant to show that "counsel's constitutionally ineffective performance affected the outcome of the plea process.  In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, she would not have pleaded guilty and would have insisted on going to trial."  Hill v. Lockhart, 474 U.S. 52, 59 (1985).

Finally, under 28 U.S.C. § 2255, a defendant may not employ a habeas petition to relitigate questions that have been raised and considered on direct appeal.  See United States v. Perez, 129 F.3d 255, 260 (2d Cir. 1997).  Nor may a defendant attempt to relitigate questions adversely decided on appeal by rearticulating them as "ineffective assistance" claims.  Slevin v. United States, 98 Civ. 0904 (PKL), 1999 WL 549010, at *4 (S.D.N.Y. July 28, 1999) ("Petitioner cannot in a § 2255 motion reargue the substance of claims the Court of Appeals has already rejected simply by introducing those claims with "Counsel failed to argue that....").

II.    Argument:  Shelikhova Is Bound by the Appeal Waiver

     a.   Counsel Was Not Ineffective With Respect to the Guilty Plea

Shelikhova complains that her counsel was ineffective with respect to her decision to enter into a guilty plea, however, she fails to point to anything her lawyer did or

said that was unreasonable.  In order to render effective assistance of counsel with respect to a guilty plea, counsel should inform the defendant about any terms of the plea agreement, "and should usually inform the defendant of the strengths and weaknesses of the case against [her], as well as the alternative sentences to which [she] will likely be exposed" if the plea offer is rejected.  Purdy v. United States, 208 F. 3d 41, 45 (2d Cir. 2000).  Counsel should not coerce the client into either accepting or rejecting a plea offer, but can provide guidance as to whether a client should take a plea offer.  See id. at 48.

> Counsel rendering advice in this critical area may take into account, among other factors, the defendant's chances of prevailing at trial, the likely disparity in sentencing after a full trial as compared to a guilty plea (whether or not accompanied by an agreement with the government), whether the defendant has maintained [her] innocence, and the defendant's comprehension of the various factors that will inform [her] plea decision.

Id.  Here, there is no indication that defense counsel was ineffective with respect to advising Shelikhova regarding the government's plea offer.

In this case, Shelikhova voluntarily returned to the United States on June 15, 2012, after being a fugitive for over two years, the government's written plea offer to Shelikhova was sent to defense counsel on August 22, 2012, and in his affidavit filed on January 26, 2017 ("Rosen Aff.", DE 856), Mr. Rosen stated that he met with Shelikhova a number of times between August 27, 2012 and December 18, 2012.  Rosen Aff. at 4.  According to defense counsel, Shelikhova "never stated that she wished to go to trial, but rather that she wanted to plea[d] guilty because she was guilty."  Rosen Aff. at 6.  Shelikhova fails to point to any inaccurate statements of law or misrepresentations of fact made by defense counsel to her about the terms of her plea agreement, her sentencing exposure or the

strength of the government's case which induced her to plead guilty. Shelikhova was fully advised of her rights and the possible consequences of her plea (Plea Tr. 11-23), and, in fact, received a sentence lower than one contemplated by the government's Guidelines estimate.

Shelikhova makes clear that she voluntarily returned to the United States, after conferring with Mr. Rosen, with the full understanding and expectation that Maksim Shelikhov, her son and co-conspirator, would enter into a cooperation agreement with the government, which she chose to facilitate. At the sentencing hearing, Mr. Rosen told the Court that he fully advised Shelikhova that if she left the Ukraine and came back to the United States, she would be immediately arrested, imprisoned, deported and face huge financial consequences. Sentencing Tr. at 24. Shelikhova falsely asserts that Maksim Shelikhov's ability to obtain a cooperation agreement also was predicated on her guilty plea, which is belied by the record and denied by defense counsel. Maksim Shelikhov pleaded guilty to a cooperation agreement on or about November 8, 2012. DE 371. Shelikhova, along with her co-defendants who had not pleaded guilty, was present at status conferences on both November 14, 2012 and November 28, 2012. DE 376, 414. Maksim Shelikhov, who was in custody, was not present because he had already pleaded guilty. At the November 28, 2012 status conference, a trial date of January 22, 2013 was set,[6] and the next court appearance was set for December 18, 2012. DE 414. Shelikhova pleaded guilty on December 18, 2012.

It is clear from the record that defense counsel conveyed the written plea offer to Shelikhova and discussed the terms of the plea offer with her, with the aid of a Russian

---

[6] The trial date was later adjourned, and jury selection did not commence until February 25, 2013.

interpreter. In addition, the written plea agreement set forth the minimum and maximum sentence, the government's estimate of the applicable Guidelines range, the restitution amount, the forfeiture provisions, and the appeal waiver. The Guidelines estimate in the plea agreement was unilaterally provided by the government pursuant to this Court's decision in United States v. Pimentel, 932 F.2d 1029, 1034 (2d Cir. 1991), which "invite[d]" the government voluntarily to provide such non-binding estimates to help "ensure that guilty pleas . . . represent intelligent choices by defendants." Defense counsel did not stipulate in the plea agreement to the government's Guidelines estimate. The plea agreement left Shelikhova free to argue for a different Guidelines calculation at sentencing. To the extent that Shelikhova's complaint is that counsel unreasonably failed to challenge the Guidelines calculation at sentencing, any such alleged error could not retroactively have rendered Shelikhova's guilty plea involuntary.

Furthermore, the Court also reviewed the relevant portions of the plea agreement with Shelikhova at the plea proceeding on December 18, 2012. See Plea Tr. at 11-20. At all points, when questioned, Shelikhova stated that she understood and agreed to the terms of the plea agreement that she signed. Id. Shelikhova was also warned about all the rights she would be giving up by pleading guilty, including the right to go to trial. Id. at 22-23. Shelikhova entered her plea of guilty and stated that she was doing so voluntarily and of her own free will. Id. In addition, contrary to her representations in the instant motion, Shelikhova denied that there were any other promises, such a promise relating to her son's cooperation, that caused her to plead guilty. Id. at 23.

Shelikhova has set forth no evidence, other than her self-serving, conclusory allegations, that she was coerced into pleading guilty. Moreover, the plea allocution

indicates that Shelikhova's guilty plea was knowing and voluntary. See, e.g., Hernandez, 242 F.3d at 112-13 (stating that a defendant's sworn statements at plea allocution carry a strong presumption of verity which cannot be overcome by conclusory allegations at later date); United States v. Juncal, 245 F.3d 166, 171 (2d Cir.2001) (noting that testimony at a plea allocution "carries such a strong presumption of accuracy that a district court does not, absent a substantial reason to find otherwise, abuse its discretion in discrediting later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made").

Considering all the options available to Shelikhova in December 2012, which included: (1) pleading to the government's plea offer; (2) pleading guilty to all ten counts in the indictment, which would not have capped the potential sentence to 240 months; (3) or proceeding to trial with Dr. Drivas and the other remaining co-defendants, it was clearly not ineffective for counsel to advise the defendant to accept the plea offer. Had Shelikhova proceeded to trial, she surely would have been convicted, along with Dr. Drivas. The evidence against Shelikhova was overwhelming. In addition to bank records, Medicare records, patient files, consensual recordings with undercover Medicare beneficiaries, the video-taped kickback payments, every trial witness who had worked in the clinic, which included Maksim Shelikhov, Sergey Zhamaryan, Dr. Jonathan Wahl, Veronykha Tchernytchenko, and Irina Barikyan, implicated Shelikhova and Girenko as coordinating and directing the fraud, with Shelikhova as the ultimate leader.

   b.   Counsel Was Not Ineffective With Respect to Sentencing

Shelikhova next argues that counsel was ineffective at sentencing by not seeking a Fatico hearing and effectively raising factual objections to the loss calculation and

Shelikhova's true role in the offense. As discussed above, Shelikhova knowingly and voluntarily pled guilty pursuant to a plea agreement in which she agreed not to appeal or otherwise challenge her conviction or sentence in the event that she received a sentence of 240 months of imprisonment or below. Because she was sentenced to 180 months of imprisonment, Shelikhova is barred from challenging any purported error in the district court's calculation of her range of imprisonment under the Sentencing Guidelines and this Court should decline to entertain her claim.

The law in this circuit is clear that "in no circumstance may a defendant, who has secured the benefits of a plea agreement and knowingly and voluntarily waived the right to appeal a certain sentence, then appeal the merits of a sentence conforming to the agreement." United States v. Pearson, 570 F.3d 480, 485 (2d Cir. 2009) (per curiam) (alterations and internal quotation marks omitted); see also Riggi, 649 F.3d at 147 (holding that even "meaningful errors are insufficient to void an appeal waiver" where the sentence neither is based on unconstitutional factors nor represents an abdication of judicial responsibility); United States v. Buissereth, 638 F.3d 114, 117 (2d Cir. 2011); Monzon, 359 F.3d at 118-19.

Further, to the extent that Shelikhova contends that counsel was ineffective at sentencing, that claim is also precluded by the appellate waiver in the plea agreement. See United States v. Djelevic, 161 F.3d 104, 107 (2d Cir. 1998) (per curiam) ("[Defendant] claims that his waiver should not bar consideration of his appeal because counsel was ineffective not at the time of the plea, but at sentencing. We emphatically reject this contention."); see also United States v. Williams, 448 F. App'x 156 (2d Cir. 2012).

Because, as discussed earlier, Shelikhova knowingly and voluntarily waived her right to appeal a sentence of 180 months or below, the appellate waiver in Shelikhova's plea agreement bars consideration of her claims of procedural error at the sentencing hearing.

Furthermore, defense counsel did not act unreasonably at the sentencing by failing to request a <u>Fatico</u> hearing on the loss amounts or raise the arguments contained in the instant motion. By the time that Shelikhova was sentenced on November 12, 2013, the Court had conducted a six-week trial of the co-defendants, had sentenced six of Shelikhova's co-defendants, including Dr. Drivas, who received a sentence of 151 months, and was fully familiar with the government's case, the nature of the fraud, and Shelkihova's role in the scheme. Furthermore, according to the applicable Guidelines manual, it made no difference in the Guidelines calculation as long as the relevant loss figure fell between $50 and $100 million. A defense strategy that sought to emphasize a defendant's redeeming qualities and acceptance of responsibility at sentencing instead of fighting over the loss amount, which the Court had previously concluded was appropriate when sentencing co-defendants, was not an objectively unreasonable strategy, and did not amount to ineffective assistance of counsel. Furthermore, there is no indication that Shelikhova would have received a lower sentence had her counsel raised or further pursued any of the arguments that she sets forth in her papers.

c.    No evidentiary hearing is warranted

This Court should deny the petition without an evidentiary hearing. A petitioner must raise a "plausible" claim to warrant an evidentiary hearing on a § 2255 motion. <u>Puglisi v. United States</u>, 586 F.3d 209, 213 (2d Cir. 2009). Objective evidence must supplement a petitioner's statements to survive dismissal. <u>See</u> <u>Raysor v. United States</u>, 647

F.3d 491, 495 (2d Cir. 2011) (finding objective evidence for claim that a petitioner, who received multiple life terms after proceeding to trial, would have accepted a 29-year plea agreement); see also Blake v. United States, No. 05-CV-3214 (JS) (E.D.N.Y. July 6, 2009) (order granting evidentiary hearing where a petitioner who received a higher sentence than a more culpable accomplice claimed ineffective assistance of counsel).

A district court judge also has discretion to determine a hearing's scope and nature. Raysor, 647 F.3d at 494. Where the judge presiding over the § 2255 motion also presided over the underlying proceedings, "a less-than full-fledged evidentiary hearing may permissibly dispose of claims where the credibility assessment would inevitably be adverse to Shelikhova." Puglisi, 586 F.3d at 214. The judge may take an "intermediate" step, requesting the production of additional letters, documentary evidence, or affidavits without holding a full testimonial hearing. Chang v. United States, 250 F.3d 79, 86-87 (2d Cir. 2001). Where a petitioner and trial counsel's live testimony would add little to written submissions, this "middle road" avoids delay and unnecessary expenditure of judicial resources. Id.; see also Machibroda v. United States, 368 U.S. 487, 495-96 (1962).

As established earlier, none of Shelikhova's claims warrant further consideration. Shelikhova's ineffective assistance of counsel claims lack sufficient specificity and do not meet Strickland's rigorous test. In sum, the court should deny Shelikhova's petition without an evidentiary hearing.

<u>Conclusion</u>

For the reasons set forth above, the petition should be denied.

Dated:　　Brooklyn, New York
　　　　　March 7, 2017

ROBERT L. CAPERS
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


By:　　/s/ Shannon C. Jones
　　　　Shannon C. Jones
　　　　William P. Campos
　　　　Assistant United States Attorneys
　　　　(718) 254-6379 (S. Jones)