1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      : 10-CR-00771(NG)
                               :
                               :
                               :
      -against-                : United States Courthouse
                               : Brooklyn, New York
                               :
                               :
                               : Tuesday, November 12, 2013
IRINA SHELIKHOVA,              : 2:30 p.m.
                               :
          Defendant.           :
                               :

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE NINA GERSHON
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S:

For the Government:  LORETTA E. LYNCH, ESQ.
                        United States Attorney
                        Eastern District of New York
                          271 Cadman Plaza East
                          Brooklyn, New York 11201
                     BY:  SARAH M. HALL, ESQ.
                          WILLIAM GULLOTTA, ESQ.
                          Assistant United States Attorney

For the Defendant:   LAW OFFICE OF MICHAEL ROSEN
                        61 Broadway
                        Suite 1105
                        New York, New York 10006
                     BY:MICHAEL ROSEN, ESQ.
                        MICHAEL BONNER, ESQ.


Court Reporter:      VICTORIA A. TORRES BUTLER, CRR
                     225 Cadman Plaza East
                     Brooklyn, New York 11201
                     **VButlerRPR@aol.com**
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.

```
                        Proceedings                      2
```

1          (In open court.)

2          (Judge NINA GERSHON enters the courtroom.)

3          THE COURTROOM DEPUTY:  All rise.

4          United States District Court for the Eastern

5     District of New York is now in session.  The Honorable Nina

6     Gershon is now presiding.

7          THE COURT:  Good afternoon.

8          MR. ROSEN:  Good afternoon, Your Honor.

9          (Defendant enters the courtroom.)

10         THE COURTROOM DEPUTY:  Criminal cause for

11    sentencing, United States versus Irina Shelikhova.

12         May I have the appearances for the Government,

13    please.

14         MS. HALL:  Good afternoon, Your Honor.  Sarah Hall

15    and William Gullotta of the United States.

16         THE COURT:  I'm sorry, Sarah Hall and who?

17         MS. HALL:  And William Gullotta for the

18    United States.

19         MR. GULLOTTA:  Good afternoon, Your Honor.

20         THE COURTROOM DEPUTY:  From Probation.

21         USPO DONAT:  Amanda Donat, Probation.

22         THE COURTROOM DEPUTY:  For the defendant.

23         MR. ROSEN:  Michael Rosen for Mrs. Shelikhova, good

24    afternoon.

25         THE COURTROOM DEPUTY:  And the interpreter, can I

```
                      Proceedings                      3
```

1    have your appearance, please.

2              THE RUSSIAN INTERPRETER:  Yana Agoureev, Russian

3    interpreter.

4              (Official interpreter sworn.)

5              THE COURTROOM DEPUTY:  Thank you.

6              Everyone please be seated.

7              THE COURT:  Did everyone receive the

8    Probation Department's recommendation?

9              MR. ROSEN:  Yes, Your Honor.

10             MS. HALL:  Yes, Your Honor.

11             THE COURT:  Ms. Shelikhova, did you read the

12   Pre-Sentence Report and the addendum to the Pre-Sentence

13   Report?

14             THE DEFENDANT:  (In English)  Yes.

15             THE COURT:  Was it translated for you into Russian?

16             THE DEFENDANT:  Yes, it was.

17             THE COURT:  Orally?  Or in writing?

18             THE DEFENDANT:  Orally.

19             THE COURT:  Okay.  By whom?

20             THE DEFENDANT:  The lawyer came for a visit with an

21   interpreter and it was translated to me during that time.

22             THE COURT:  Is that right, Mr. Rosen?

23             MR. ROSEN:  Yes, Your Honor.  The interpreter was

24   Isabella -- are you in court -- Isabella is the interpreter.

25             THE COURT:  The interpreter who's frequently here,

Proceedings                                    4

1    has been in this case?

2           MR. ROSEN:  Exactly, and who has been at the MCC

3    with me many times with Mrs. Shelikhova.

4           THE COURT:  Okay.  All right.  Victor, you have her,

5    you know her last name?

6           THE COURTROOM DEPUTY:  Isabella is also here in the

7    audience.

8           THE COURT:  She is here?

9           All right.  Thank you.  May we have your last name

10   for the record, please?

11          THE RUSSIAN INTERPRETER:  Yes, Avrutim --

12   A-V-R-U-T-I-M.

13          THE COURT:  Thank you.

14          Then let me put on the record the other documents,

15   in addition to the Pre-Sentence Report and the addendum to the

16   Pre-Sentence Report, which I have reviewed.

17          I have the Government's letter of September 6th,

18   2013.

19          Mr. Rosen's letter of September 5th.

20          Mr. Rosen's letter of November 4th.

21          On September 9th, I also received via Michael

22   Shapiro, counsel for the defendant, Maksim Shelikhova, a

23   letter on behalf of his mother, the defendant here today.

24          Actually, it says it was cc'd to Ms. Hall, but

25   Mr. Rosen, I don't know whether you received it.

VB        OCR        CRR

Proceedings                                                5

1           MR. ROSEN:  I did, Your Honor.

2           THE COURT:  All right.

3           All right.  Were there any other documents that

4    should be in my file?

5           MR. ROSEN:  None that I've submitted, Judge.

6           MS. HALL:  No, Your Honor.

7           THE COURT:  Okay.

8           And the preliminary order of forfeiture was already

9    signed; is that correct?

10          MR. GULLOTTA:  Was it signed?  I know it was

11   submitted on September 5th.

12          THE COURTROOM DEPUTY:  It has been filed, Judge.

13   Your order has been signed and filed.

14          THE COURT:  I haven't signed it yet, are you sure?

15          THE COURTROOM DEPUTY:  You have signed it.

16          THE COURT:  I have signed it?

17          THE COURTROOM DEPUTY:  I'll double-check.

18          THE COURT:  I have an unsigned copy in my file.

19   This would have been the preliminary order of forfeiture.

20          Counsel, did you receive the signed copy and was it

21   on ECF?

22          MR. GULLOTTA:  I don't recall seeing it.

23          MR. ROSEN:  No, Your Honor.

24          THE COURT:  You don't think so?  Okay.

25          THE COURTROOM DEPUTY:  No, Judge.

Proceedings                                             6

1          THE COURT:  All right.  Then I've signed it as of

2    today.  And that was an order of forfeiture in the agreed-upon

3    amount of $38,241,545.

4          I should say that the letter from Mr. Rosen also

5    includes a letter from the defendant herself, as well as other

6    individuals who wrote in support of the defendant.

7          Let's take up now the objections that the defense

8    has made to the calculations by the Probation Department.

9          Some of the objections seem to relate to issues that

10   really would be immaterial to the sentencing and unless the

11   defense wishes me to pursue them, I won't refer to them.  The

12   one that might affect the sentencing relates to the loss.

13         MR. ROSEN:  Yes, Your Honor.

14         THE COURT:  Did you have anything further that

15   anybody wanted to say on loss?

16         MR. ROSEN:  On loss, Your Honor, I'm aware of

17   Your Honor's finding in the prior sentences in this case.  I

18   think Your Honor found that the intended loss was $77 million.

19         THE COURT:  Right.  And the actual loss was over 50

20   million.

21         MR. ROSEN:  What I just wish to address on the, I

22   guess, the actual loss, you know, I begin with the complaint

23   which is document number one, ECF Document 1, where it says in

24   the complaint that the clinics received 46,887,000 and I then

25   just call Your Honor's attention to document 663, which is the

Proceedings                                                        7

1   Government's letter that you referred to earlier.  I think

2   it's the September 6th letter, where they assert that

3   Mrs. Shelikhova profited $38,241,000.

4            THE COURT:  Well, she agreed to that forfeiture

5   amount, has she not?

6            MR. ROSEN:  Yes, I'm not quibbling with that.

7            THE COURT:  All right.

8            MR. ROSEN:  I'm trying get to the point that in the

9   cooperating witness's plea, which is Document 391, pages 21 to

10  22, through counsel, the witness himself -- the cooperating

11  witness himself, Mr. Shelikhova, Maksim Shelikhova, questions

12  the loss being in excess of 50 million.  That's where I just

13  pick up the differences.

14           I understand Your Honor's rulings and I don't intend

15  and I don't have proof to counter the 50 million mark.  I just

16  call to Your Honor's attention the differences throughout this

17  litigation on who says what loss, but as I understand it,

18  Judge Gershon, it's what you say that counts and, obviously,

19  you've already made this determination.  But I just want to

20  point out that there seems to be differences along the way.

21           The other thing, and I think that was already

22  litigated before Your Honor.

23           THE COURT:  Well, let's deal with loss first, okay,

24  and then we'll go to the next.

25           Does this relate to loss?

Proceedings                                              8

1          MR. ROSEN:  It does, Judge.

2          THE COURT:  Okay.

3          MR. ROSEN:  And I think that you also determined

4    during Dr. Drivas's sentence, I again would like to put forth

5    the application note 3(e) of guideline 2(b)(1), 1(b)(1)(k)

6    which once you get through some of the verbiage recognizes a

7    loss offset by the fair market value of services that are

8    rendered to the victim, and the victim here, I can see, is

9    Medicare, and what I propose is that the Government has never,

10   to my knowledge and I wasn't part of the trial, obviously, but

11   I have never seen where the Government maintains and can prove

12   that everything that happened in five years at these clinics

13   was a phantom, was a fiction.  Because if services were is

14   rendered, and I know Your Honor has heard this before and has

15   ruled, but I think it's my obligation to reinvent it, if I

16   can, that if services were rendered to eligible beneficiaries

17   and those services were needed, then I think the guideline --

18   again, 2(b)(1), 1(b)(1)(k), application note 3(e), recognizes

19   that there recognize that is there should be an offset.

20          And I submit from what I know, and I'm not the last

21   word on this, again, you are, that there were services

22   rendered that were needed to people who were eligible.  So, I

23   can't accept based on what I've been immersed in this thing

24   for all these, I guess, months, years now, that everything

25   that happened at these three locations didn't happen.  So,

Proceedings                                              9

1    again, I voice my objection based on that.

2              There is a case called United States versus Byors,

3    B-Y-O-R-S, at 386 F.3d 222 Second Circuit 2009, that seems to

4    agree with that proposition that there should be an offset.

5    And unless the Government will again represent, which I don't

6    know if they ever have, but represent that there was never

7    anything valid and legitimate in terms of affording medical

8    care at those clinics, then there should be an offset.

9              I am not looking, Judge Gershon, for a hearing or a

10   Fatico or anything like that.  I am just bringing to the

11   Court's attention some of the questions I have when I went

12   through this Probation report.  And I understand this was

13   articulated to Your Honor and Your Honor rejected that, at

14   least that's what I was told by counsel who appeared for

15   Dr. Drivas at his sentencing.

16             The other objections, I think you're a hundred

17   percent right, they don't apply to loss and two of my

18   objections have been corrected by Ms. Donat, I believe, and

19   that becomes moot.

20             If Your Honor wants to know the paragraphs that the

21   Probation Department did correct, I'll supply them to you.

22             THE COURT:  I think it's set forth in their letter

23   and that's sufficient.

24             MR. ROSEN:  Okay.

25             I believe, Your Honor, that is the totality of the

Proceedings                                    10

1   loss objections.  I have a couple of others that I wish to

2   just articulate.

3          THE COURT:  All right, go ahead.

4          MR. ROSEN:  That's paragraph 20 of the Pre-Sentence

5   Report, where Mrs. Shelikhova denies ordering doctors to open

6   corporate bank accounts.  And again, I understand that it has

7   no bearing on the guidelines.

8          THE COURT:  Well, she opened them herself; correct?

9          MR. ROSEN:  Well, bank accounts for the clinics and

10  then there were physicians that opened their own corporate

11  accounts and the PSR says that she had ordered these doctors

12  to do so.  She has advised me that she would like that to be

13  corrected.  And again, I don't believe, as the report says,

14  there's no bearing on the guidelines.

15         And paragraph 21, most respectfully, also having no

16  bearing on the guidelines, Mrs. Shelikhova has advised me to

17  advise the Court that she denies the allegation of Medicaid

18  fraud with regard to REM transportation.

19         And I think there's one more, with the Court's

20  permission.

21         THE COURT:  Yes, go ahead.

22         MR. ROSEN:  It is paragraph 31 where Mrs. Shelikhova

23  has asked me to transmit to the Court her objection to being

24  named a participant in an alleged fraud at a former clinic.

25         THE COURT:  Well, I'm not addressing that at all.

Proceedings                              11

1           MR. ROSEN:  Okay.  I just thought I would make a

2    record.  I don't have --

3           THE COURT:  I don't have sufficient evidence with

4    regard to that, and I don't intend to rely on that anyway.

5           MR. ROSEN:  Okay.

6           Other than that, I don't have any factual objections

7    with regard to the Pre-Sentence Report.

8           THE COURT:  All right.

9           Let me hear from the Government with respect,

10   essentially, to the loss amount and the set-off issue.  I am

11   trying to think which case where this was raised.

12          MR. ROSEN:  I think it was Dr. Drivas, most

13   respectfully.  I think Mr. Adler raised it because, quite

14   frankly, I called Mr. Adler and asked him.

15          THE COURT:  Did you raise it in your papers or

16   you're just raising it now?

17          MR. ROSEN:  No, I think I did.

18          THE COURT:  The set-off issue?

19          MR. ROSEN:  Let me --

20          THE COURT:  I'm trying to locate it in the

21   sentencing transcript for Dr. Drivas.

22          MR. ROSEN:  Well, you may be right.  I think I

23   raised it in my objections.

24          THE COURT:  I see, okay.

25          Let me hear from the Government.  As I say, I'd like

Proceedings                                              12

1   to see, since you relied on the argument made by other

2   counsel, I'd like to see exactly where it is.  I know I

3   rejected it, but I had something to say and I'd like to find

4   out what that was.

5          MR. ROSEN:  I understand that's what Your Honor did.

6          MS. HALL:  Your Honor, just to address some of the

7   points that defense counsel made.

8          He cites the original complaint in this case, and I

9   don't have it in front of me, but he cited a loss amount in

10  the complaint as 46 million.

11         By the time the Government superseded on the

12  indictment, the figures had been refreshed from Medicare.  We

13  had obtained more updated data as to the billing and that

14  figure placed the paid amount over $50 million.

15         So, the complaint was early on in the case.  It was

16  superseded by further information received from Medicare as to

17  the loss amount.

18         In regards to --

19         THE COURT:  Let me just address that first.

20         The addendum to the PSR addresses the objection to

21  the loss amount, and I am satisfied that that is completely

22  correct and that the attempt at loss was $77 million, the

23  actual loss was over $50 million, as set forth by Medicare

24  itself, and there really hasn't been any challenge to that

25  other than this claim that set off should apply.

Proceedings                                    13

1          So, you could point me, if you know, to where I

2     dealt with this before, or just deal with it again now, that

3     would be helpful.

4               MS. HALL:  In regard to the offset, Your Honor?

5               THE COURT:  Yes.

6               MS. HALL:  I don't recall it being raised before by

7     this defense counsel's papers, but --

8               THE COURT:  But it was raised by another party, as

9     he says.

10              MS. HALL:  Yes.

11              THE COURT:  But I am having difficulty locating it.

12              MS. HALL:  That, I couldn't, I'm not, I don't know

13    where it is.

14              THE COURT:  All right.

15              MS. HALL:  The Government does recognize hat

16    guidelines do make account for potential for an offset of the

17    fair market value of legitimate services rendered.

18              THE COURT:  Right.

19              MS. HALL:  That is what the guidelines say.

20              However, in this case, under, since we are now in a

21    sentencing posture, the preponderance of the evidence standard

22    is, in effect and the Government has put forward more than

23    sufficient evidence to meet that preponderance standard to

24    show that the loss amount is what the Government has asserted

25    it to be.

Proceedings                                    14

1          For example, we cite in the sentencing papers for

2     this defendant on page 11 of the Government's letter,

3     September 6th, 2013, United States versus Aginsky case, that's

4     165 F.3d at 15.  It's Second Circuit 1998, which holds that

5     under a preponderance of the evidence standard in effect at

6     sentencing, the inference may be properly drawn that where

7     beneficiaries were paid kickbacks, the Court may properly

8     conclude that the entire amount was fraudulent.

9          And there is other authority to that effect as well.

10    So the offset issue, while there is a provision for that in

11    the guidelines, doesn't apply in this case.

12         In regard to the other objections that defense

13    counsel raises, as Your Honor points out, they're not relevant

14    to the guidelines calculation.

15         THE COURT:  All right.  Counsel, I have located

16    something in the papers earlier, so let me take a very brief

17    recess to take a look at this set-off issue again, and I will

18    resume in a few minutes.

19         (Recess taken at 4:15 p.m.)

20

21

22

23

24

25

Proceedings                                          15

1           (In open court.)

2           (Judge NINA GERSHON enters the courtroom.)

3           THE COURTROOM DEPUTY:  All rise.

4           Thank you, please be seated.

5           (Defendant enters the courtroom.)

6           THE COURT:  All right, Counsel, we're resuming on

7    the issue of the offset.

8           As I understand it, Mr. Rosen -- you can have a seat

9    -- your position is that you're not looking for an evidentiary

10   hearing on an offset, you're just saying there should be an

11   offset for legitimate services.

12          I assume that, like every other defense attorney in

13   this case, you had a full access to all of the records, all of

14   the patient records, the codes for each treatment, the

15   Medicare billing records, the actual charts of the patients,

16   that you wanted to review them, and it seems to me that the

17   Government has amply proved both the actual loss and the

18   intended loss, the intended loss being $77 million.

19          In order for an offset to have any significance on

20   the guidelines, the offset would have to be greater than

21   $27 million to bring the loss below $50 million, and what I've

22   seen in this case is massive fraud, intentional fraud.

23          The purpose of the clinics from the very beginning

24   being not to provide patient treatment, but rather to bilk

25   Medicare of money to do that in a wide variety of ways that

Proceedings                                              16

1   have been identified in detail in the Government's papers and

2   certainly clear from the trial in this case and are set forth

3   in the Probation report as well, but most particularly in the

4   Government's letters.

5            And that in the face of this, it seems to me that if

6   the defense wants to argue that there should be some offset

7   for some legitimate services that were ever provided by this

8   clinic, that it would be up to the defense to show me even one

9   legitimate service that was performed under the direction of

10  this defendant.

11           And then in the absence of anything at all, or any

12  reason to believe that this defendant intended to provide any

13  legitimate service to anyone, and actually did provide

14  legitimate services which Medicare should be responsible for,

15  I am going to deny this application with regard --

16           MR. ROSEN:  Could I --

17           THE COURT:  Yes, go ahead.

18           MR. ROSEN:  Could I just comment on, Your Honor --

19           THE COURT:  Sure.

20           MR. ROSEN:  -- as held, I understand it's been the

21  Government's position from day one that the purpose of all

22  these three clinics was not to treat patients, but to defraud

23  Medicare.

24           I just wish to take exception to that respectfully,

25  because I thought it was the Government's burden to separate

Proceedings                                    17

1   if there were legitimate treatments.  It would be their

2   obligation to show that there were no, in five years, in three

3   clinics, not one person was appropriately treated because

4   Judge, Judge Gershon, not everybody got a kickback.  Not every

5   patient got a kickback.

6          And from my experience with another similar type

7   case in this district, kickbacks were improper, I'm not

8   suggesting they're proper, had a different reality than the

9   Government has portrayed from day one, the competition in that

10  Brighton Beach area, I mean, when I was in Brighton Beach, we

11  didn't have -- we just had knishes, not 400 medical centers.

12         But the competition, some clinics offered vacations,

13  dinners, food, and some clinics bartered who accounted with,

14  well, we'll give people money to come in.  Not to create

15  illnesses and phony treatments, because they wouldn't have to

16  buy these tons of medical equipment and all of that, if it ws

17  all like the old boiler rooms in the stock cases, Judge

18  Gershon, where you had a desk and a phone, and you didn't need

19  anything.

20         So, I appreciate and respect Your Honor's holding

21  and findings, I just wish to articulate as best I can why I

22  think that the Government has not established that there were

23  no legitimate treatment afforded to the patients there, and

24  that's really what I wanted to say.

25         THE COURT:  All right.  Ms. Hall, do you to want to

Proceedings                                              18

1    say anything with respect to that?

2         MS. HALL:  Your Honor, the Government's position is

3    that we have adequately and amply set forth a myriad of

4    fraudulent schemes that were perpetrated at this clinic.

5         One of the main masterminds, the niece of this

6    defendant, stated -- and that's cited in our brief -- that the

7    entire purpose of this clinic was to defraud.

8         The exhibit to the Government's sentencing

9    memorandum sets forth five single-spaced pages of different

10   types of fraudulent billing schemes from the payment of

11   kickbacks to induce the beneficiaries to attend the clinic to

12   receive services they didn't need, to billing for things that

13   were entirely invented out of thin air, such as the sleep

14   study tests.

15        There was testimony at the trial from the

16   Government's undercover witness who was billed for a number of

17   $1,000 sleep-study tests that he never had.  We had massive

18   falsification of medical charts by individuals with no medical

19   qualifications.  We had no-show doctors.  We had individuals

20   perpetrating as doctors.

21        And in light of the fact that the vast overwhelming

22   majority of the patients were, in fact, paid kickbacks under

23   the case that I previously cited in our brief, that taints the

24   entire magnitude of the billing to Medicare as fraudulent.

25        So, the Government's position is that we have proven

Proceedings                                    19

1   at trial and we have proven in this context in sentencing,

2   which is a much lower standard of proof, i.e., a preponderance

3   of the evidence standard, that the entire billed amount, i.e.,

4   $77 million was fraud.

5              THE COURT:  All right.  I agree with the Government

6   and the analysis, as I said before, and again, if by some

7   chance any patient benefitted, for example, benefitted from a

8   massage not provided by a certified massage therapist, which

9   was one of the standard things that happened at this clinic,

10  it's certainly incumbent upon the Government to explore each

11  and every such possible coincidental benefit, and it seems to

12  me that the defendant having been fully aware all of the

13  records had she thought there were really offsets that were

14  legitimate and that should be applied, should have brought

15  them to my attention at that point.  We could have required

16  the Government to address them and to prove that they weren't

17  legitimate, but I think on this record merely having the

18  defendant say, oh, there should be offsets is not sufficient

19  basis for me to reject the abundant proof that I have that the

20  entire operation was fraudulent.

21             I think that deals with the various defense

22  objections to the guideline calculation.  I should say the

23  guideline manual that we'll be using is the 2009 manual

24  because the later manuals would be, would involve higher

25  guidelines for this defendant.

Proceedings                                    20

1              So, my finding is that the offense level is 37, the

2      guideline range on the single count to which the defendant

3      pled to, which was the money laundering conspiracy, that was

4      Count 4, would be 210 to 240 years.  The 240 is the statutory

5      maximum so that's why it becomes the top of the guideline

6      range.  Criminal History Category is one.

7              Oh, the Government is using a different number, 235

8      to 240.  I am not sure where that came from.  It seemed to me

9      that it should be 210.  We're on offense level 37.

10             MS. HALL:  Your Honor, the plea agreement, the

11     Government's estimation of the guidelines calculation in the

12     plea agreement is slightly different from the PSR.

13             THE COURT:  I see.

14             MS. HALL:  The plea agreement included a plus two

15     for sophisticated laundering, whereas the PSR did not.  The

16     PSR included a plus two for obstruction, whereas the plea

17     agreement did not.

18             And the plea agreement gave the defendant two points

19     for acceptance as opposed to three, whereas I believe the PSR

20     assumed three points.

21             So, the Government's calculation as set forth in the

22     plea agreement and in our papers is --

23             THE COURT:  Well, do you disagree with the

24     Probation Department's calculation?

25             MS. HALL:  No, Your Honor.

Proceedings                                              21

1          THE COURT:  Okay.

2          MS. HALL:  The differences are minor, we don't

3    disagree with the PSR.

4          THE COURT:  All right.  So then let me just

5    reiterate my conclusion that the Probation Department's

6    calculation is correct.

7          Now, as I understand it, the defendant in the plea

8    agreement agreed to the restitution amount of $50,943,386.

9          MR. ROSEN:  That's correct, Judge.

10         THE COURT:  Okay.  Which, by the way, I think, also

11   suggests that there is nothing wrong with the Government's

12   loss analysis or my rejection of the set-off argument.

13         This amount reflects the amounts actually paid by

14   Medicare to the three clinics, which this defendant was

15   involved in running.

16         The restitution amount then will be joint and

17   several with her co-defendants, and the schedule will be $25

18   per quarter while she's in custody, and ten percent of her

19   gross income per month while she is on supervised release.

20         But let's go back then to the rest of the

21   sentencing.  I will hear from the defense attorney, from the

22   defendant and then from Ms. Hall.

23         MR. ROSEN:  Thank you, Your Honor.

24         Mrs. Shelikhova is now 51 years of age, and as

25   Your Honor has found, she is in Criminal History Category I.

Proceedings                                                    22

1   She entered a plea, accepted responsibility, saved the Court

2   and Government expense and time of trial and has expressed

3   sincere remorse and contrition.

4           The circumstances surrounding Mrs. Shelikhova's

5   return to the United States in June of 2012 constitutes, in my

6   experience, and I submit this to the Court, a rare, unusual

7   and extraordinary circumstance which warrants Your Honor

8   taking this into consideration in fashioning an appropriate

9   sentence.

10          The gist of what I'm saying, and as I hope I will

11  develop it as I go along, this is clearly and abundantly

12  outside the Heartland of the drafters of the guidelines and

13  anybody else who had anything to do with guidelines, and if I

14  might, I'll tell you what I mean.

15          In making this request, I respectfully submit that

16  Your Honor should consider a sentence well below the

17  Government's requested sentence, and the

18  Probation Department's requested sentence.

19          I begin, Judge Gershon, by acknowledging that

20  Mrs. Shelikhova left the country instead of surrendering in

21  July 2010, whether because of incredibly poor judgment, fear,

22  panic or illness, or a combination of any of them, she

23  nevertheless landed in her country of origin, the Ukraine,

24  which, Judge Gershon, as we all know, has no extradition

25  treaty with the United States.

Proceedings                              23

1        She had, I guess in the parlance of the street, safe

2   haven for the rest of her life.  It has now become clear,

3   Your Honor, please, that at the Government's behest and with

4   the Government's knowledge, her son Max, reached out to her in

5   the Ukraine from the MDC to convince his mother to return from

6   her safe haven in the Ukraine.  And this is revealed in, I

7   didn't submit it, but it was submitted, it's on ECF,

8   Document 706, which is Max's sentencing letter, which is part

9   of the ECF, pages 1 and 3.

10       It is clear, without doubt now, that the purpose of

11  following the Government's request or behest, let me use the

12  right word, behest, and its knowledge was to convince his

13  mother to return from her safe haven so that he, Max, could

14  obtain a cooperation agreement with the Government.

15       There is now clearly no dispute about that, not that

16  there ever was, but it is clear in my presentation to this

17  Court.

18       It has been proffered to Your Honor on more than one

19  occasion, without dispute by the Government, that Max would

20  need to convince and get his mother to return before he would

21  be offered a cooperation agreement.  And again, this is in two

22  places that's on ECF that's been submitted to Your Honor and

23  proffered to Your Honor.  One is Document 555 at page 4, and

24  the other is Document 706 that I just referred to.  Clear,

25  without dispute.  You want a cooperation agreement, you

Proceedings                                    24

1  convince and get your mother to leave her safe haven.

2          Okay.  And Judge Gershon, I'm going use some very

3  particular words, not my words, but I think they're very

4  significant words.  It was proffered to Your Honor in

5  Document 555 at page 4 that it was made clear to Max --

6          THE COURT:  What document is that, Counsel?

7          MR. ROSEN:  It was an affirmation or affidavit in

8  support of bail for Max Shelikhova.

9          It was proffered to Your Honor that these were the

10  words, and in my 49 years, I've never experienced anything

11  like this -- it was made clear to Max, in no uncertain terms,

12  that that had to be accomplished as a condition of getting a

13  cooperation agreement.  And again, I say this most

14  respectfully, this has never to this moment been disputed by

15  the Government.

16          So, Judge Gershon, after advising Mrs. Shelikhova

17  that if and when she did come back, she would immediately be

18  arrested, remanded, further imprisoned, deportation

19  thereafter, huge financial consequences, she came back.  She

20  nevertheless, and I represent this to the Court as on officer

21  of the Court, that this was communicated to Mrs. Shelikhova,

22  all these negatives about leaving safe haven, and she made a

23  decision.

24          Nevertheless, she left her safe haven and returned

25  to the United States in June of 2012 as I had arranged with

Proceedings                                25

1    the U.S. Attorney's Office and I think the FBI.  Of course she

2    was arrested at JFK the moment she stepped off the plane and

3    has been incarcerated at the MCC for the 17 months since then.

4          Judge Gershon, I submit that these circumstances

5    which I can envision should really be additionally part of

6    3553(a) circumstances of a particular defendant are so rare,

7    unusual and extraordinary, that again I submit, having

8    practiced long before the guidelines came in and now since the

9    guidelines came in, out of the Heartland of anybody's concept

10   of what a person did to effectuate a positive for not only her

11   son, but for the Government.  And if you let me articulate

12   that.

13         THE COURT:  Yes.

14         MR. ROSEN:  It was the Government's and Max's

15   expectations bore fruit, Judge Gershon.  The Government

16   secured, according to Max's Counsel's submissions, the

17   Government secured its primary -- quote, primary cooperating

18   witness even to the exclusion of Elena Girenko, who was the

19   one who initially said this whole enterprise was phony from

20   the beginning, but just let me get to my note so I'm not

21   misquoting.

22         She was described as the mastermind, Elena, at the

23   highest level of the conspiracy that she founded and managed.

24   So, the Government and you know that Ms. Girenko was not

25   called as a witness at the previous trial, but Max was.  And

Proceedings                                    26

1   according to his own Counsel, submitted to Your Honor, Max was

2   the primary cooperating witness in the case.

3           Your Honor no doubt recalls Max from his appearance

4   on the stand in that trial of the doctor who was convicted.

5   Clearly, I submit, to this Court, with every ounce of

6   sincerity, that was a plus.

7           Her return was a plus for the Government.  They got

8   their witness and they couldn't use Elena for whatever reason,

9   and got a conviction of the doctor that was heading up that

10  clinic.  A plus for the Government.

11          How about Max?  How about a plus for Max?

12          He championed in his submission to Your Honor,

13  quote, my successful effort to bring about the return of my

14  mother, and his assistance to the Government as his most

15  salient factor, I think those are the words, why Your Honor

16  should sentence him to time served plus maybe a year.  Most

17  salient factor is I got my mother to come back from her safe

18  haven.

19          I never heard of this.  Even in my reading, long

20  before I got to 225 Cadman Plaza, never.  So, this is a case

21  of first impression for me.

22          The return of Mrs. Shelikhova is clearly a plus for

23  Max, as well as a plus for the Government, and I respectfully

24  submit to this Court, which I have the highest respect for,

25  this Court has been almost my blood for my career, that

Proceedings                                    27

1   without Ms. Shelikhova's voluntary return from safe haven,

2   neither the Government, nor Max would have reaped the benefits

3   that I have described.

4           Yes, it's outside the Heartland.  This overriding

5   circumstance considered alone or in combination with the hard

6   17 months at MCC, her possible deportation, her shattered

7   family, her health, her mother's health issues, forfeitures

8   and her contrition warrant Your Honor in considering these

9   offender characteristics as part of 3553(a) and to impose an

10  individualized sentence.

11          And I couldn't articulate for more of an

12  individualized set of circumstances than I just described.  I

13  mean, if it's happened before, I'm not aware of it.

14          Yes, commensurate with the goals of sentencing, I am

15  aware of the prescriptions and goals of 3553(a).  For example

16  Mrs. Shelikhova, after what she's gone through will never, in

17  my humble opinion, violate the law again, and seeing all that

18  has happened to her, I again submit to this Court will surely

19  deter others from committing the offense gotten her here.

20          Respect for the law, which is also a very important

21  part of 3553(a).  I have an abiding belief that respect for

22  the law goes both ways, Judge Gershon.  I mean, where the law

23  allows a judge, Federal judge, to consider certain

24  circumstances, that's the law.  And here I respectfully submit

25  that Your Honor should consider this extraordinary

VB        OCR        CRR

Proceedings                                        28

1   circumstances of her return as reflecting an individualized

2   sentence here because one, the facts warrant it and two, an

3   individualized sentence taking into consideration these

4   specific characteristics are the law.

5              I mean, for example, Gall and Pepper, which I cite

6   in my papers, are among the most recent Supreme Court cases

7   that say we should focus on individual circumstances, and I

8   think Pepper even said, Justice Sotomayor said, sometimes in

9   sentencing the characteristics of the offender are just as

10  important as the offense.

11             And again, I cannot and I've tried very hard, and I

12  really have exhausted my available resources to find another

13  case that's ever come down like this.  And I think it should

14  be part of the consideration for this 51-year old woman, who

15  in addition to coming back, walked right into prison.

16             I didn't even make, as Your Honor is I'm sure aware,

17  a bail application, because it was fruitless.  A waste of

18  time.

19             So, I'm asking this Court in consideration of these

20  circumstances to impose a sentence which allows

21  Mrs. Shelikhova, and I understand this deportation issue is

22  something that is not within my immediate purview, or perhaps

23  even Your Honor's, a chance at life outside of prison.  She

24  has, you know, done a substantial crime.  I have not picked

25  apart and I don't intend to now, well, she never paid anybody

Proceedings                    29

1   directly.

2           I understand foreseeability.  I understand what

3   conspiracy is, and I understand to be a part of it and you

4   have more than just a clerical role, you're on the hook, and

5   that's the law as well.  But I submit to this Court the

6   unusual circumstance that hopefully Your Honor will, has the

7   Government benefitted from her return, and Max hopefully will?

8   Hopefully, Mrs. Shelikhova will as well.

9           Thank you for the time you've given me.

10          THE COURT:  All right, thank you.

11          Ms. Shelikhova, is there anything that you would

12   like to say to me directly?

13          THE DEFENDANT:  (In English)  Yes.

14          MR. ROSEN:  Judge, Mrs. Shelikhova has asked if she

15   could read this in English.  It's been a couple of

16   retranslations, but she would prefer to address you without

17   the middle person of an interpreter.

18          THE COURT:  That's up to her.

19          MR. ROSEN:  Okay.

20          THE DEFENDANT:  Your Honor.

21          THE COURT:  Is this what you wrote, though?  These

22   are yours words?

23          THE DEFENDANT:  It's my translation.  I wrote

24   Russian and for me translate for English, because for me

25   difficult speak English little bit I want read, okay.

Proceedings                                          30

1          THE COURT:  All right.

2          THE DEFENDANT:  Your Honor, I would like to start

3     off by saying thank you.

4          THE COURT:  Would you please put microphone in front

5     of the defendant?

6          MR. ROSEN:  Yes.

7          THE DEFENDANT:  Your Honor, I will like to start by

8     saying thank you for giving me the chance to speak before your

9     court.  I am very sorry for my English, but I want to tell you

10    myself what I am thinking about that worries me.  Maybe my

11    words will found on, but I want to tell you from the bottom of

12    my heart that I am so sorry.

13         I understand and accept my guilt, and I am very

14    sorry that my actions led me to breaking the law.  And now I

15    am awaiting my sentence, the decision, which will affect this

16    rest of my life.  I am addressing you, Your Honor, and your

17    entire justice system.

18         I am hard-working woman and all my life I have

19    worked very hard.  Even now being in jail I work all the time

20    because I can't just sit there without doing anything.  I am

21    asking you to believe that I am never had it in mind to make

22    as much money as I could by any means possible.

23         I always wanted and made sure that my labor was

24    useful, and that what I did was right, beneficial, and had the

25    ability to grow.  And I regret that I did so many wrong things

Proceedings                                    31

1   and made so many mistakes with which eventually brought me to

2   committing so many violations.

3            I hate myself for letting it all happen.  All my

4   sincere, good and poor dreams have not been realized in the

5   honest and correct way, the way I envisioned them.

6            I have been already punished, and I am asking you to

7   accept my remorse and apologies.  I am asking you for double

8   forgiveness as mother for her son, because I permitted him to

9   do something which resulted in him breaking the law.

10           The most horrible punishment for me is the

11  separation from my loved ones.  I have a very old and ill

12  mother with whom I have lived all my life.  She is waiting for

13  me every single day and she needs me and my help already.  My

14  heart is broken.

15           I am so guilty in this horrible separation.  I pray

16  to God every single day to give me a chance to reach my mother

17  in this life and to help.  I pray for my son because without

18  them, my life has no meaning.

19           I am asking you very much to believe me, to believe

20  in my sincere regret, and I give me a chance to return to a

21  normal life.  And by doing good deeds and doing my work, I can

22  correct my mistakes and only by doing it, I can prove that I

23  can be an honest person and bring good to my family, as well

24  as to the society where I live.

25           I love people very much and I believe that the

Proceedings                                        32

1   difficulty I am going through will not change my feelings

2   toward them, and I will not change how I relate to them.

3   After raising that had happened, what I am feeling now, I am

4   strongly convinced that nothing and nobody could force me to

5   be again something that wrong lead me to break a law and put

6   me behind bars.

7              I love America very much, a country where I live for

8   many years.  A country which help me and my family, and now, I

9   am feeling tremendous guilt, because it's that of being

10  grateful I had broken the law.  That is why once and again, I

11  am asking you to believe me and give me a chance.

12             Thank you for listening to me and giving me the

13  opportunity to tell you all this.

14             Thank you, very much.

15             THE COURT:  Thank you.

16             Ms. Hall.

17             MS. HALL:  Thank you, Your Honor.

18             Your Honor, the Government respectfully urges the

19  Court to impose a sentence within United States Sentencing

20  Guidelines for a variety of reasons, but primarily because a

21  below guidelines sentence would be insufficient to satisfy the

22  factors set forth in 18 U.S.C. 3553(a).

23             As Your Honor is well aware, throughout the course

24  of the trial and all of the submissions of Counsel, this

25  defendant, Irina Shelikhova, was the principal mastermind of

Proceedings                                     33

1    the Bay Medical healthcare fraud, which was a massive $77

2    million dollar Medicare fraud, which was one of the biggest

3    healthcare fraud schemes ever perpetrated and ever prosecuted

4    in this district.

5           As detailed extensively at the trial, the

6    defendant's scheme involved multiple facets:  The recruitment

7    of patients who are paid cash kickbacks, the use of extensive

8    network of money launderers providing the cash needed to pay

9    the patients, the billing of Medicare for millions of dollars

10   in medical services that were medically unnecessary or not

11   provided at all, the use of unlicensed employees to treat

12   patients, and the massive falsification of medical documents

13   and charts.

14          Even though the defendant was the mastermind and the

15   primary profiteer of this fraud, she regularly hid behind

16   others, including her own family members.  She recruited many

17   people into this scheme.  She recruited her estranged husband,

18   Sergey Shelikhov, her then-boyfriend, Sergey Zhamaryan and her

19   son, who was then in his early 20s, Maksim Shelikhov.  She

20   recruited these individuals and many, many more.

21          And this defendant was able to conceal her

22   leadership role in the scheme by having her family members put

23   their names on Medicare paperwork and New York State corporate

24   paperwork, and also to run the money laundering operation so

25   she would not have to do so.

Proceedings                                        34

1          It's clear throughout all of this, all of the

2    Government's evidence, that the defendant's number one

3    motivation for this crime was pure and unvarnished greed.  It

4    was Irina Shelikhova who ultimately controlled the more than

5    $50 million the clinic was paid by Medicare.

6          It was Irina Shelikhova who was a signatory on four

7    bank accounts that received approximately $34.9 million from

8    Medicare.  And once this defendant had the money, she lavished

9    this money, the taxpayer's money on herself, on her son, on

10   her niece, on her boyfriend and other individuals in her inner

11   circle.

12         The extreme pervision of this case is that the

13   taxpayer's money was used to buy real estate, luxury vehicles,

14   including a Bentley, an Astin Martin, a Range Rover, BMW and

15   Mercedes, many luxury watches, jewelry and clothing, multiple

16   extravagant trips to an exclusive resort in Miami, numerous

17   plastic surgeries for this defendant paid for by Medicare, of

18   course, million of dollars in credit card bills, lavish

19   parties and restaurant bills.

20         And Your Honor, ironically and sadly, the

21   defendant's clinic was booming during the recession of 2008

22   and 2009, while millions of Americans and millions of

23   New Yorkers were losing their jobs, losing their houses,

24   losing their financial stability, Irina Shelikhova and her

25   cohorts at Bay Medical were raking in millions and millions of

Proceedings                                        35

1   dollars in ill-gotten gains at the expense of the Federal

2   taxpayers.

3             And only a fraction of the $50 million stolen by

4   this defendant's scheme has been recovered by the Government.

5   In fact, there are millions of dollars in unrecovered fraud

6   proceeds and this defendant has done nothing to help the

7   Government find such money.  This defendant has paid nothing

8   back.

9             Now, in her counsel's sentencing submissions, he

10  repeatedly mentions that this defendant's finances have been

11  quote unquote, taken away.  But that misses the point

12  entirely.

13            The money was never this defendant's money in the

14  first place.  It belonged to the United States Government and

15  ultimately the Federal taxpayers.  As soon as this defendant

16  was indicted, she fled the United States for the Ukraine, a

17  country that has no extradition treaty with the United States.

18            She remained a fugitive for almost two years outside

19  the jurisdiction of the United States, and Your Honor, if the

20  unrecovered fraud proceeds are in Ukraine, they are outside

21  the reach of the U.S. Government to this day.

22            It was not until her son was arrested and detained

23  and the defendant voluntarily returned to the United States.

24  She did so undoubtedly to benefit her son, but she also had

25  her own reasons for returning to the United States, which are

Proceedings                                          36

1  somewhat in conflict with counsel's statement at oral argument

2  now.

3          The defendant's own letter to Your Honor attached to

4  the September 5th, 2013 sentencing submission, page 1 at the

5  very bottom, the defendant writes to the Court, I left for

6  Ukraine hoping to improve my health and definitely come back,

7  but not everything happened the way I thought.

8          In Ukraine, I encountered many complications and

9  could not return as fast as I wanted, but during this whole

10  period of time I tormented myself and suffered, understanding

11  that that I cannot and do not want to live like that.

12          So, Your Honor, the defendant clearly had her own

13  motivations for returning to the United States that had

14  nothing to do with benefitting her son and certainly had

15  nothing to do with benefitting the United States Government.

16          Taking a step back, there was a real harm inflicted

17  upon Medicare by the defendant's actions.  As noted, this is

18  one of the biggest Medicare fraud schemes in this district

19  ever.  There were myriad of lies told by the defendant to

20  Medicare, and each one of those was a perversion of the trust

21  that the Medicare system places in clinics that were run by

22  individuals such as this defendant.

23          Every patient who got paid in this defendant's

24  clinic with Medicare's money contributed to eroding confidence

25  in programs such as Medicare, and every false claim that

Proceedings                                  37

1   Medicare paid for the supposed Medicare rendered in this

2   defendant's clinic by phony doctors and unlicensed lay-people,

3   was a diversion of Medicare's money from legitimate

4   beneficiaries who need real medical care, sometimes

5   disparately.

6            Medicare fraud is, unfortunately, rampant in this

7   jurisdiction.  It needs to be addressed here and deterred

8   here.

9            Sentences handed down in this case can and will

10  reach the community with an effective message of deterrence.

11  However, there will be no deterrence without the real

12  consequences of significant sentences.

13           Your Honor, very respectfully, the sentence you hand

14  down today needs to be enough to prevent an Irina Shelikhova

15  in the community right now from even contemplating committing

16  the crime of Medicare fraud.  Currently the message to

17  would-be defendants in the community is that Medicare fraud

18  allows you to earn a comfortable and safe living at the

19  expense of the American taxpayer.

20           In this district, unfortunately, there are a lot of

21  individuals who are willing to do that every day.

22           The lure of a large payday such as the $77 million

23  billed, $50 million paid in this case, coupled with

24  historically light sentences in this district has

25  unfortunately and sadly led to undeterred and rampant Medicare

Proceedings                          38

1    fraud.

2          And finally, Your Honor, the sentence in this case

3    should take into account all of the characteristics of this

4    defendant.  Her conduct in this case has shown her character.

5    Her conduct has shown that she willingly and knowingly put

6    elderly patients at risk by running a medical clinic that saw

7    500 patients a day at its height, who were treated by

8    completely unlicensed individuals, who rendered supposed

9    medical care to them.

10         This defendant's conduct showed that she did nothing

11   to ensure that there was proper care for those patients.  Her

12   conduct shows that she didn't hesitate to recruit family

13   members in the fraud, including her own son.

14         Her conduct shows that she didn't hesitate to put

15   millions of dollars, 50 million dollars in Medicare money into

16   her own pocket, and her conduct shows that when confronted

17   with Federal charges and an arrest warrant, she made the

18   conscious and deliberate decision to flee the United States

19   and become a fugitive for two years in a safe haven.

20         Since she's returned to the United States, she's

21   shown limited remorse and she wrote in her letter to the Court

22   submitted with her counsel's letter of September 5th, 2013,

23   she writes, quote, in the course of business, in the course of

24   the business due to insufficient knowledge, many mistakes and

25   violations were made which led to breaking the law.

Proceedings                                          39

1        But what this defendant did is no mistake.  It was

2    intentional.  It was calculated.  It was planned over the

3    course of more than five years.

4        The Court's sentence should ensure that not only

5    that this defendant never returns to a lifestyle of crime, but

6    also that those in the community, the Irene Shelikhovas out in

7    Brooklyn right now who are tempted to steal from Medicare, are

8    also adequately deterred from the temptation of engaging in

9    this unfortunately lucrative crime.

10       For all of those reasons, Your Honor, the Government

11   very respectfully requests for a sentence within the guideline

12   range.

13       Thank you.

14       THE COURT:  Thank you.

15       Ms. Donat, is there anything else you want to add?

16       USPO DONAT:  No, Your Honor.  We rely on our

17   sentencing recommendation.

18       THE COURT:  Okay.  Any else then from counsel?

19       MR. ROSEN:  No, Your Honor.

20       THE COURT:  I have studied all of the papers that

21   were submitted to me and considered the guidelines and the

22   3553 factors.

23       This defendant was a, as the Government calls her, a

24   mastermind and the principal profiteer from this massive

25   fraud.  Although she often hid her conduct behind others, she

Proceedings                                    40

1    was on the bank accounts, she got the money, she used it for

2    herself, her son and others who she cared to lavish her

3    profits on with an enormous undertaking that lasted over five

4    years.

5           It was a massive fraud of the Medicare system and in

6    addition to -- well, Medicare is the technical victim.  I am

7    aware from all of the evidence that I have seen that the

8    misuse of the old people who were patients at this clinic for

9    her own personal financial gain was just extraordinary and

10   painful to observe.

11          The defendant was at the clinic virtually every day,

12   as I understand it.  She writes in her letter to me how sorry

13   she is, but also says things like I was very attentive and

14   kind to people who attended the clinic.  I put my heart into

15   everything I did.  I desired that everything was performed at

16   the highest standards, but at my huge regret in the course of

17   business, due to insufficient knowledge, many mistakes and

18   violations were made which led to breaking the law.

19          I don't know entirely how one parses of that letter,

20   but what's clear to me from the actual evidence is that this

21   defendant, who was present, who directed a massive chart

22   falsification operation, who directed others and trained

23   others in how to commit healthcare fraud, who directed her son

24   in getting the money laundering conspiracy, which was

25   necessary to get cash in order to pay cash kickbacks to

Proceedings                    41

1    patients, what's clear to me is that this defendant was fully

2    knowledgeable about what was going on at the clinic.  She knew

3    she had doctors who were not performing as doctors should.

4           She had non-doctors, Mr. Khandrius, performing as a

5    doctor, injecting people with things, which were not medicines

6    but water, and getting money from Medicare to do it, using

7    therapists who were not licensed, all of this under her

8    immediate supervision, and all of this shows me that this

9    defendant, despite her attempts to minimize her culpability,

10   was indeed not concerned with other people and certainly not

11   concerned with the patients who came to the clinic.

12          In response to all of that, the defense's principle

13   argument is that I should consider the admittedly unique

14   circumstances of her return.  I agree, those circumstances

15   were unique in my knowledge relating to her son seeking to get

16   her back so that he could get cooperation agreement with the

17   Government, but it has to be remembered that she came back

18   after she voluntarily fled this country and now she wants

19   credit for coming back.  She should have never left in the

20   first place.

21          Certainly, those unique circumstances don't warrant

22   the extreme variance from the guidelines that the defense here

23   is requesting.

24          So, and with respect to the crime itself, there are

25   simply no mitigating circumstances, financial, emotional or

Proceedings                                    42

1   otherwise, that in any way affect the submission of this

2   massive crime.  Nothing to excuse it or even explain it in any

3   way other than pure greed.

4          So, under all of the circumstances that I have

5   outlined and that are set forth in the papers, I am going to

6   adopt the recommended sentence of the Probation Department,

7   which I think is fair and just, and it is 15 years in custody

8   and there will be no fine imposed in light of the priority of

9   restitution.

10         I have already described the restitution, which will

11  be joint and several with the co-defendants.  Three years of

12  supervised release with special conditions that the defendant

13  comply with the restitution and forfeiture orders and

14  schedules, that she provide full financial disclosure to the

15  Government and finally, if she's deported, there be no illegal

16  re-entry into this country.

17         I am also imposing an exclusion from Federal

18  healthcare programs and finally, there's a mandatory $100

19  special assessment that I impose.

20         With respect to other issues, I believe there are

21  open counts?

22         MS. HALL:  Yes, Your Honor.

23         The Government moves to dismiss the remaining counts

24  of the superseding indictment, with prejudice.

25         THE COURT:  The application is granted.

Proceedings                                  43

1          The defendant is advised of right to an appeal, and

2     I would just ask if there's any designation request.

3          MR. ROSEN:  Yes, Judge.  We ask, if Your Honor would

4     consider either requesting Alderson in Virginia.

5          THE COURT:  I don't typically recommend a particular

6     place, if there's a location for some reason --

7          MR. ROSEN:  Well, Coleman in Florida, there's a camp

8     there.

9          THE COURT:  Well, I'm not picking the place.

10         MR. ROSEN:  Well, a designation would be --

11         THE COURT:  Why does she want to go to Florida?

12         MR. ROSEN:  Because she has family there.

13         THE COURT:  She has family in Florida.  What family

14    are in Florida?

15         MR. ROSEN:  A sister.

16         THE COURT:  Florida, okay.

17         So, you would like a recommendation to a prison in

18    Florida, all right.  Her other family is here in New York, I

19    thought.

20         MR. ROSEN:  Well, there's a mother here in New York,

21    but she's not able to visit because of her incapacity, but she

22    does have family in Florida.

23         THE COURT:  All right.

24         MR. ROSEN:  I would also ask, since I raised the

25    issue of her mother, that there's an issue that is developing,

Proceedings                                            44

1   which is difficult but that's the mother resides in a building

2   that is subject to forfeiture and we understand that.  We

3   understood that when we signed the agreement.

4           However, if there was some way that either the Court

5   or with the Court's concurrence, I can work something out

6   where the mother can remain in that apartment, that would be a

7   positive thing for the woman.  Not so much for

8   Mrs. Shelikhova, but for her mother who is 84, 85, and

9   confined to a wheelchair.  Hopefully, the Court can assist.

10          THE COURT:  Well, I don't know what I can do.

11  You've agreed to an order of forfeiture, as to that building.

12          MR. ROSEN:  Yes.

13          THE COURT:  And now you're coming to me so say I

14  should do something about the apartment?

15          MR. ROSEN:  I'm not asking you to --

16          THE COURT:  Look, talk to the Government.  I don't

17  know whether they're seeking to sell the building or it's

18  going to be -- I don't know what the status of the building

19  is.

20          MR. ROSEN:  I'm just raising it as a potential for

21  either negotiation or the Court's involvement.  If the Court

22  can't get involved, I understand that.

23          THE COURT:  Well, I mean, you raise -- Mr. Gullotta.

24          MR. GULLOTTA:  Yes, Your Honor.  I believe that is

25  one of the few properties that actually has value, so the

Proceedings                                          45

1   Government intends to pursue its forfeiture.

2          In other cases, I know there are sometimes

3   circumstances where a tenant will pay rent to the Government

4   while it owns the property.  It's something that could perhaps

5   entertain prior to an ultimate sale of the property.  In the

6   meantime, I'm not sure that else can be worked out.

7          MR. ROSEN:  I'll pursue it.

8          THE COURT:  All right.

9          Anything else?

10         MR. ROSEN:  No, Your Honor.

11         THE COURT:  Is there any property that the

12  Government is holding of the defendant, other than the

13  forfeited property?  I mean, personal property of any kind

14  that needs to be resolved?

15         MR. ROSEN:  I don't think so, no.

16         THE COURT:  All right.

17         All right then, that concludes the proceeding.

18  Thank you.

19         ALL:  Thank you, Your Honor.

20         (Defendant remanded.)

21         (Matter concluded.)

22

23                        oooOooo

24

25

                    VB      OCR      CRR
I certify the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.
    /s/ Victoria A. Torres Butler   December 17, 2013