UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IRINA SHELIKHOVA,

        Petitioner,

v.

UNITED STATES OF AMERICA,

        Respondent.

_____/

Crim. Case No.

RECEIVED
APR 21 2017
PRO-SE OFFICE

## REPLY TO GOVERNMENT'S RESPONSE TO PETITIONER'S §2255 MOTION TO VACATE

NOW COMES the Petitioner, Irina Shelikhova, as a pro se prisoner, to submit this Reply to the Government's Response of March 7, 2017 (R. 863) to her §2255 Motion to Vacate requesting relief, including that of an evidentiary hearing.

Section 2255(b) requires a district court to "grant a prompt hearing" on a habeas corpus petition "[u]nless the motion and files and records of the case conclusively show the prisoner is entitled to no relief." **Puglisi v. United States,** 586 F 3d 209, 213 (CA2 2009). To establish entitlement to a hearing, petitioner must adduce sufficient facts to render his or her claims "plausible", but need not establish "that he will necessarily succeed on the claim." **Armienti v. United States,** 243 F 3d 820, 823 (CA2 2000). The Second Circuit has set forth detailed guidance of how a district court should determine whether a hearing is necessary. See **Puglisi,** at 213-215. In particular, the Court noted that, given the absence of pre-motion discovery in a §2255 case, "a petitioner may need only to identify available sources of relevant evidence rather than obtain it as in civil cases or seek a discovery order from the court under Rule 6 of the Rules Governing Section 2255 Proceedings." Id., at 213-214.

### PRELIMINARY STATEMENT

The Government's Response misconstrues Shelikhova's arguments, as "[s]pecifically, Shelikhova argues that she is, in fact, innocent of all charges" (R. 863, p. 2), presumably to cause prejudice in front of this Court. Accurately stated,

Shelikhova admits to having been guilty of the cash kickback to patient conspiracy, which was conducted to meet competition doing the same later in the clinic's existence.  Shelikhova denies guilt to the money laundering conspiracy charge, which was the only count included in a plea agreement to which she was required to plead guilty.  In April, 2013, 3 co-defendants, Aleksandra Zaretser, Vladimir Kornev, and Yelena Gelper, were acquitted at trial for money laundering.

Shelikhova also argues that, due to ineffective assistance of counsel, her guilty plea was involuntary and unknowing where she was coerced by counsel with a conflict of interest, as based on a secret agreement undisclosed to her or this Court, in which counsel collaborated with the government to require her return to the United States, guilty plea, and sentencing to the charge and every "fact" the government demanded before her son, Maksim Shelikhov, would be granted the benefit of a cooperation agreement, by scripting her every response.  The issue was not that he was denied a cooperation agreement until after she pled guilty.

Shelikhova further argues counsel was ineffective at sentencing where he objected to the loss determination without having reviewed the underlying records, contrary to his representations to the Court, which the CD's obtained from the victim show were overstated, among other objections that should have been raised.

STATEMENT OF FACTS

I.   Shelikhova's Background (R. 863, p. 3)

From 2003 to 2005, Shelikhova worked in the billing department of Coney Island Rehabilitation, a medical office in Brooklyn that later changed its name to Flatlands Medical, which was operated by Elena Girenko's mother, and where Elena Girenko and Dr. Gustave Drivas also worked.  Elena Girenko was Shelikhova's niece, and Dr. Drivas was the sole shareholder and director of the clinic (R. 663, p. 2).  Shelikhova did not operate the clinic.

Elena Girenko and Dr. Drivas reach the agreement to open Bay Medical Care PC, and Shelikhova was invited to work there as well.  When Dr. Drivas and Dr. Collins (now deceased) decided to work together, they opened the new company,

SVS Wellcare Medical, PLLC, along with Serge V. Shelikhov as its organizer.

Elena Girenko, seeking to cooperate and lessen any potential consequences for herself, stated the clinics were set up with the intent to defraud-this is categorically untrue, from this movant's perspective.

The government concedes Shelikhova's first language is Russian and her understanding of English may be limited.

II. The Criminal Scheme (R. 863, p. 4).

From the start, Shelikhova has disputed the alleged amounts of $77.4 million billed and over $50 million collected.  At sentencing on November 12, 2013, counsel Michael Rosen was asked by the Court if he had reviewed the records:

> THE COURT: "I assume that, like every other defense attorney in this case, you had a full access to all of the records, all of the patient records, the codes for each treatment, the Medicare billing records, the actual charts of the patients, that you wanted to review them, and it seems to me that the Government has amply proved both the actual loss and the intended loss, the intended loss being $77 million."

(R. 863-4, p. 15).  This assumption is not borne out by the evidence.  Shelikhova asked for discovery CD's from Rosen, who on November 29, 2013, and again on February 20, 2015 sends her two CD's, except they did not include the Bay Medical information.  Mr. Rosen admits he received the disks from Mr. Shapiro, who was counsel to Maksim Shelikhov, her son, in response to his request to provide Shelikhova with bank and other records (See Exh. A).

Once in prison, Shelikhova submitted Freedom of Information Act (FOIA) requests for all documents to support the government's allegations of $77.4 million billed and over $50 million collected.  Contained on the CD's obtained under FOIA from the Center for Medicare & Medicaid, Department of Health & Human Services, who is named as the victim for restitution, was the clinics' billing records, this was reviewed by Shelikhova over the better part of a year.  They do not support the government's allegations, and they took over a year to be provided.

The movant had never seen and    Michael Rosen did not review these CD's, as at sentencing, he says, "I don't have the proof to counter the 50 million mark" (R. 863-4, p. 7).  In his Affidavit of January 25, 2017, Rosen does not address the claim he did not review the discovery, instead citing Maksim (Max) Shelikov's testimony from the **Drivas** trial that the "loss actually suffered by Medicare as a result of the Bay Medical fraud was near $50 million dollars" (R. 856, ¶ 28).  Max was not a competent witness to the amount, as he did not handle the billings, nor did he indicate he had independently reviewed the claims.

Shelikhova believed the services being rendered by the clinic were legitimate. The vast majority of patients were sick, elderly people, who required medical help. Shelikhova never instructed anyone, nor gave her permission to bill for procedures or tests that were not performed.  In no event did Shelikhova have an agreement with anyone, whether employed at the clinic or a patient, to pay kickbacks or bill for services, tests, or procedures not rendered.  Nor did the clinic pay kickbacks to patients from its inception.  Irina Barikyan, who was the government's chief witness and source of many of the "facts" supporting the allegations of health care fraud, was the individual to propose payment of kickback money for old patients to refer new patients.  It was later discovered that Barikyan had stolen 50% of the kickback money for herself, which was used to finance her husband's own corrupt medical clinic, and she stole the patient list before she left Bay Medical. Barikyan is the source of testimony claiming a "phony allergy testing fraud that involved giving patients bottles of tap water instead of allergy medications" (R. 663-1, p. 2).  Shelikhova denies knowledge of such fraud.  When Barikyan had stolen sufficient funds, she, together with Olga Novgorodskaya, opened a new look-alike clinic under her husband's name nearby.  With copies of the entire database of Bay Medical's stolen patient list, Barikyan enticed patients from her former employer, promising them even better incentives at her new clinic, Cropsey Medical.

Irina Barikyan also falsely testifies that Shelikhova "directed a massive chart falsification operation", except she has been provided with no specific

names in support, and in any event, denies the allegation.

Barikyan made a number of perjurious statements the movant can easily prove to be malicious and vindictive lies. The previously mentioned, as well as, for instance, her assertion that the clinic continued to bill for Dr. Collins after his untimely death, can be proven slanderous by the billing records.

Furthermore, the recordings the FBI obtained from the kickback room, whenever desputes would arise in billing or providing kickbacks to patients, the person that is consulted to resolve the dispute is not Shelikhova, but Elena Girenko.

Additionally, according to the records provided by the victim under FOIA, there were 15 other doctors, none of which were charged. A list of the clinic's doctors and their services is provided as Exhibit C. Where none of these doctors were indicted and no allegations of wrongdoing were made by any of them as unindicted co-conspirators, their services must have been legitimate.

III. Shelikhova's Role in the Scheme (R. 863, p.4).

Shelikhova had not worked at two prior clinics in Brooklyn, as Coney Island and Flatlands were the same clinic. Dr. Drivas and Elena Girenko opened Bay Medical in 2005, with Girenko managing the business and Shelikhova heading the billing and accounting department.

According to **United States v Wahl**, 563 Fed Appx at 48, "The first such clinic was incorporated on March 1, 2005, and its certificate of incorporation and supplier agreement with Medicare described Drivas as its president."

According to the Presentence Report, on February 1, 2006, Bay Med. received authorization to participate in Medicare with the owner and primary

-5-

medical provider listed as Dr. Drivas, with its office staff reported to be
Irina Shelikhova (claims submitter) and Veronica Tchernickenko (receptionist).
SVS Well Care Medical PLLC was incorporated on April 24, 2006 when it likewise
received its Medicare authorization, with its application listing the director/
owner of SVS as Serge V. Shelikhov, Dr. Drivas as a "contracted managing employee",
Dr. Wahl as a contract physician, and its office staff including Katherina Kostiovt-
chenko, Irina Shelikhova, and Serge V. Shelikhov, who were authorized signatories
on SVS's corporate bank account used to electronically receive Medicare/Medicaid
reimbursements.  SZS Medical Care, LLC was incorporated on February 12, 2008
when it received its Medicare authorization, and was owned by Dr. Drivas, with
physicians listed as Dr. Drivas and Dr. Wahl.(PSR, ¶¶ 6, 7, 8).

Estranged husband, Sergey Shelikhov, and boyfriend, Sergey Zhamaryan, tes-
tified they were used by Shelikhova in self-serving testimony to put their names
on Medicare and New York State Division of Corporations paperwork to avoid insert-
ing her name on the documents, except Irina's name did appear on the Medicare
documents as office staff, and because she was the claims submitter, her name
appeared on the bank accounts.

According to the Superseding Indictment, it was alleged that from March,
2005 to July, 2010 the defendants "paid cash kickbacks to Medicare beneficiaries
to induce those beneficiaries to receive unnecessary physicians' services, physi-
cal therapy and diagnostic tests" (R. 83, ¶ 18).

While Shelikhova admits she had knowledge of kickbacks being paid to patients,
this practice did not occur in the beginning of the clinic's existence, but rather
was initiated in response to competition from another clinic engaging in the same
practice.  It was not to pay for the patients' complicity in health care fraud.

Shelikhova never gave any money to patients, nor did she determine how much
to pay for a visit.  Elena Girenko was the controlling person for the kickback
room, using her friend, Katerina Kostiovtchenko, to run it.

In **United States v. Wahl**, 573 Fed Appx at 48, it was reported a "poster hung in this [the kickback] room in which a woman appeared to 'shush' the viewer, with the phrase 'Don't Blab' printed in Russian". Much has been made of this poster by the government and the media, and it has been extensively used as the evidence of Shelikhova's intent to engage in fraud. This poster was not Shelikhova's property, nor was it her idea. Indeed, she hated it. The poster was the personal property of Irina Barikyan, who brought it into her office, putting it up on the wall, along with a number of religious icons given to her as gifts from patients.

Cash kickbacks were not paid from the clinic's inception as there were no patients to pay cash to bill for services. Clinic services were advertised through newspapers, magazines, and eventually through word of mouth from patients to their friends and relatives. The first patient in the clinic, out of the Medicare patients, was Shelikhova's elderly mother, who has a lot of medical problems and needs constant medical attention. She received full medical services that only a legitimate medical office could provide. The clinic's hospitality, which also attracted new patients, included a buffet with various snacks, refreshments, daily and weekly newspapers and magazines, and attentive personal services. The patients loved the doctors and staff.

As the result, Shelikhova repeatedly told Michael Rosen she did not believe herself to be guilty of health care fraud or money laundering, but she always admitted guilt to kickbacks to patients. If the government wanted to allege all of the clinic's services were fraudulent, then the other 15 doctors and all of their claims should have come under indictment.

Whereas the government alleges Shelikhova "profited from the scheme" by the amount of $38,241,545, underlying the forfeiture order (R. 663, p. 20), there is a huge disconnect between that allegation and the amount of spending alleged by Shelikhova of $864,000 on family and friends (R. 863, p. 6), and the bank account containing $232,320 seized in her name (R. 863-1, p. 8).

IV.  Shelikhova's Flight (R. 863, p. 7)

On July 16, 2010, seven of the eight individuals for whom an arrest warrant had been issued were arrested, except for Shelikhova.  She was not present at work, having had surgery the previous day.  On July 17, 2010, Shelikhova hires defense attorney Michael Rosen to represent her, who advised a plea agreement in her case would likely be for 36 to 48 months.  Shelikhova's physical condition was poor due to long-standing problems, resulting in the surgery on July 15 to correct problems developed after a difficult oncologic surgery in the past.  Boyfriend Sergey Zhamarian urges Shelikhova to leave the country out of concern for her health, advising she would not get proper medical treatment in jail.  After also seeking the advice of an old friend in the Ukraine, who promised to help with her medical problems, Shelikhova left the country.  Her son, Max, who had previously purchased tickets to go to the Ukraine and a wedding in Israel, left as planned.  Max had not been charged in the Complaint.

On October 7, 2010, an indictment is filed charging 11 defendants, including Shelikhova.  She is charged with violations of 18 USC §1349, Conspiracy to Commit Health Care Fraud (Ct. 1); 18 USC §371, Conspiracy to Pay Health Care Kickbacks (Ct. 2); 18 USC §2, Aiding and Abetting Health Care Fraud, 18 USC §1347 (Ct. 3). Her son, Max is also charged in the original indictment.

On October 28, 2011, a year later, Shelikhova is charged in a superseding indictment with violations of 18 USC §1349, Conspiracy to Commit Health Care Fraud (Ct. S1); 18 USC §371, Conspiracy to Pay Health Care Kickbacks (Ct. S2); 18 USC §1347, 18 USC §2, Aiding and Abetting Health Care Fraud (Ct. S3); 18 USC §1956(h), Money Laundering Conspiracy (Ct. S4); 18 USC §1956(a)(1)(B)(i), 18 USC §2, Aiding and Abetting Money Laundering (Cts. S5, S7, S9, S13, S16)(R. 83).

Five defendants were added to the superseding indictment and charged with money laundering--Zaretser, Kornev, Gelper, Shelabadova and Kraiter.  Out of the 26 doctors employed by the medical clinic, two were charged--Dr. Gustave Drivas and Dr. Jonathan Wahl (See Exh. C).

Max Shelikhov is arrested on November 14, 2011, just over 2 weeks later,

-8-

after attempting to enter Canada on a flight from the Ukraine where his then
attorney had instructed him to go to attend a meeting in Toronto, Canada.

AUSA Hall reports that during the weekend of November 12, 2011, "the govern-
ment received information that Maksim Shelikhov was attempting to enter Canada on
a flight from the Ukraine. At the government's request, based on the outstanding
arrest warrant, the Canadian border patrol denied Maksim Shelikhov entry into Cana-
da and made him take a flight to New York where agents arrested him upon arrival,
on Monday, November 14, 2011" (R. 663, p. 8).

Initially, bond is denied for Max. After several hearings, a $3 million bond
is ordered. AUSA Hall threatens one of the persons who was going to provide
$150,000 for Max's bail, causing the offer to be withdrawn and the bond revoked.
Max is threatened that no plea agreement will be offered on charges bearing up to
a 20-year sentence unless his mother returns from the Ukraine. At the **Drivas** trial,
Max testified "that the prosecutors made it clear to him in no uncertain terms
that in order for him to ever enter into a cooperation agreement he would have
to get petitioner ('his own mother') to return to the United States. He agreed
to it (Tr.1906)"(R. 856, ¶ 28, p. 6). It is not until after Shelikhova's return
from the Ukraine on June 14, 2012, that Max pleads guilty pursuant to a coopera-
tion agreement with the government on November 8, 2012 (R. 856, ¶ 22, p. 4), which
was a full year after his arrest on November 14, 2011.

In or around May, 2012, Michael Rosen sets up a conference call with Max's
new attorney, Michael Shapiro, who advises she has 3 weeks to return from the
Ukraine for her son to be offered a plea bargain. Shelikhova agrees to return
from the Ukraine because Max placed numerous calls to her from the Federal Deten-
tion Center in which was clearly very distraught : if she didn't return. All of
the calls were hysterical in nature, most spoke of him ending his life, and that
he was facing 20 years or more for the charges. Max is her only child.

Michael Rosen makes no arrangements for a plea deal for Shelikhova to return
to the United States from the Ukraine, which has no extradition treaty with the

United States.  Michael Rosen, Robert Bondar, who was a Russian interpreter and attorney, and the FBI were at the airport to meet Shelikhova upon her return to the United States on June 14, 2012.

V.   The Guilty Plea (R. 863, p.8).

The Plea Agreement offered by the government calculates the guidelines at 40 with a two-level reduction that would be available for acceptance of responsibility, resulting in an adjusted offense level of 38, a range of imprisonment of 235-293 months, capped at 240 months because of the statutory maximum of 20 years for Count 4, the money laudering conspiracy charge (R. 863-1, p.3).

On December 18, 2012, which Shelikhova believed was intended to ba a pretrial conference, she is called to meet with Rosen, who tells her she has 15 minutes to make a decision on the plea agreement, as the judge is waiting for her. She desagreed with the amounts. She was not willing to plead guilty to money laundering, whereas she was willing to plead guilty to conspiracy to pay health care kickbacks.  When she says she cannot make a decision so quickly, Rosen says he does not care and starts hysterically screaming at her.  When Shelikhova says she will not sign the plea agreement, Rosen runs from the room.  She begs the marshal to get her attorney back to talk to her.  Eventually, Rosen returns, having had the marshal bring Shelikhova to a cell outside the courtroom.  Rosen tells her she now has 3 chances: 1) the plea agreement in which she stipulates to all of the facts wanted by the government; 2) she could go to trial; or, 3) she could do an open plea.  Shelikhova tells Rosen she would choose the open plea, which left the "facts" open to debate, the allowable sentence from zero to 20 years, yet would protect her son Max, who had not yet been sentenced.

In the change of plea colloquy, Ms. Shelikhova articulates that she held discussions on the plea agreement with her attorney, but she refrains from agreeing or acknowledging that she is satisfied with him as counsel. Ms. Shelikhova never goes into details on her dissatisfaction with Michael Rosen, nor does the court inquire further, when a satifactory answer was provided only on the fact that he held discussion on the plea agreement, not whether she understood all that is meant in the plea agreement. The court first inquired about the movant having received a copy of the indictment and if the charges against her were read to her in Russian.

The movant responds: "It was not read to me line by line, word by word, but it was explained to me what's in it." (Doc. 44, p.27, line 16). When court continues: "And, counsel, do you think that's sufficient?" (Doc. 44, p.27, line 24). Rosen deflects: "You are asking me?" And then continues, "I certainly do, Your Honor." The court: "That you explained it rather than read it to her?" (Doc. 44, p.28, lines 1-5).

As further evidence of Rosen's lack of communication and his intimidation tactics, movant points to the Rule 11 Hearing, and her explanation of the offense. Michael Rosen in his ability to control the proceedings and intimidate movant further, drafts what she is to say to the court. He makes decisions without consulting her and without addressing her concerns.

> THE GOVERNMENT: The government's position is that this is a forfeited piece of property. The plea agreement provides that it will be forfeited; and, furthermore, the plea agreement provides that she is not going to interject a claim to that property later. So if she is not agreeing to that, he is not agreeing to the plea agreement.

| | |
|---|---|
| MR. ROSEN: | I'm not going to hold up the plea agreement. We will agree to it.  I just wanted to articulate, having lived through an aged parent is being in a place that she lives. |
| THE COURT: | Counsel, I'm not making the decision. |
| MR. ROSEN: | I know.  **I will** agree to it. |
| THE COURT: | But it's up to your client. |
| MR. ROSEN: | **We will agree that that should be included, even though it's heartless to agree.** |

(Doc. 44, p.33, line 10).  It is the court which then asks movant to agree, and it is movant who turns again and simply acquiesces to the wishes of her attorney, who continues to make decisions without even inquiring of his client's wishes.  Throughout this colloquy he never turns to her to explain what is being said, he never asks for her opinion, he simply makes the decision, so that he can move the proceeding along, so that Rosen would not have to prepare for trial.

This is not the only instance in which Rosen decides to interject an answer, or control the answer she provides to the court, which ultimately paints a picture of her understanding of the proceedings. Rosen interjects to prevent movant from answering; manipulating the court by narrative to answers which the court would accept.  Rosen's control over Shelikhova's speech and understanding of the proceedings does not yet stop, but continues. During the change of plea colloquy, Ms. Shelikhova is required in her own words to articulate the elements of the offense, and to describe her role in the offense.

| | |
|---|---|
| THE COURT: | In your own words, describe what you did. |
| MR. ROSEN: | Judge, with your permission and because of the language situation, the defense--I have prepared an allocution which tracked the indictment and the statute and gave that to the official court interpreter to at least initiate this allocution |

-12-

|            | proceeding.  So, with your permission, perhaps the interpreter can read. |
|------------|--------------------------------------------------------------------------|
| THE COURT: | Well, I'm not interested in your allocution. I'm interested in Ms. Shelikhova's allocution. She is educated; she is intelligent.  I think she understands what's going on here.  I need to hear it from her. |
| MR. ROSEN: | We have something that the interpreter has gone over with her.  Whatever pleases Your Honor. |
| THE COURT: | If she reads it and avows that it's her own, that's fine, but I need to hear from the defendant. |

(Doc. 44, p.43, line 2)

Movant then proceeds to read that which is written, by Michael Rosen.  It is clearly written by Michael Rosen, he acknowledges that this allocution is his and his alone, and Ms. Shelikhova is simply told to avow that it is now hers.  Additionally, she clearly does not understand what is now taking place.  But simply reads what Michael Rosen has placed in front of her. Her line is scripted.

|            |                                                                          |
|------------|--------------------------------------------------------------------------|
| DEFENDANT: | Do I have to say something, or I **agree**? |
| THE COURT: | Yes. You have to tell me what it is about what you did that makes you conclude that you are in fact guilty of this crime.  Give me dates, tell me where, and tell me what you did. |
| DEFENDANT: | From 2005 to 2010, July of 2010, I and others, together with others, agreed to- |
| THE COURT: | let the interpreter.  I'm sorry. |
| DEFENDANT: | --receive money from the medical insurance. |
| THE COURT: | I'm sorry.  You agreed with others to? |
| DEFENDANT: | Receive the money from the medical insurance. We transferred that money to different accounts with the purpose of receiving case, and other-- and also other suggestions had been conducted. I was personally involved in that together with others. |
| THE COURT: | And did you know the proceeds of the money that |

```
                         you were laundering came from the healthcare
                         fraud that's charged in the indictment?

DEFENDANT:               Yes, I did.  I did.

THE COURT:               Where did this occur?

DEFENDANT:               I did not understand the question.

THE COURT:               I need to know:  Did this all happen in Brooklyn
                         or somewhere else?

DEFENDANT:               Yes, in Brooklyn.  In Brooklyn.
```

(Doc. 44, p.43, line 19)

The court then informs Shelikhova, "Ultimately, it's going to

be my decision what the sentence will be.  After I get a report from

the Probation Department, I will hear from you, I will hear from your

attorney, I will hear from the government attorneys," to which

Shelikhova responds, "Yes, I understand" (R. 863-3, p. 18-19).

Next the record shows:

```
THE COURT:               Okay.  So just so you understand what goes into
                         these guidelines, I will be considering things
                         such as whether you have a prior criminal record,
                         I will be considering your role in this parti-
                         cular offense, I will be conseidering the amount
                         of money that the victim lost, and there may be
                         a lot of other things that I will consider that
                         I haven't yet--that I don't even know about.

                         Do you understand that?

DEFENDANT:               Yes, I understand, and I truly hope for that.

THE COURT:               You truly hope that what?

MR. ROSEN:               For that.

THE COURT:               I'm sorry.  I didn't hear that.

DEFENDANT:               That everything will be calculated properly.

THE COURT:               I hope so as well.
```

(R. 863-3, p.19)  After asking for her plea, and if she was making

it voluntarily and of her own free will, the court asks, "Has anyone

threatened or forced you to plead guilty?", to which Shelikhova responds, "No" (R. 863-3, p.23).

Shelikhova is not asked if there were any threats against a family member impacting her decision.

VI.  Sentencing (R. 863, p.9).

The Probation Department calculated the total offense level at 37, which included a 3-level adjustment for acceptance of responsiblity, but added 2 levels for Obstruction of Justice for having left the country to go to the Ukraine, an enhancement that was not requested by the government or included in the plea agreement.  The plea agreement added 4 levels for "sophisticated" means, 2 levels under §2B1.1 (b)(10)(c) and 2 levels under §2S1.1(b)(3)(R. 863-1, p.3).

At the sentencing hearing, Rosen objects to the actual loss amount and says he wanted to call the court's attention to the "differences throughout this litigation on who says what loss," arguing the Complaint stated the coinics received $46, 887, 000.00 (R. 1), the government's letter asserted Shelikhova profited $38, 241, 000.00 (R. 663), and the cooperating witness himself, Max Shelikhov, questioned the loss being in excess of $50 million (R. 391, p. 21-22), but admits, "I don't have the proof to counter the $50 million mark" (R. 863-4, p.6-7).

The CDs provided under FOIA from the victim that the movant reviewed in 2015 and 2016 would have provided such proof.

Mr. Rosen argues there should be a loss offset by the fair market value of services that were rendered to the victim, but he provides no evidence and states he was not looking for a hearing or a Fatico (R. 863-4, p. 8-9).  AUSA Hall admits, "The government does recognize that guidelines do make account for potential for an offset of the fair market value of legitimate services rendered"  (R. 863-4, p.13).

Other obections Rosen just wished to articulate included Shelikhova denies ordering doctors to open corporate bank accounts, she denies the allegation of Medicaid fraud with regards to REM transportation, and she denies being named as a participant in an alleged fraud at a former clinic. (R. 863-4, p.10).

Where Rosen provided no proof regarding the loss amounts being inaccurate, the court understandably agreed with the government's arguments regarding them.

Shelikhova addressed the court to state that she "understood and accept my guilt" (R. 863-4, p. 30). Her son, Max's sentencing hearing still had not been conducted, having been repeatedly re-scheduled. The day after his mother's sentencing, on November 13, 2013, Max sends an email stating, "Tell my mother that yesterday after her sentencing trial prosecutor's office sent a letter to the court, where I was given full protection for the return of my mother, so she should not think it was all in vain..." In his Affidavit, Michael Rosen makes much of Max pleading guilty pursuant to a co-operation agreement with the government on November 8, 2012 (R. 856, ¶22, p.4), which disregards the fact the benefit of the agreement was not available until after his mother was sentenced to all of the "facts" the government wanted.

The court finds the offense level is 37 from the Presentence Report (PSR), which would be a guidelines range of 210 to 240 months on a Criminal History Category of I, commenting the government is using a different number, 235 to 240, e.g., "I am not sure where that came from" (R. 863-4, p. 20). AUSA Hall responds the plea agreement included plus two for sophisticated laundering, whereas the PSR did not. The PSR included a plus two for obstruction, whereas the plea agreement did not. And the plea agreement gave the defendant two points for acceptance as oppose to three.

-16-

In fact, the plea agreement calculated four levels for sophisticated means (See p. 11, supra)(R. 863-1, p. 3).  Mr. Rosen did not object on the record to these overlapping enhancements, but told Shelikhova the government's plea agreement was for a sentence of 15 years, 8 months, which is 188 months, or a level 36, bearing a range of 188-235 months, which reflects the removal of two levels from the 38 levels calculated in it (R. 863-1, p. 3).  This advisement suggests another secret agreement was made with the prosecutor, as there is no reference to a 188 month sentence in the plea agreement (R. 863-1), or different plea agreement.

Nor does Mr. Rosen object to the two-level obstruction of justice enhancement included in the PSR pursuant to § 3C1.1, either at sentencing or in written objections to the PSR.  His response to nearly every one of movant's objection was, "Big Deal - 2 points."

AUSA Hall admits the plea agreement did not include a two-level enhancement for obstruction of justice (R. 863-4, p. 20).

The Court imposes a "below Guidelines sentence of 180 months" (R. 863, p. 11), which was above an accurately calculated Guidelines sentence due to Mr. Rosen's ineffectiveness.  At a minimum, if Mr. Rosen had reviewed the CD's from the victim, including to verify if the government's numbers were overstated, as Shelikhova argued from the beginning, the actual loss and intended loss would have been below $50 million for a two-level reduction; and if Mr. Rosen had made objection to the obstruction of justice enhancement based on caselaw he had cause to know, there would have been another two-level reduction to a level 33, which bears a range of 135 to 168 months, all of which is below the 180 months imposed.

VII.  The Direct Appeal (R. 863; p. 11)

Shelikhova appealed her sentence to the Second Circuit Court of Appeals. The government moved to dismiss the appeal based on the appeal waiver contained in the plea agreement.  Appointed counsel filed a brief pursuant to **Anders v. California**, 386 US 736 (1967), and Shelikhova filed a pro se brief arguing the plea was not knowing and voluntary.

The appeal was denied on May 26, 2015 in **United States v. Khandrius**, 613

Fed Appx 4, 9 (CA2 2015), which held, "We agree with Shelikhova's counsel and the government that there are no meritorious issues to be raised on appeal because (1) Shelikhova's guilty plea was valid; (2) her waiver of appellate rights was knowing and voluntary; and (3) her plea agreement clearly specified that she would not appeal a 'term of imprisonment of 240 months or below.'"

<u>ARGUMENT</u>

I.   Applicable Law on Appellate Waivers and Ineffectiveness Claims (R. 863, p. 12)

In light of the procedural posture of this case and the government's argument the waiver should apply, Shelikhova invokes the Memorandum from Deputy Attorney General Cole to Federal Prosecutors dated October 14, 2014.   In this Memorandum sent to all federal prosecutors, the Department of Justice promulgated a new policy regarding including waivers of ineffective assistance of claims in Rule 11 agreements.   The Memorandum specifically provides:

> "For cases in which a defendant's ineffective assistance claim would be barred by a previously executed waiver, prosecutors should decline to enforce the waiver when defense counsel rendered ineffective assistance resulting in prejudice or when the defendant's ineffective assistance claim raises a serious debatable issue that a court should resolve."

While the Second Circuit has held a Justice Department's policy statement is not controlling law and does not bind the Court, as per **United States v. Canon**, 737 F 3d 181, 183-184 (CA2 2013), the two specific circumstances stated in the 2014 Memorandum as reasons for prosecutors not to enforce a waiver are present in the instant case.

According to **Gonzalez v. United States**, 722 F 3d 118, 130 (CA2 2012), "In order to satisfy the prejudice prong with respect to a claim focusing on a plea of guilty, 'the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial'" (citing **Hill v. Lockhart**, 474 US 52, 59 (1985)).   "With respect to a claim of ineffective assistance in sentencing, the defendant must show a reasonable probability that, but for counsel's substandard performance, he would have received a less severe sentence" (citing **Glover v. United States**, 531 US 198,

-18-

203 (2001)("Authority does not suggest that a minimum amount of additional time in prison cannot constitute prejudice. Quite to the contrary, our jurisprudence suggests that any amount of actual jail time has Sixth Amendment significance.").

Courts have held time and again that "a waiver of appellate or collateral attack rights does not foreclose an attack on the validity of the process by which the waiver has been procured". **Sanders v. United States**, US Dist LEXIS 85802 (SD NY 2016)(citing **United States v. Cleveland**, US App. LEXIS 4845 (CA2 2016)(quoting **Frederick v. Warden**, 308 F 3d 192, 195 (CA2 2002). "Where the record on appeal does not include the facts necessary to adjudicate a claim of ineffective assistance of counsel, our usual practice is not to consider the claim on the direct appeal, but to leave it to the defendant to raise the claims in a petition for habeas corpus under 28 U.S.C. §2255." **Id.**, at 195. "Ineffective assistance with respect to an appeal waiver, if proven, would cast doubt on enforceability of the appeal-waiver provision." **United States v. Oladimeji**, 463 F 3d 152, 155 (CA2 2006).

Finally, the government argues Shelikhova should not be allowed to relitigate claims adversely decided on appeal by rearticulating them as "ineffective assistance" claims. At the time of the direct appeal, Shelikhova did not have the benefit of the information obtained under FOIA from the victim to support her claims the intended and actual loss figures had been substantially overstated. As the result, neither court-appointed counsel nor the Second Circuit credited her claims as legitimate when the evidence in the underlying record established otherwise. Moreover, as the Government's Response shows, the claims decided by the Second Circuit are not the same claims based on the same facts as raised herein. According to the Government's Response, "Shelikhova argued that her plea was invalid because of the 'prosecutorial misconduct' relating to the government's failure to offer Maksim Shelikhov a cooperation agreement unless he could persuade Shelikhova to return to the United States", and that Max's "ability to obtain a cooperation agreement was contingent on her pleading guilty" (R. 863,

-19-

p. 11).  In the instant action, specifically, it is Shelikhova's claim that Max
was denied the benefit of the cooperation agreement unless she returned, pled
guilty, and was sentenced to every "fact" demanded by the government, which was
a secret agreement withheld from her through sentencing, rendering the plea and
sentencing process defective due to ineffective assistance.  When Max obtained
the cooperation agreement is irrelevant; that his sentencing hearing was delayed
until after Shelikhova's sentencing as ammunition to coerce her acquiesence
through Mr. Rosen's cooperation with the government and Max's attorneys, are the
relevant facts to an accurate and fair determination of both whether the plea was
knowing or voluntary.

"Changes in fact essential to a judgment will render collateral estoppel in-
applicable in a subsequent action raising the same issues." **Montana v. United
States**, 440 US 147, 159 (1979).  "The redetermination of issues is warranted if
there is reason to doubt equality, extensiveness, or fairness of procedures fol-
lowed in prior litigation."  Id., at 163-164, Ft. 11.  According to **Stone v. Wil-
liams**, 970 F 2d 1043, 1055 (CA2 1991), "Modification of significant facts creat-
ing new legal conditions allows relitigation."

II.  Argument:  Shelikhova Is Bound by the Appeal Waiver (R. 863, p. 14)

a.  Counsel Was Not Ineffective With Respect to the Guilty Plea (R. 863, p. 14)

(1)  There is no dispute prosecutors made son Max's cooperation agreement con-
tingent upon coercing his mother to return to the United States.

Contrary to the Government's Response, Shelikhova did not voluntarily return
to the United States, but according to the Affidavit of attorney Michael Rosen,
she was coerced by her son, Max, who testified "prosecutors made it clear to him
in no uncertain terms that in order for him to ever enter into a cooperation agree-
ment he would have to get petitioner ('his own mother') to return to the United
States.  He agreed to it (Tr. 1906)" (R. 856, ¶ 26, p. 6).  Max mounts a campaign
of hysterical phone calls to his mother, insisting his life is over, if she does
not return, as prosecutors demanded.

-20-

Shelikhova returns to the United States on June 15, 2012 (R. 863, p. 8). It is not until _after_ she returns, on November 8, 2012, that Max pleads guilty pursuant to a cooperation agreement with the government (R. 863, ¶ 22, p. 4). This is a full year after Max was arrested on November 14, 2011 (R. 863, ¶ 5, p. 2).

(2)  Attorney Michael Rosen was part of this coercive process.  While Mr. Rosen set up the conference call in May, 2012 with Max's attorney, Michael Shapiro, who threatened her that she had just 3 weeks to return for Max to obtain a cooperation agreement; he does not directly admit to having set up the call or participating in it, but he does admit, "At some point, I believe in the Spring of 2012, petitioner indicated a desire to return to the United States in the hope that it would aid Max's situation. Mr. Bondar acted as translator for these conversations.  I advised petitioner of the consequences to her of returning.  Petitioner decided to return and told me she would let me know of her intended travel plans" (R. 856, ¶ 6, p. 2-3).  Rosen continues, "On or about May 29, 2012 I received information from Mr. Bondar that petitioner planned to return to the United States on June 14, 2012 on Aerosvit flight 131, arriving at 5:05 pm at JFK, Terminal 4.  I transmitted the information to AUSA Shannon Jones" (R. 856, ¶ 7, p. 3).

Mr. Rosen omits reference to his role in and direct knowledge of the prosecution's coercive tactics at the time Shelikhova was still in the Ukraine, as there was absolutely no benefit to her to return, other than to save her son. Indeed, to argue otherwise is irrational and would suggest Shelikhova not only had mental problems, but suffered from low intelligence, rendering the plea process unknowing.

In fact, at the sentencing hearing, Mr. Rosen expresses how extraordinary and unusual the circumstances were in Shelikhova returning from the Ukraine:

> "It has been proffered to Your Honor on more than one occasion, without dispute by the Government, that Max would need to convince and get his mother to return before he would be offered a cooperation agreement. And again, this is in two places that's on ECF that's been submitted to Your Honor and proferred to Your Honor.  One is Document 555 at page 4, and the other is Document 706 that I just referred to.  Clear, without dispute.  You want a cooperation agreement, you convince and get your

-21-

mother to leave her safe haven" (R. 863-4, p. 23-24). "It was preferred
to Your Honor that these were the words, and in my 49 years, I've never
experienced anything like this--it was made clear to Max, in no uncer-
tain terms, that that had to be accomplished as a condition of getting a
cooperation agreement. And again, I say this most respectfully, this
has never to this moment been disputed by the Government. So Judge Ger-
shon, after advising Mrs. Shelikhova that if and when she did come back,
she would immediately be arrested, remanded, further imprisoned, deporta-
tion thereafter, huge financial consequences, she came back. She never-
theless, and I represent this to the Court as an officer of the Court,
that this was communicated to Mrs. Shelikhova, all these negatives about
leaving safe haven, and she made a decision. Nevertheless, she left her
safe haven and returned to the United States in June of 2012 as I had ar-
ranged with the U.S. Attorney's Office and I think the FBI. Of course
she was arrested at JFK the moment she stepped off the plane and has been
incarcerated at the MCC for the 17 months since then. Judge Gershon, I
submit that these circumstances which I can envision should really be
additionally part of 3553(a) circumstances of a particular defendant
are so rare, unusual and extraordinary, that again I submit, having
practiced long before the guidelines came in and now since the guide-
lines came in, out of the Heartland of anybody's concept of what a per-
son did to effectuate a positive for not only her son, but for the Gov-
ernment" (R. 863-4, p. 24-25).

At sentencing, Mr. Rosen's direct hand in arranging for Shelikhova's return

is more evident in his commentary, e.g., "she left her safe haven and returned

to the United States in June of 2012 as I had arranged with the U.S. Attorney's

Office and I think the FBI" [emphasis added](R. 863-4, p. 24-25).

An evidentiary hearing in which Mr. Rosen, Mr. Bondar and Mr. Shapiro were

asked the question of who arranged and participated in the May, 2012 conference

call in which the information was imparted to Shelikhova that in order for Max

to obtain a cooperation agreement, she had to return to the United States, would

expose their knowledge. Moreover, that prosecutors used defense counsel in this

case to effectuate arrests is shown by Max's first defense attorney who lured him

to Canada under the guise of a meeting, exposing a pattern of such collaboration.

(3) The benefit of the cooperation agreement for Max was not available to

him until after his mother pled guilty and was sentenced to every "fact" demanded

by the government, rendering the plea process involuntary and unknowing where she

had been led to believe it was only her return to the United States that was being

required. Here again, Mr. Rosen's hand in collaborating with the government in

this process is evident at every turn.

-22-

"[A] plea which is the tainted product of ignorance, incomprehension, coercion, terror, inducements, threats or promises is void." **United States v. Malcolm,** 432 F 2d 809, 812 (CA2 1970)(citing **Boykin v. Alabama,** 395 US 238, 242-243 (1969).

Where Shelikhova believed she retained the right upon her return to defend herself, certainly not plead guilty to money laundering or health care fraud, it was not true where Max's life continued to be held in the balance as coercion against her. Until she was sentenced to everything the government wanted, Max was not afforded the promise Mr. Shapiro represented would accrue upon her return. No attorney advised that she had to plead guilty to any or even all of the charges. Indeed, initially upon her return, Mr. Rosen said he would fight and go to trial.

"[T]he initial choice of whether to plead guilty or not or to insist on a trial belongs solely to the defendant." **Gonzalez v. United States,** 722 F 3d 118, 133 (CA2 2012). See generally **Jones v. Barnes,** 463 US 745, 751 (1983)("the accused has the ultimate authority to make certain fundamental decisions regarding the case, [such] as...whether to plead guilty"); **Boria v. Keane,** 99 F 3d 492, 496-497 (CA2 1996)("The decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in any criminal case. This decision must ultimately be left to the client's wishes." "[T]he **Strickland** inquiry requires [a] probing and fact-specific analysis," **Sears v. Upton,** 177 L Ed 2d 1025 (2010), and the strength of the government's evidence and the severity of the possible punishment are not always determinative on the issue of whether, in the absence of substantive advice form counsel, a particular defendant would have decided to plead guilty or go to trial."

Shelikhova repeatedly told Rosen she did not believe she was guilty of money laundering. Mr. Rosen had cause to know that the money laundering charges should not rest on a cash kickback to patient conspiracy as they were part of the underlying crime.

The Tenth Circuit has written that "Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford

-23-

an alternative means of punishing the prior 'specified unlawful activity.' **United States v. Edgmon**, 952 F 2s 1206, 1214 (1991).  In **United States v. Holmes**, 44 F 3d 1150, 1154 (1994), the Second Circuit adopted this holding.

In a September 18, 1997 Report to Congress, "Sentencing Policy for Money Laundering Offenses, including Comments on Department of Justice Report", the United States Sentencing Commission reported, "although the DOJ noted its agreement with the Tenth Circuit holding in **United States v. Johnson**, that money laundering cannot properly be charged for 'merged' transactions that are part of the underlying crime, the Commission has continued to receive documentation on defendants who have been convicted and sentenced for money laundering where there is nearly complete identity between the money laundering and the underlying conduct" (full copy online at http://www.gov/r_congress/launder.pdf)(See also Exh. D).

"Because by definition, money laundering involves the proceeds of unlawful activity, it is well settled that the transaction charged as money laundering cannot be the same transaction through which the funds became  tainted by crime." **United States v. Shellef**, 732 F Supp 2d 42, 73 (ED NY 2010)(citing **United States v. Napoli**, 54 F 3d 63, 68 (CA2 1997), abrogated on other grounds; **United States v. Hall**, 613 F 3d 249 (D.C. Cir. 2010)(collecting cases); **United States v. Zvi**, 168 F 3d 49, 57 (CA2 1999).

The Superseding Indictment alleges crimes ranging in time from March, 2005 to July, 2010; thus, the timeframe of the charges straddle changes in the law as to whether proceeds referred to net income or gross receipts and involve merger problems.  The fractured decision of the Supreme Court in 2008 held proceeds "must be limited to net income only when there is a 'merger' problem". **United States v. Santos**, 553 US 507.  Whereas money laundering has a statutory maximum penalty of 20 years imprisonment, conspiracy to commit health care fraud in violation of 18 USC §1349, has a statutory maximum of 10 years, and conspiracy to pay health care kickbacks in violation of 18 USC §371, has a statutory maximum of 5 years, demonstrating the existence of a possible "merger" problem.

On May 20, 2009, the Fraud Enforcement and Recovery Act (FERA) was passed by Congress, adding (c)(9) to 18 USC §1956, which defined "proceeds" as "gross receipts". In United States v. Quinones, 635 F 3d 590 (CA2 2011), when addressing Santos applicability, Justice Stevens' statement was quoted, "the legislative history of §1956 makes it clear that Congress intended the term 'proceeds' to include gross revenues from the sale of contraband and the operation of organized criminal syndicates involving such sales". See Santos, 553 YS at 525-526, & n. 3 (Stevens, J, concurring in the judgment). "Justice Alito's dissent likewise recognized the argument among five Justices that the term 'proceeds' includes gross revenues from the sales of contraband." Id., at 523, n. 1. Quinones at 599-600. This case held Santos did not apply in a controlled substance case, but did not address the proper interpretation of 'proceeds' under Santos where the predicate offense does not involve the sale of contraband. Id., at 600, n. 5.

"The United States Court of Appeals for the Second Circuit has held that Justice Stevens' concurrence controls and, thus, proceeds under the money laundering statute refer only to profits where a merger problem arises and there is no legislative history indicating Congress's intent that the money laundering statute should still apply." United States v. Gushlak, 495 Fed Appx 132 (CA2 2012). "Here, there is arguably a merger problem to the extent that Gushlak used securities fraud proceeds to pay kickbacks to stock brokers associated with carrying out the fraud conspiracy. See United States v. Santos, 553 US at 517 (plurality op.)." Id., at 134.

Where Shelikhova's case was not a prosecution involving drug trafficking or the operation of organized crime syndicates involving the sale of contraband, Rosen had cause to know that there may be a merger problem in regards to the money laundering conspiracy for the proceeds alleged obtained prior to May 20, 2009.

Alternatively, it was represented in the PSR that there was $4 million in cash laundered from the clinic through 5 defendants (¶ 24). Payments were reportedly made to companies alleged to be "shell" companies conducting no legitimate business. The company to which most of the funds were paid, V & V Construction,

was to do a new office, and its owners were in fact acquitted at trial in 2013 after the PSR had been prepared. The three defendants acquitted were Zaretser, Kornez, and Gelper. Anatoly Kraiter, who was reported to have laundered $236,120 in the PSR on behalf of SZS Medical through Kolkneva Entertainment in the PSR (¶ 27), was a friend of Elena Girenko. Kraiter pled guilty through a cooperation agreement.

As to guilt on health care fraud, according to **United States v. Bradley**, 644 F 3d 1213, 1248 (CA11 2011), in **United States v. Medina**, 485 F 3d 1291 (CA11 2007), the conviction for 18 USC §1347 was reversed where the evidence consisted of the testimony "regarding the defendant's 'general practice' of billing Medicare for traditionally manufactured medications while providing instead 'a "compounded" medication...mixed in the pharmacy.'" **Medina**, at 1299. "That officer did not, however, point to any specific transactions in which the defendants actually sold compounded drugs, but billed for traditionally manufactured medications. This omission was fatal to the Government's case. We explained that, to provide sufficient evidence of health care fraud, the Government had to 'present some evidence that at least one specific patient received compounded medication when [the pharmacy] billed Medicare for manufactured medication.' Id., at 1299-1300 (emphasis added)."

In **Medina**, the convictions were vacated except for conspiracy to pay kickbacks where it was held, in a health care fraud case, the defendant must be shown to have known that the claims submitted were, in fact, false, citing **United States v. Laughlin**, 26 F 3d 1523, 1526 (CA10 1994). **Id.**, at 1297. "Although paying kickbacks violated 42 USCS §1320a-7b, that alone was insufficient to convict for health care fraud under 18 USC §1347 without defendant making knowing false or fraudulent representations to Medicare." **Id.** The penalty provided for violation of 42 USCS §1320a-7b is a 5-year maximum prison sentence.

In the instant case, not only was it in Irina Barikyan's best interest to lie about the practices of her former employer, Bay Medical, to obtain a great "deal" from the government where, although described as a "co-conspirator", she

-26-

was not even charged, but her lies, criminal activities, and collaboration with the government were of considerable assistance in destroying the competition to her husband's new medical clinic and obstructing Bay Medical from prosecuting her for stealing half of the kickback money from them, both of which were significant financial benefits. Ironically, this protection of Barikyan by the government in Shelikhova's prosecution served to promote health care fraud against Medicare through the operation of a new and corrupt clinic, Cropsey Medical, which also came to be under investigation and Barikyan's husband and Olga Novgorodskaya under indictment.

Moreover, where none of the other doctors are charged, who obviously represented an overwhelming majority in legitimate services, according to data on the CD's provided by the victim, when none of their services were shown to be fraudulent, there is no health care fraud available to show by the preponderance of the evidence standard.

On March 23, 2010, subsection (b) was added to 18 USC §1347, Health Care Fraud, which states, "with respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section." See Patient Protection and Affordable Care Act, Pub. L. 111-148, Title X, § 10606(b), 124 Stat. 1008 (2010).

Where the allegations in the indictment covered the timeframe from March, 2005 to July, 2010, the vast majority of the claims were encompassed within the period of time prior to this change in the law.

According to "Modern Jury Instructions--Criminal", as published by Matthew Bender Criminal Law Library, Vol. 2, ¶ 44.03, Health Care Fraud (18 USC §1347), Instruction 44-16, Second Element--Intent to Defraud, which discusses the 2010 legislation, "If, on the other hand, [this provision] is intended to mean that specific intent to commit fraud is not required, then it is problematic because it undermines the definition of fraud as a scheme intended to wrongfully deprive others of property. As it unlikely that Congress intended so great a change in fraud jurisprudence without substantial legislative discussion, the recommended instruction continues

-27-

to require specific intent to defraud, although this should be treated with some caution until the meaning of section 1347 is addressed by some court" (See Exh. E).

Rosen had cause to know of this change in the law, which occurred almost 3 years before he told Shelikhova she had 15 minutes to decide what she was going to do about the government's plea agreement on December 18, 2012, which any competent defense attorney would know violated Ex Post Facto Clause prohibitions if applied retroactively to her case.

That Rosen was aware of this change in the law and the government's intent to apply it to Shelikhova's case is evident from his conduct.  His initial estimate of a plea bargain in the case is a three to four year sentence in 2010.  Rosen's later disinclination to review discovery, hostility and irritation at Shelikhova's questions and pleas for him to provide any kind of a defense, failure to explain the charges and their elements, coercion to plead guilty without properly reviewing the plea agreement with her and providing no advance warning she had to make an immediate decision, even going so far as to run from the room when she refused, lying about her options to claim she could do an "open" plea but at the same time having her sign the plea agreement, which explains her plea to the Court that everything would be "calculated properly" (R. 863-3, p. 19), his insistence on keeping her strictly to "script" in front of the Court for fear she would say something that would derail things (R. 863-3, p. 14, 17, 2427), lying to her by telling her she could appeal when he knew there was an appeal waiver in the plea agreement, and even his greediness in running her out of funds so she would not be able to replace him with competent counsel, are all red flags to suggest he collaborated with the government to insure not only that this particular agreement but also the new law apply. Her change of plea hearing states her understanding that the "purpose of the transfer was to receive cash, and then that cash was taken and that cash was to receive payments" (R. 863-3, p. 26), which was stated by AUSA Jones to be "she allocuted that the transactions were basically to hide the fact that they were getting cash kickbacks" (R. 863-3, p. 27).  The proceeds

-28-

of the money that was allegedly laundered was defined to have come from the health care fraud changed in the indictment (R. 863-3, p. 25).

Elena Girenko, the real mastermind of any fraudulent schemes, received a 42 month sentence, which was within Rosen's estimate in 2010, whereas Shelikhova received a sentence over 300% more than originally discussed where she was not permitted by Rosen to challenge the health care fraud or money laundering charges.

The Supreme Court in **Peugh v. United States**, 133 S Ct 2072 (2013), described an ex post facto law as including, "every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed"; and "every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offence, in order to convict the offender."

In Shelikhova's case, the unconstitutional retroactive application of this change in the law guaranteed she could not dispute the charges, e.g., an unconstitutional presumption of guilt, and it guaranteed a sentence three times as harsh as otherwise may have applied. It also rendered the conviction void for vagueness where it encouraged discriminatory treatment and violated due process.

"[T]he void-for-vagueness doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions." **Skilling v. United States**, 177 L Ed 2d 619, 662 (2010).

There is a tremendous risk of arbitrary and discriminatory prosecutions and practices with 18 USC §1347(b). All a prosecutor now has to do is make the allegation and the accused is presumed guilty where the element of knowledge or intent is removed from dispute. It encourages lying by "co-conspirators", which is already a serious defect in the fairness afforded in a federal prosecution. In this case, it was overwhelming where Shelikhova was a convenient scapegoat for everyone to blame everything upon in her absence. Coupled with a defense attorney who appears to have presumed his Russian client would be highly unlikely to ever discover his duplicity on this point, given her need for an interpreter and his

demands for more money thereby precluding her from affording competent counsel, prejudice to Shelikhova was guaranteed.

Several times in the Government's Response, the argument is made that Shelikhova voluntarily returned to the United States, and that she falsely asserts Max's ability to obtain a cooperation agreement also was predicated on her guilty plea (R. 863, p. 16).  A cooperation agreement is worthless without the government's motion to the Court for a sentence reduction, and the record establishes Max did not receive the benefit of his cooperation until his mother not only returned, but pled guilty and was sentenced to every "fact" the government demanded, as collaborated by Mr. Rosen.

At sentencing, AUSA Hall argues Shelikhova voluntarily returned to the U.S.:

"She did so undoubtedly to benefit her son, but she also had her own reasons for returning to the United States, which are somewhat in conflict with counsel's statement at oral argument now.  The defendant's own letter to Your Honor attached to the September 5th, 2013 sentencing submission, page 1 at the very bottom, the defendant writes to the Court, I left for Ukraine hoping to improve my health and definitely come back, but not everything happened the way I thought.  In Ukraine, I encountered many complications and could not return as fast as I wanted, but during this whole period of time I tormented myself and suffered, understanding that that I cannot and do not want to live like that.  So, Your Honor, the defendant clearly had her own motivations for returning to the United States that had nothing to do with benefitting her son and certainly had nothing to do with benefitting the United States Government."

(R. 863-4, p. 36).  Everything Shelikhova said on the record was scripted by Mr. Rosen, in collaboration with the prosecutor's demands.  Both Rosen and the prosecution team had cause to know the plea agreement could be voided by coercion, causing Rosen to script a letter in which Shelikhova would represent that she came back for her own reasons, rather than having been extorted to do so.

(4)  Rosen collaborated with prosecutors to conspire against Shelikhova in an undisclosed secret agreement committing fraud upon this Court.  Shelikhova's great love for her son, Max, caused her to return to the United States, as manipulated by the defense attorneys who did not disclose the secret agreement that until she was sentenced to every "fact" the government wanted, Max would not benefit from her sacrifice.

-30-

Language in a plea agreement that affirmatively denies the existence of any side agreement between the parties, such as where there is a secret undisclosed agreement requiring a party to stand mute in the face of a court's inquiry, violates Guidelines 6B1.4. **United States v. Fagge**, 101 F 3d 232, 234 (CA2 1996). "We have previously suggested that if a plea 'agreement required that arguably relevant information be kept from the district court, 'we could not enforce such an agreement because it would be against public policy.'" (citing **United States v. Lovaglia**, 954 F 2d 811, 817-818 (CA2 1992)(quoting **United States v. Williamsburg Check Cashing Corp.**, 905 F 2d 25, 28 (CA2 1990)). "An agreement to keep the judge ignorant of pertinent information cannot be enforceable, because a sentencing court "must be permitted to consider any and all information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed.'" **Williamsburg**, 905 F 2d at 28 (quoting **Wasman v. United States**, 468 US 559, 563 (1984)). **Id.**, Nt. 1. In regards to a government motion under §5K1.1, substantial assistance to authorities, USSG 1B1.8, Application Note 1 states, "This provision does not authorize the government to withhold information".

Rosen made no legitimate effort to mitigate the damage to Shelikhova before she left the Ukraine, during plea negotiations, or sentencing. He made no investigation, he did not appear to negotiate for a better offer, he merely did whatever the government wanted. Indeed, Rosen acted as if Max were his client, not his mother.

Ineffective assistance of counsel during plea negotiations can invalidate a guilty plea and make granting withdrawal appropriate, to the extent that the counsel's deficient performance undermines the voluntary and intelligent nature of defendant's decision to plead guilty (citing **United States v. Artega**, 411 F 3d 315, 320 (CA2 2005)). **United States v. Doe**, 537 F 3d 204, 213 (CA2 2008). To determine whether a defendant has proferred a fair and just reason to justify withdrawal of a plea, a district court should consider, inter alia, whether the defendant has asserted a claim of legal innocence. Id.

(5) Effective assistance of counsel was denied where Rosen suffered from

both personal and professional conflicts of interest.

Under Cuyler v. Sullivan, 446 US 335 (1980), "if a defendant's lawyer had an 'actual conflict of interest' in which the lawyer 'actively represented conflicting interests', the defendant need only demonstrate that the actual conflict 'adversely affected his lawyer's performance' in order to prove a violation of his Sixth Amendment right to effective counsel," and he need not demonstrate prejudice. Tueros v. Greiner, 343 F 3d 587, 591-592 (CA2 2003)(quoting Sullivan, 446 US at 358, 350).

The argument can be made that Rosen actively represented the best interests of Shelikhova's son, Max, resulting in a conflict of interest that was per se prejudicial. That Shelikhova would be required to plead guilty to and be sentenced for the crimes and "facts" the government wanted before the motion for reduction for Max would be filed so that he would have the benefit of the cooperation agreement was not discovered until after her sentencing when later the same day the motion for substantial assistance was filed. Thus, prejudice occurred both under the Strickland standard and the Cuyler standard.

"Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." Strickland, 466 US at 686. "In certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance" Id., at 692 (citing United States v. Cronic, 466 US 648, 659 and n. 25 (1984)). Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance" Id., (citing Cuyler v. Sullivan, at 348, 350).

"Where a defendant shows actual or constructive denial of assistance with counsel or state interference with counsel's assistance, prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the

cost." **Torres v. Connelly**, 554 F 3d 322 (CA2 2008).  In **United States v. Levy**, 25 F 3d 146 (CA2 1994), the defendant's lawyer represented a co-conspirator at the same time.  The defense lawyer's actual conflicts of interest that prompted him to forego a viable defense established a Sixth Amendment violation.

"Even a defendant's explicit, in-court waiver of his right to a non-conflict lawyer is not valid and effective when the trial court fails to explain adequately the ramifications of the attorney's conflict and fails to provide the defendant with time to reflect on his decision." **Id.**

In the instant case, Shelikhova's right to conflict-free representation was not protected where neither of the defense attorneys, Rosen or Shapiro, who were aware of the conflict, nor the government who interferred with this right, disclosed this secret agreement to the Court, presumably as it would have required disclosure to Shelikhova and it would have provided a showing for bad faith in the government's dealings with both her and her son, Max.

Shelikhova would suggest that due to these conflicts of interest and the government's manipulations of the defense attorneys to engage in such unconstitutional conduct, including in deceiving this Court, that she should be afforded relief in her sentence based upon the government's bad faith in refusing to move for a downward departure for Max until <u>after</u> she was sentenced.

"A fairly simple procedure is used to determine whether an evidentiary hearing on the issue of good faith is warranted:  when a defendant claims that the government has acted in bad faith in refusing to move for a downward departure, the government may rebut that allegation by explaining its reasons for refusing to depart.  The defendant must then make a showing of bad faith to trigger some form of hearing on that issue.  The defendant need not, of course, establish the government's bad faith in order to secure an evidentiary hearing; he must only make a showing of bad faith." **United States v. Roe**, 445 F 3d 202 (CA2 2006).

    b.  Counsel Was Not Ineffective With Respect to Sentencing (R. 863, p. 18)

    Mr. Rosen was ineffective with respect to sentencing for the same reasons

he was ineffective during the plea negotiation process, incorporating the arguments from (I) and (II)(a) herein.

(1)  Rosen was ineffective for failing to review and verify the accuracy of the amounts alleged as intended and actual loss, which further foreclosed a valid arguement regarding the use of actual loss vs. intended loss or offset.

According to the data provided by the victim under FOIA, the totality of the clinic's billing was $49, 882, 310.75 vs. the government's allegation of $77 million for intended loss, and the accurate amount of payments for the claims is even less vs. the government's allegation of over $50 million.  As the court correctly observed at sentencing, "In order for an offset to have any significance on the guidelines, the offset would have to be greater than $27 million to bring the loss below $50 million" (R. 863-4, p. 15), which presumed the accuracy of the government's assertion of intended loss at $77 million.

The term "intended loss" may fairly be read to encompass a defendant's reasonable expectation of loss, **United States v Lacey, 699 F.3d 710 (CA2 2012).**

When reviewing the Medicare data, Shelikhova was able to determine that most claims included the modifier, notifying Medicare that an offset was required (by Medicare) billing directive before the balance payment on a claim could be made to the clinic.  Moreover, the billing format has the appearance of repetitive claims when multiple treatment codes are entered for the same patient.  Where the average patient was elderly and infirm with numerous health conditions, different treatments were required.  In addition, the total amount of billing submittals due to corrections or other reasons for return by Medicare, also included resubmitted claims.

In **United States v Nachamie, 28 Fed Appx 13, 25 (CA2 2002),** the district court's estimate of intended loss was supported

-34-

by a preponderance of the evidence.  Nachamie and his co-defendants submitted in excess of $12 million in claims to Medicare.  The court discounted this amount by almost one-half to account for billings in excess of reimburseable amounts, beneficiary co-payments, and duplicate bills.

"In United States v Singh, 390 F.3d 168 (CA2 2004), a doctor caused his office to submit to Medicare and Medicaid insurers bills that were higher than the fixed rates established by the government for the services provided.  See Id., at 176-177, 193. The district court determined intended loss based on the combined total face value of the bills.  See Id at 193.  The defendant argued that he never intended to receive full reimbursement because he knew the rate schedules were carved in stone.  Consistent with the Geevers approach [United States v Geevers, 226 F.3d 186, 192 (CA3 2000)], Singh held that the defendant 'should have a further opportunity on remand to show, if he can, that the total amount he expected to receive from the insurers was indeed less than the amounts he actually billed.'  Id., at 194."  United States v Confredo, 528 F.3d 143, 152 (CA2 2008).

(2)  Rosen was ineffective for failing to argue that the billings and payments for the unindicted physicians should be deducted from the intended and actual loss.

(3)  Rosen was ineffective for failing to argue that an obstruction of justice enhancement should not have been imposed.

In the Plea Agreement, the government did not demand this 2-level enhancement (R. (R. 863-1. p.3)), whereas it was included in the calculation made in the PSR (¶51).

United States v. Vargas, 986 F 2d 35, 42 (CA2 1992), has held, "we have ruled that mere flight from an arresting officer to avoid capture in the aftermath of a crime does not of itself constitute an obstruction of justice within the meaning of that provision" (citing United States v. Stroud, 893 F 2d 504, 508 (CA2 1990)). "In a related context, it is noteworthy that the federal obstruction of justice statute, 18 USC §1503, has never been interpreted to apply to flight from arrest... Furthermore, the Bail Reform Act, 18 USC §3142, explicitly draws a distinction between flight and obstruction of justice." Stroud, 893 F 2d at 507, n. 2.

In United States v. Bliss, 430 F 3d 640 (CA2 2005), an enhancement for obstruction of justice was reversed where the defendant fled the jurisdiction, used an alias, was placed on the FBI's Ten Most Wanted List and aired on "America's Most Wanted" after which a viewer tip led to his arrest. Id., at 644. "The distinction between merely avoiding or fleeing from arrest and obstructing justice is somewhat imprecise and courts have generally relied on the facts of the particular case to determine when the enhancement is justified." "Subsequent to our decision in Stroud, the Sentencing Commission amended its Application Notes to include 'avoiding or fleeing from arrest' in the illustrative list of behaviors that 'do not warrant application of this adjustment'. USSG 3C1.1, App. Note 5...". Id., at 647. "[W]e conclude that Bliss' actions, which amount to little more than 'simply disappearing to avoid arrest,' id., at 1107, fall short of what we believe the Sentencing Commission contemplated in prescribing the enhancement for obstruction of justice." "We therefore look for other 'obstructive conduct' that, 'coupled with' his flight might allow us to affirm the court's ruling" (citing United States v. Madera-Gallegos, 945 F 2d 264, 267 (CA2 1991)). Id., at 648-649.

According to United States v. Archer, 671 F 3d 149, 166-167 (CA2 2011), "An obstruction-of-justice enhancement is warranted, inter alia, when the defendant threatens, intimidates, or otherwise unlawfully influences a potential witness with the intent to obstruct justice. USSG § 3C1.1 cmt. n. 4(a). An intent to deter cooperation with the government is sufficient. United States v. Shoulberg, 895 F 2d 882, 885 (CA2 1990). Most cases where we have upheld the application

of this enhancement involve clear and direct threats against cooperating witnesses or government agents."

The obstruction of justice enhanvement should not have applied where Shelikhova was already being punished for fleeing the juris-diction by the government's filing of the superseding indictment on October 28, 2011, a year after the initial indictment on October 7, 2010, in which the 20-year money laundering charges were added--double the statutory maximum of health care kickbacks.

(4)  Rosen was ineffective for not having objected to the substantially overlapping enhancements in the Plea Agreement for sophisticated means that allowed for the obstruction of justice enhancement to be overlooked.

In the Plea Agreement, prosecutors demanded a 2-level enhance-ment for sophisticated means pursuant to §2B1.1(b)(10)(c)(should be (9)(c))) and a 2-level enhancement for sophisticated money laundering pursuant to §2S1.1(b)(3)(R. 863-1, p.3).

"Impermissible double counting occurs [under the Sentencing Guidelines] when one part of the guidelines is applied to increase a defendant's sentence to reflect the kind of harm that has al-ready been fully accounted for by another part of the guidelines." United States v Sabhnani, 599 F.3d 215, 251 (CA2 2010)(citing United States v Volpe  224 F.3d 72. 76 (CA2 2000); United States v Napoli, 179 F.3d 1, 12, n. 9 (CA2 1999).

(5)  Rosen was ineffective for failing to argue the cumula-tive effect of the aggregation of substantially overlapping en-hancements may warrant a downward departure.

"[T]he cumulation of...substantially overlapping enhancements,

when imposed upon a defendant whose adjusted offense level translates to a high sentencing range, presents a circumstance that is present to a degree not adequately considered by the Commission and therefore permits a sentencing judge to make a downward departure." **United States v Abiodun, 536 F.3d 162, 170 (CA2 2008) (citing United States v Lauersen, 348 F.3d 329, 344 (CA2 2003).**

Enhancements for sophisticated means (2 levels), conviction under 18 USC §1956 (2 levels), and leader/organizer role (4 levels), added 8 levels, increasing the minimum of Shelikhova's sentencing range by 123 months or over 10 years (Level 37 versus Level 29).

Shelikhova was not the mastermind; did not receive the primary financial benefit. Bank records can easily confirm that Girenko had the highest personal income of all involved and, for example, Zhamaryan to date retains a $160K Breitling watch he purchased himself from the proceeds of his company.

(6) <u>Rosen was ineffective for failing to request a **Fatico** hearing.</u>

"That provision [USSG §6B1.4] requires that where the facts are the subject of a plea agreement, all agreed-upon and disputed facts relevant to sentencing must be disclosed in a non-misleading fashion" (citing **United States v Telesco, 962 F.2d 165, 167-169 (CA2 1992)).** "It leaves no room for agreements to conceal facts from the court." **United States v Fagge, 101 F.3d at 234.**

c.  No evidentiary hearing is warranted (R. 863, p.20).

Shelikhova is entitled to an evidentiary hearing. The cumulative effect of errors made by Rosen denied the right to the effective assistance of counsel.

"Since Rodriguez's claim of ineffective assistance of counse can turn on the cumulative effect of all of counsel's actions  all of his allegation of

ineffective assistance should be reviewed together." **Rodriguez v. Hoke**, 928 F 2d 534, 538 (CA2 1991)(citing **Strickland**, 466 US at 695-696).  **United States v. Lumpkin**, 192 F 3d 280, 290 (CA2 1999)(citing **Taylor v. Kentucky**, 436 US 478, 487-488 & n. 15 (1978)(concluding that "the cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness.").

Moreover, apart from the 2014 Cole Memorandum, Shelikhova requests a ruling on the merits in spite of the appeal/2255 waiver because her claims go to the validity of the waiver.  See **Van Loo v. United States**, 2004 U.S. Dist. LEXIS 13426 (SD NY 2004).

As the result of her reliance upon Rosen's representations that she could always appeal, until she went to Court and found out otherwise after she had already stated on the record she would plead guilty (R. 863-3, p. 20), Shelikhova was tricked and deceived into acquiescing to his repeated failures in objecting or presenting any kind of a defense and to his bullying and intimidation tactics. Even if it could be argued the Second Circuit considered her pro se claims on direct appeal, Shelikhova did not have the information from the CD's provided by the victim at the time.  Moreover, her claim that she was coerced throughout the plea and sentencing processes based on Max being denied the benefit of the cooperation agreement until afterwards was not addressed the Second Circuit, by the government's own admission.  When the motion for reduction was filed should also be a matter for an evidentiary hearing.

### THE MOVANT SUFFERED CLEAR PREJUDICE WHEN HER COUNSEL DID NOT CHALLENGE THE GOVERNMENT'S STATEMENTS AND PURPORTED FACTS REGARDING KICK-BACKS, CLAIMS, AND LOSSES.

Although the movant consistently requested the information, questioned its validity and denied the assertions of the USAO, Rosen never attempted to gain any insight, obtain any discovery for the movant to review and discussed no argument or potential

challenge with the movant.  Video surveillance obtained by the
government and introduced as trial evidence, was only represented
by Rosen as conclusively damning and impossible to challenge.
Nevertheless the movant was insistant on wanting to review the
evidence.  She had never been involved in any patient negotiation
and could not believe that she had been so ignorant of what was
purported to have transpired in the meeting room.  Needless to say
the movant never had any opportunity to see _any_ discovery pre-plea
or pre-sentencing.

Fact is, the transcripts of the videotapings of the activities
in the kick-back room were given to the defendant post sentencing.
The disk shows the government copied it on january 13, 2013, post
plea and post sentencing.  these transcripts document fourteen (14)
days.  the government stated in its response that, 1) on average,
500 patients visited the clinics per day; 2) the surveillance period
was approximately forty (40) days during which time approximately
$400-500,000.00 was paid out in "kick-backs."  The trial exhibits
however show a very different reality.  These show that, 1) approx-
imately four (4) people on average per day (based on the 14 days
covered in the exhibit documenting a total of fifty-three (53)
patients) were paid in total $23,580.00, for 468 procedures, which
averages approximately $50.38 per procedure.  Based on the govern-
ment's own statements and exhibits received by the defendant and
defendant's counsel post sentencing, the referral fees, as stated
by "Lena" on May 14, 2010, Session 147 with an unidentified male
(UIM), were not paid "until recent times."  Providing undoubtedly
proof that these payments to patients were not a part of the original

business structure. In deed it was becoming so competitive that patients threatened to go to other medical offices if they would not get paid, as those did pay them (see on May 7th, Session 100; May 13th, Session 141-16; May 14th, Session 154-23A; and May 14th, Session 154-15A). Additionally, based on the government's statements of 500 patients in the clinics per day, the documented four (4) patients per day in the "kick-back" room represents less than 1% of the patients receiving any type of payment. The fourteen (14) day period of the government trial exhibit documents payments to fifty-three (53) patients for 468 procedures, yet according to the government's statements to this Honorable Court, this period should have documented 7,000 patients; fifty-three (53) patients of 7,000 patients and procedures equates to less than 7%. If one takes the less than 1% of patients, who have received a fee and received less than 7% of the services provided, one comes to a very different conclusion of the activities and proposed losses produced by the defendants and their activities. Her Honor made a number of statements to that effect and challenged defense counsel Rosen to provide her with evidence and an argument to consider. Had Rosen not been ineffective he would come to the aforementioned conclusions based on consulting with his client and reviewing the evidence provided by the government. No discovery was made available to the defendant and nothing was provided to her until she filed a complaint with the Bar Association in order to obtain her file and work product from Rosen. In addition to the loss amounts and claims numbers to Medicare the government's exhibit also shows the primary leadership role falls on "Lena" as shown in nearly all

of the video documentation.  On May 7, 2010, Session 96, has a
patient requesting approval from "Lena" to a treatment Yuri Khandrius
recommended, but could not give her without "Lena's" approval,
which she granted during that session. "Lena" refers to Elena Girenko.

### COUNSEL'S INEFFECTIVE ASSISTANCE WAS FURTHER CONFIRMED
### AND SUBSTANTIATED BY ROSEN'S OWN AFFIDAVIT IN
### RESPONSE TO MOVANT'S §2255 MOTION.

The movant never received the affidavit submitted by Rosen in
response to her claims of ineffective assistance of counsel, and
had to request a copy being sent to her by a friend.  His response
is the truth word for word, constructed in such a manner as to
imply the complete opposite or insinuate proper action on his part.
Rosen references having "seen" the defendant, and in actuality he
did only "see" her, which was to imply that he has met with her,
counseled her, performed his duty as her legal advisor.  He did
not do any of that, he simply "saw" her, without an interpreter,
without her file, without discussing anything other than inquiring
about how she was doing.  Rosen "visited" the movant while he was
primarily consulting with other clients, thus giving the appearance
of mounting a vigorous defense for her.  May this Honorable Court
note the word play Rosen uses and the nuances of the dance, at-
tempting to appear innocent while mocking the defendant's statements,
plight and fight for justice.

Attorney Michael Rosen's Affidavit filed on January 26, 2017,
contains self-serving and contradictory statements, a close reading
by an experienced, attentive juror will note the obvious discre-
pancies without knowing each and every detail, which should lend
to sufficient cause for this Honorable Court to give the order for

an evidentiary hearing over disputed facts.

Whereas Rosen attests the allegation he coerced petitioner to plead guilty in order for her son, Maxim (Max) Shelikhova, to obtain a cooperation agreement is "untrue and absurd since Max secured his cooperation agreement before petitioner entered her plea in this Court" (R. 856, ¶2, p.1); this does not address the point that Max would not obtain the benefit of a cooperation agreement unless he coerced his mother into returning to this country and pleading guilty.

By Rosen's own admission, in Paragraph 28, he admits Max testified for the governement in the Drivas trial in early 2013 establishing this fact, e.g., "Specifically, he [Max] also testified that the prosecutors made it clear to him in no uncertain terms that in order for him to ever enter into a cooperation agreement he would have to get petitioner ('his own mother') to return to the United States."  He agreed to it (Tr. 1906 (R. 856, ¶28, p.6)).  At a minimum, this constitutes proof of undue coercion by the government in petitioner's case.

Moreover, Rosen admits that on September 4, 2013, he filed a sentencing memorandum that referenced "Max's counsel's prior statement to the court that he was told by the government that Max would have to get petitioner to return to the United States before he would be offered a cooperation agreement" (R. 856, ¶30, p.7).

That the government also demanded that petitioner must plead guilty and be sentenced before Max would receive the

-43-

benefit of the cooperation agreement is shown by Max's sen-
tencing date being repeatedly rescheduled until after peti-
tioner's sentencing on November 12, 2013.  Mr. Rosen is a
seasoned criminal defense attorney.  Surely, he cannot reasonably
expect this court to believe he was so naive as to not under-
stand the full extent of what was demanded by the government
for Max to obtain the benefit of the cooperation agreement.
Mr. Rosen was involved every step of the way in assuring that
the petitioner pled guilty and was sentenced as the government
demanded for Max to obtain the benefit of the cooperation
agreement.

Max is arrested November 14, 2011, pleads guilty on
November 8, 2012, and testifies at the Drivas trial in early
2013, yet is not sentenced until after his mother is sentenced
on November 12, 2013.  If petitioner were not being coerced
and extorted into not only pleading guilty but being sentenced
as the government wanted, Max could have been sentenced con-
siderably earlier than he had been and the government could
have filed a motion for a Rule 35 reduction afterwards, as
is usually done.  The fact is, coercing Max to extort his own
mother into returning to the United States was very effective
and clearly used to force her into pleading guilty and being
sentenced to all of the facts the government demanded.  If
Mr. Rosen had not been part of this unconstitutional scheme,
then the appearance that this coercion was present should have
induced a legitimate defense attorney into entering an objection
to it on the record.

In further support, Rosen does not address the claim that

that he made no proper investigation of the loss amounts alleged
by the government, instead relying in his Affidavit of Max's
testimony from the Drivas trial--testimony that the government
solicited from their own withness, e.g., Max "testified further
that the loss actually suffered by Medicare as a result of the
Bay Medical fraud was near $50 million dollars (Tr. 1866)" (R.
856, ¶28, p.6).  Max was not a competent witness as to the loss
suffered by Medicare, as he did not handle the billings nor did
he have the experience or education to warrant such testimony.
Mr. Rosen was ineffective in that he did not hire a forensic
accountant to review such evidence and render legitimate testimony
on the issue.  Merely entering an objection without a valid
argument is eneffective.  In any event, Max's testimony was
clearly coached when he stated loss was "near $50 million,"
not over $50 million, which was a two-level difference in the
sentencing guidelines.

By his own addmittance, Rosen was involved in conversations
with petitioner for four months prior to her return to the
United States (R. 856, ¶5, p. 2).  In May 2012, Rosen set up
and was part of the conference call with Max's attorney, Michael
Shapiro, who tells her she had three weeks to return from the
Ukraine for her son to be offered a plea bargain, a fact Rosen
does not admit.  His Affidavit is vague on this point, e.g.,
"At some point, I believe in the Spring of 2012, petitioner
indicated a desire to return to the United States in the hope
that I would aid Max's situation" (R. 856, ¶6, p.2).  This vague
response is intended to conceal his knowledge of Shapiro's con-
veyance of the government's threat because Rosen does not respond

-45-

in the manner in which any competent defense attorney should
have responded, e.g., contacting the prosecutor for a plea agree-
ment before petitioner's return. Instead, by his own admission,
Rosen states, "I advised petitioner of the consequences to her
of returning," chich he does not describe, if this representation
had been at all credible (R. 856, ¶6. P. 2-3).

In any event, it is not until petiioner's return on June 14,
2012, that Max pleads guilty to a cooperation agreement with the
government  on November 8, 2012, which was a full year after his
arrest and showing the agreement was indeed contingent on the
coercion of her return. (R. 856, ¶¶5, 9, 22, p.2-4).

Whereas Rosen makes repeated reference to the need for an
interpreter because of the "language difference," he later attests
"petitioner's feigned 'language barrier' contentions are without
merit" [emphasis added](R. 856, ¶¶ 5, 27, p.2, 6). If there was
no language barrier problems, then there would not have been
the need for him to hire an interpreter; additionally he would
have been deceptive to the court when he referenced the barrier,
such as at the plea hearing (R. 44, p.43).

For Rosen to cite the guilty plea colloquy on December 18,
2012, as some sort of proof she had not been coerced through
Max's circumstances and was satisfied with Rosen as counsel is
self-serving and misrepresents her circumstances where Max's
fate was being held over her head at the time. She had no
choice.

CONCLUSION

A number of federal appellate courts have taken the position that they will not enforce even a voluntary and knowing waiver in a plea agreement if enforcing them would result in a "miscarriage of justice." See, e.g., United States v Vèlez-Luciano, 814 F.3d 553 (1st Cir. 2016); United States v Adams, 814 F.3d 178, 182 (4th Cir. 2016); United States v Hahn, 359 F.3d 1315, 1327 (10th Cir. 2004); United States v Andis, 333 F.3d 886, 891 (8th Cir. 2003); United States v Khattak, 273 F.3d 557, 562 (3rd Cir. 2001); United States v Teeter, 257 F.3d 14, 25-26 (1st Cir. 2001).

The movant believes that she has met the Strickland standard and demonstrated exceptional situations in which a waiver does not forclose relief, such as if the waiver being a part of a misrepresented therefore unknowing and involuntary plea agreement, or if the court relied on a constitutionally impermissible factor, or if the defendant received ineffective assistance of counsel in regard to the negotiations of a plea agreement, or if the sentence exceeded the recommended guidelines. Jones v United States, 167 F.3d 1142, 1144 (7th Cir. 1999). And, in United States v Andis, supra, 333 F.3d at 892, the Eighth Circuit would not enforce an appellate waiver if the sentence is "contrary to [an] applicable statute."

THEREFORE, the movant, IRINA SHELIKHOVA, respectfully requests this Honorable Court to GRANT the following relief:

ORDER that her Motion under 28 USC §2255 be GRANTED;

ORDER that an  evidentiary hearing be conducted;

ORDER that counsel be appointed to represent her;

ORDER that her pea agreement be vacated as involuntary and unknowing;

ORDER that her sentence be vacated and reduced at a resentencing;

ORDER that she be GRANTED immediate release for time served;  or any other relief to which this Court finds she may be entitled.

Notitce is provided to the court that the movant did not author this reply to the government's response to petitioner's §2255 Motion to Vacate.  she was assisted by Russian speaking prisoners, who are not attorneys.  All pages were read to movant in full, line by line, and she affirms by her signature that all statements herein are true to the best of her knowledge and belief.

Respectfully submitted this _18_ day of April, 2017.

Irina Shelikhova, pro se
Fed. No. 81448-053
FCI Tallahassee
501 Capital Circle, NE
Tallahassee, FL  32301

Date: _April, 18, 2017_

## CERTIFICATE OF SERVICE

This is to certify, under penalty of perjury, under the laws of the United States of America, pursuant to 28 USC §1746, that I have served a true and correct copy of the foregoing REPLY TO GOVERNMENT'S RESPONSE TO PETITIONER'S §2255 MOTION TO VACATE upon the following addresses by placing same in a sealed envelope, bearing sufficient postage for delivery via the United States Postal Service to:

Clerk of Court
United States Dist. Court
225 Cadman Plaza East
Room 185
Brooklyn, NY  11201-1818

Shannon C. Jones
William Campos
Office of U.S. Attorney
271 Cadman Plaza East
Brooklyn, NY  11201

and deposited it in the postal box provided for inmates on the grounds of the Federal Correctional Institution, Tallahassee, Florida  32301, on this 18 day of April, 2017.

Irina Shelikhova

Litigations deemed FILED at the time it was delivered to prison authorities.  See **Houston v Lack**, **487 U.S. 266 (1988)**.

From: mrosenlaw <mrosenlaw@aol.com>
To: mrosenlaw <mrosenlaw@aol.com>
Subject: Transmittal of discovery disks to Irina
Date: Fri, Nov 29, 2013 9:16 am

November 29, 2013

Irina--I am sending you with this note the following:

1- Disk, labeled, "Government Document Production-Medicare Applications and EFTs-10-CR-771 (NG)"

2- Disk, labeled, "Government Discovery-DVD (Bank Statements) and Exhibit A (List of Medicare Beneficiaries)"

I received these disks from Mr. Shapiro in response to my request to provide you with bank and other records.

I have sent you 3 prior document packages, including forms that you must fill out. IT IS URGENT THAT YOU CONTACT ME DIRECTLY.

Michael Rosen (516-381-6690, cell)

EXHIBIT A

NUMBER OF CLAIMS FOR CLINIC PHYSICIANS ON CD'S PROVIDED BY
CENTER FOR MEDICARE & MEDICAID SERVICES
(Chart Does Not Include Drs. Drivas or Wahl)

| PHYSICIAN | TOTAL NUMBER OF CLAIMS |
|-----------|------------------------|
| Arnoff | 19,808 |
| Raykher | 46,134 |
| Collins | 16,302 |
| Ostrowski | 520 |
| Khasidy | 76 |
| Valdberg | 2,022 |
| Artomonov | 11,453 |
| Guy | 194 |
| Bhardwaj | 584 |
| Laufer | 152 |
| Sorkin | 192 |
| Moy | 3,424 |
| Carrera | 143 |
| Puma | 22 |
| Butterman | 225 |

EXHIBIT B

# LIST OF DOCTORS & SERVICES

TRULINCS  81448053 - SHELIKHOVA, IRINA - Unit: TAL-F-W

--------------------------------------------------------------------------------

FROM: 81448053
TO:
SUBJECT: DOCTORS
DATE: 04/12/2016 07:46:46 AM

LIST OF DOCTORS AND SERVICES:

1. PHYSICIANS DOCTORS:
GUSTAVE DRIVAS, M.D. (INTERNAL MEDICINE);
SHAYA RAYKHER, M.D. (INTERNAL MEDICINE);
JONATHAN WAHL, M.D. (INTERNAL MEDICINE);
NINA DAYAEN, DO
LUIZA GUSEYNOV (INTERNAL MEDICINE)- worked for short period
IRINA BOGINNSKY (INTERNAL MEDICINE)- worked for short period

SERVICES:
- Accepted new patients (Initial visit);
- performed follow-up (FU) patients;
- draw blood for blood tests;
- measure blood pressure, EKG, PFT;
- prescribes and performed test for osteoporosis (aka "Bone density"), we hade special equipment for this test;
- prescribed and performed in the med/office all kind of sonograms (Echo, Abdominal, Thyroid, Vascular and etc.);
- prescribed neurological tests (NCV and EMG), which were performed by special technicians in our office;
- prescribed and performed test VNG (for problems of vestibular system), performed by trained technicians on special
equipment in the office;
- prescribed and performed IV (with vitamins and etc.);
- performed season prophylactic vaccinations;
- test of head and brain (for headaches and etc.);
- prescribed physical therapy (PT);
PHYSICAL THERAPY:
- massages: - hand massage
            - with glass jars (medical)
            - local of special certain areas
            - aqua massage with special hand-operated machines, with use of special equipment for particular body parts
              for physical therapy procedures;
            - local massage of feet on special equipment;
- procedures with use of medicinal clay, "akzekerit", paraffin;
- laser procedures;
- hot and cold packs;
- manual therapy;
- extended complex of physical exercises (with use special exercises equipment:bicycles, treadmill, range of motion and etc)
- physical exercises on the computer operated exercise machine for patients with balance disorders.

Also 2 doctors of acupuncture worked in the office:
- Elina Matskina
- Nelly Rozanova
Performed different kinds of acupuncture as complimentary services. We did not bill for these services because it is not covered
by Medicare. Procedures were very effective and brought relief to a lot of patients, so we performed services continuously.

NEUROLOGISTS:

RONALD COLLINS (He is one of the 2 medical directors with Dr. Drivas, but he died in September 2008)
GERMAN LAUFFER

THEIR TREATMENTS:
- initial visit and full-up(FU)
- prescribed neurological tests multiple neurology/tests - all in the med/office
- prescribed physical therapy

EXHIBIT C

TRULINCS  81448053 - SHELIKHOVA, IRINA - Unit: TAL-F-W
--------------------------------------------------------------------------------

DOCTORS PMR (PAIN MANAGEMENT DOCTORS):

MIKHAIL ARTOMONOV
MARVIN MOY
- initial visit and full-up(FU)
- prescribed neurological tests
- prescribed physical therapy
- performed pain-stop blockades (simple and ones with use of special/ equipment "C-Arm" - machine with ex-rays

DERMATOLOGIST AND DO:

NATALIYA ARNOFF
- initial visit and full-up(FU)
- test
- physical therapy(PT)
-performed dermatological procedures (example: removal of moles and etc.)
- sonograms

PULMONOLOGIST:

DR. OSTROVSKIY
DR. RAKESH K.B. HARDWAJ
- initial visits and FU
- PFT test
- prescribed sleep test, which were performed in specialized clinic

UROLOGISTS:
DR. KAHASIDY
DR. MARTIN BUTTERMAN

- initial visit and FU
- urological tests
- sonograms of abdomen and etc.

GYNECOLOGIST:
DR. LEONID SORKIN

- initial visit and FU
- tests. lab
- sonogram

DOCTOR PODIATRIST:
DR. DORA VOLDBERG

- initial visit and FU
- special preparation of feet
- correction of different defects of feet

CARDIOLOGIST:
DR. R.CARRERA

- initial visit and FU
- sonograms (echo, vascular etc.)
- stress test in the office (we had special equipment)

GASTROENTEROLOGIST:
DR. WILLIAM FONFEDER                                    EXHIBIT C

- initial visit and FU

TRULINCS  81448053 - SHELIKHOVA, IRINA - Unit: TAL-F-W

----------------------------------------------------------------------------------------------------

- sonograms
- mini surgeries in the office for: colonoscopies. Performed by special schedule with anaesthesia(did not belong to office medical group, and billed separate for anaest./serv.)

ALLERGOLOGIST AND DERMATOLOGIST
DR. N.KUMAR
DR. YI.-MING YANG

- initial visit and FU
- tests

A few Doctors of Radiology work by the contracts: Dr. Constant - worked outside of the office. Performed reading of sonograms from our office and made reports.

Office had "Office's blood Lab"
In the beginning Dr. Collins was the provider. He died shortly after and we appointed dr. Rykher as provider. All doctors from our office prescribed blood tests and they were performed in our office in professional/Labs. (which was in compliance with all regulations).

EXHIBIT C

*Report to the Congress:*

# Sentencing Policy for Money Laundering Offenses, including Comments on Department of Justice Report

(as directed by section 2(b) of Public Law 104-38)



United States Sentencing Commission
September 18, 1997

(EXCERPTS FROM)

EXHIBIT D

# REPORT TO CONGRESS:

## SENTENCING POLICY FOR MONEY LAUNDERING OFFENSES, INCLUDING COMMENTS ON DEPARTMENT OF JUSTICE REPORT

### Introduction

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### A.    The Statutory Directive

After several years of comprehensively studying money laundering sentencing practices, the United States Sentencing Commission unanimously approved (with one member abstaining) and submitted to Congress a proposed comprehensive rewrite of the principal sentencing guideline for money laundering offenses on May 1, 1995.  The purpose of the Commission's amendment was to effect a major structural change in the money laundering sentencing guidelines, a change that would result in guideline penalties for money laundering offenses that were more proportionate to both the seriousness of the underlying criminal conduct from which the laundered funds were derived and to the nature and seriousness of the laundering conduct itself. The revised approach involved using the guideline measurement for the underlying crime as the starting point, with enhancements added that reflected the integral part which money laundering plays in certain very serious crimes.

This amendment, however, and another, concurrently-submitted amendment affecting cocaine offenses, were opposed by the Department of Justice ("DOJ").  Subsequently, Congress disapproved both amendments through section 1 of Public Law 104-38.  In section 2 of the disapproved legislation, Congress directed DOJ to report on federal prosecutorial charging and plea practices affecting money laundering offenses, and to include a description of steps taken to ensure consistency and appropriateness in the use of the money laundering statutes.  The Commission was directed, in turn, to submit comments on DOJ's study.  This report is hereby submitted in accordance with that directive.

### B.    Organization of this Report

In Part II, the Commission identifies the nature and source of some of the continuing problems with current sentencing policy for money laundering offenses, and explains why a revised guideline structure continues to be needed.  Part III outlines the Commission's objectives of deriving a more consistent, effective, and fair sentencing policy for money laundering offenses. In Part IV, the Commission comments, as directed by Congress, on salient aspects of DOJ's study,[1] in light of sentencing data and case law.  The Report concludes with an expression of the

---

[1] Department of Justice, <u>Report for the Senate and House Judiciary Committees on the Charging and Plea Practices of Federal Prosecutors with Respect to the Offense of Money</u>

EXHIBIT  D₁

prosecutors throughout the nation.  It relates principles of general charging policies, as well as specific money laundering charging policies, some aspects of which were developed to address particular concerns raised by the Commission during its multi-year analysis of money laundering sentencing practices.  DOJ describes how it implements these policies through semi-annual training sessions for federal prosecutors, frequent presentations at law enforcement agencies, publication of a separate money laundering manual, and circulation of a newsletter related to money laundering issues.  The DOJ Report concludes with a description of the required approval, consultation, and reporting requirements for certain categories of money laundering prosecutions, as well as the informal communication process which is encouraged between field prosecutors and DOJ's specialists in the Asset Forfeiture and Money Laundering Section.

**B.      Shortcomings in Coverage and Force of DOJ Policies**

The Commission commends DOJ for the steps it has taken to implement policies designed in part to address the Commission's concerns about the need for predictable and appropriate sanctions for serious money laundering activity.[32]  Nonetheless, while the Commission and DOJ share the stated goal of avoiding unwarranted sentencing disparity in this area, the Commission views DOJ's methods, unaccompanied by a properly restructured money laundering guideline, as inadequate to the task.  For one thing, many of these DOJ policies are not proscriptive and thus do not require uniform application within the 94 Offices of the United States Attorneys.[33]  Moreover, such policies do not afford a justiciable right of redress to any individual defendant.[34]  For these and other reasons, these policies alone are not sufficient, in the Commission's view, to avoid unwarranted disparity and lack of proportionality under the current money laundering guidelines.  Thus, a primary goal of federal sentencing policy as enunciated by Congress in the Sentencing Reform Act is not being achieved to the fullest extent possible.

---

[32]  For example, DOJ issued a "Blue Sheet" on August 4, 1993, that requires federal prosecutors throughout the country to consult with DOJ's specialized Asset Forfeiture and Money Laundering Section in certain designated situations, such as when the prosecution is based on the deposit of illicit proceeds ("receipt-and-deposit cases"), or on transactions that are intertwined with the underlying offense such that there is no clear delineation between the underlying offense and the money laundering transaction ("merger cases").  In addition, all offices of the United States Attorneys are required to send to the Asset Forfeiture and Money Laundering Section a copy, for informational and tracking purposes, of every money laundering indictment after it is filed in situations for which prior approval or consultation were not required.  *Id.* at 16.

[33]  *See* DOJ Report at 15.

[34]  United States Attorney's Manual §1-1.100 (October 1, 1988).

13

EXHIBIT D

on information which is exclusively in the control of DOJ or United States Attorneys' offices would have been very illuminating.

### D.    Additional Areas of Concern

In addition, although DOJ noted its agreement with the Tenth Circuit holding in *United States v. Johnson*[41] that money laundering cannot properly be charged for "merged" transactions that are part of the underlying crime,[42] the Commission has continued to receive documentation on defendants who have been convicted and sentenced for money laundering where there is nearly complete identity between the money laundering and the underlying conduct.[43]

Further, as we understand DOJ's explanation of how its policies apply in practice, the Commission has access to substantially more actual case history to inform its policy decisions. As DOJ has explained, the specialized Asset Forfeiture and Money Laundering Section received a copy of the indictment (which may charge multiple defendants) after the case was instituted in approximately 700 instances from FY 1993 through FY 1995. Apparently, somewhat more information is provided to this central office on either a formal or informal basis when approvals are sought (9 instances), consultations are required (70 instances), or consultations are voluntarily undertaken by the United States Attorneys' offices (240 instances).[44]

---

[41]  971 F.2d 562 (10th Cir. 1992).  In *Johnson*, the government alleged that the funds which the defendant had investors wire to him as part of the wire fraud scheme which he perpetrated were "proceeds" from the specified unlawful activity, an interpretation which the court rejected as a basis for a money laundering conviction under 18 U.S.C. § 1957.

[42]  DOJ Report at 14, n.16.

[43]  These cases, sentenced in 1995, are illustrative: U.S.S.C. ID Nos. 239315 and 236256 (conduct establishing elements of "underlying" bankruptcy fraud essentially the same as the financial transactions establishing money laundering); U.S.S.C. ID Nos. 216136 (bank loan manipulation and unauthorized borrowing on bank insurance policies to guarantee loans charged as embezzlement and bank fraud; part of the manipulation also separately charged as money laundering).

[44]  DOJ Report at 15.  We note that the Executive Office for U.S. Attorneys reported that 2,119 cases (indictments) for prosecutions under 18 U.S.C. § 1956 were filed in this same period. See Attachment 3.  Neither the DOJ Report nor the Executive Office separately identify information about charging and plea activity under 18 U.S.C. § 1957, under which "receipt and deposit" cases, among other financial transactions greater than $10,000, are prosecuted.  In light of DOJ's statement that such cases have declined, *see* DOJ Report at 15, specific numbers on the

16

EXHIBIT   D

**Instruction 44-16   Second Element—Intent to Defraud**

The second element which the government must establish beyond a reasonable doubt is that the defendant knowingly and willfully executed or attempted to execute that scheme with the intent to defraud.

"Knowingly" means to act voluntarily and deliberately, rather than mistakenly or inadvertently.

"Willfully" means to act knowingly and with a bad purpose.

To act with intent to defraud means to act willfully and with the specific intent to deceive for the purpose of causing some financial loss to another.

The question of whether a person acted knowingly, willfully and with intent to defraud is a question of fact for you to determine, like any other fact question. This question involves one's state of mind.

Direct proof of knowledge and fraudulent intent is almost never available. It would be a rare case where it could be shown that a person wrote or stated that as of a given time in the past he committed an act with fraudulent intent. Such direct proof is not required.

(*If an attempt to execute is alleged, add:* In order to prove that the defendant attempted to execute the scheme, the government must prove beyond a reasonable doubt that (1) the defendant intended to execute the scheme alleged in the indictment, and (2) that the defendant did some overt act that was a substantial step in an effort to execute the scheme. Merely preparing to commit a crime is not a substantial step. The defendant must go beyond mere preparation, and his act must strongly confirm that he intended to execute the scheme. However, the government does not have to prove that the defendant did everything except the last act necessary to complete the scheme. A substantial step beyond mere preparation is enough.)

The ultimate facts of knowledge and criminal intent, though subjective, may be established by circumstantial evidence, based upon a person's outward manifestations, his words, his conduct, his acts and all the surrounding circumstances disclosed by the evidence

485                                     1

© 2016 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EXHIBIT E

and the rational or logical inferences that may be drawn therefrom. Circumstantial evidence, if believed, is of no less value than direct evidence. In either case, the essential elements of the crime charged must be established beyond a reasonable doubt.

––––––

## Authority

**Sixth Circuit:** United States v. Davis, 490 F.3d 541 (6th Cir. 2007).

**Ninth Circuit:** United States v. Dearing, 504 F.3d 897 (9th Cir. 2007).

## Comment

This instruction is adapted from the one used in mail, wire and bank fraud cases. For a general discussion of the charge, see Comment to Instruction 44-5, *above.*

In 2010, as part of the Patient Protection and Affordable Care Act, 1  Congress added the following to section 1347:

(b) With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section. 2

It is not entirely clear what the purpose of this provision is. The language concerning actual knowledge of the statute is in keeping with the general principle that ignorance of the law is no defense. The specific intent language is less clear. Taken literally, the language states that specific intent to violate section 1347 is not required, but does not address the question whether specific intent to defraud is still required. If that reading is correct, then it is merely an extension of the ignorance principle just stated. If, on the other hand, it is intended to mean that specific intent to commit fraud is not required, then it is problematic because it undermines the definition of fraud as a scheme intended to wrongfully deprive others of property. As it is unlikely that Congress intended so great a change in fraud jurisprudence

485                                                                 2

© 2016 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EXHIBIT E

without substantial legislative discussion, the recommended instruction continues to require specific intent to defraud, although this should be treated with some caution until the meaning of section 1347 is addressed by some court.

---

**Footnotes**

1  Pub. L. 111–148, tit. X, § 10606(b), 124 Stat. 1008 (2010).

2  18 U.S.C. § 1347(b).

485                                           3

---

© 2016 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EXHIBIT E

